In Propria Persona
James Arnett
9288 N. Monmouth Court
Tucson, Arizona 85742
email: jamesarnettaz@gmail.com
(520)878-9779 (home)
(520)304-0129 (field)

FILED _____ LODGED
RECEIVED _____ COPY

APR 24 2012

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

# CIV12-311   TUCDTF

| | |
|---|---|
| James Arnett,<br>                    Plaintiff,<br>vs.<br><br>BENJAMIN SNOW HOWARD,<br>LIFELINE MEDIA LLC, a Texas<br>entity, NATIONWIDE AFFORDABLE<br>HOUSING, a Texas corporation,<br>and the BEN HOWARD TRUST,<br>an Idaho trust,<br>                    Defendants. | CIVIL   ACTION |

DATED this 24 day of APRIL 2012.


_____
James Arnett
In Propria Persona

**Jurisdiction**

Venue is proper in this Court pursuant to 28USC§1391 as Defendant Benjamin Snow Howard (Defendant Howard), a resident of Layton, Utah, conducted business with Plaintiff James Arnett (Plaintiff Arnett), a resident of Tucson, Arizona, soliciting services, making offers to acquire labor, in person and remotely, within the jurisdiction of the District of Arizona. Defendant Lifeline Media LLC is an entity registered in Hurst, Texas; Defendant Nationwide Affordable Housing is a corporation registered in Hurst, Texas; Defendant Ben Howard Trust is a trust registered in Idaho. Each registered entity is directed and managed by their sole agent, Defendant Howard, who may be served with Process at his residence, located at: 3580 N. 2225 E., Layton, UT 84040.

**Complaint**

1.   BACKGROUND: On or about 5 February 2011, Defendant Howard [author of "Overcoming Life's Trauma", and "Guilt Free Living", and "The Secret To Prosperity"] visited the Tucson, Arizona work studio of Plaintiff Arnett, [producer and director of the "September Eleventh" film series for the New York State Fraternal Order Of Police] for the purpose of completing the design and finalizing construction of his Internet venture, at his Web domain, http://www.benshoward.net. Defendant Howard asked Plaintiff to perform this service for him as a [gratis] personal favor, in order to help him launch his plans to take his self-help seminar business from local events to the national level, proposing published book, audio-book and movie embodiments of his "Overcoming Life's Trauma" live presentation, which Defendant Howard was performing on a regular

1   basis in the State of Utah. Plaintiff provided him with a (CSS based)

2   website design, from which, Defendant Howard could edit the specifics

3   of his proposed services and product lines.

4

5   2.   When Defendant Howard was staying at Plaintiff Arnett's Tucson

6   work studio, located at: 7425 N. Mona Lisa Rd., unit 236, Tucson,

7   Arizona 95741, he had solicited Plaintiff Arnett's services to

8   produce an audio-book, and a three hour motion picture for him, over

9   a two month period, both products based upon Defendant Howard's live

10   presentation of "Overcoming Life's Trauma".

11

12   3.   Defendant Howard then offered Plaintiff Arnett assignment as a

13   major equity partner and the producer and director positions in the

14   project (having the essential expertise), in order to secure his

15   cooperation to perform production in Utah. Plaintiff Arnett agreed

16   but would advise him of a later date, regarding his availability, due

17   to his obligation to complete the theatrical motion picture,

18   "Blocked", he was then engaged in producing. Satisfied, Defendant

19   Howard returned to Utah and deployed the website Plaintiff Arnett had

20   coded for him.

21

22   4.   On or about, 21 May 2011, Plaintiff Arnett advised Defendant

23   Howard that he was then available for his project. By telephone from

24   Utah, Defendant Howard reiterated his offer that he made to Plaintiff

25   Arnett in Tucson, offering assignment as a major equity partner and

26   the producer and director positions in the project, and adding the

27   additional promises to pay all of his expenses, including his Tucson

28   work studio rent, meals, field phone, lodging, vehicle, a per diem

1    for gas, food, coffee, cigarettes and round-trip air transportation.

2    The parties were to formalize the agreement together in Utah.

3    Plaintiff Arnett agreed. Defendant Howard booked a one-way flight to

4    Salt Lake City, Utah for him.

5

6    5.   On 5 June 2011, Plaintiff flew from Tucson, Arizona to Salt Lake

7    City, Utah, to begin work at Defendant Howard's personal residence,

8    located at: 6232 E. 1800 N. Eden, Utah 84310. Upon Plaintiff's

9    arrival, Defendant Howard briefed him on the project, characterizing

10   the project to Plaintiff as personally commissioned to him by "God",

11   via direct revelation, due to his ordination in the "Melchisedek

12   Priesthood", conferred by the Church of Jesus Christ of Latter Day

13   Saints (LDS), with the notable distinction of possessing a "Temple

14   Recommend", providing Plaintiff reason to have confidence that

15   Defendant Howard was sincere in his motivations and practices.

16

17   6.   Another LDS member, a single mother from a local university film

18   program, **Ms. Dawn Strate Kalana**, was engaged by Defendant Howard as

19   "Associate Producer". He offered her that credit in the film and her

20   expenses were to be paid by Defendant Howard. Ms. Kalana accepted and

21   worked for Defendant Howard. To date, neither credit, nor

22   reimbursement for her expenses have materialized. Defendant Howard

23   stated to Plaintiff there was plenty of time to draft the equity

24   agreement as the busy work schedule provided.

25

26   7.   On or about 8 June 2012, the graphic arts services of

27   **Mr. Gerren Ard** were offered to Defendant Howard by Plaintiff Arnett.

28   To that end, Plaintiff facilitated a telephone call, in order for

1  Defendant Howard to speak with, and hire the services of Mr. Ard.
2  Defendant Howard then purchased him an airline ticket, approximately
3  seven weeks ahead of the scheduled flight.
4
5  8.   On or about 23 June 2011, Plaintiff Arnett had completed both,
6  the audio book and a commercial television spot; and developed the
7  final production plans, with digital pipeline for producing the full
8  three-hour, high definition, motion picture for commercial
9  distribution as a self-help "work shop" series of video discs.
10
11  9.   On or about 25 June 2011, Plaintiff Arnett began location
12  filming in Utah. Defendant Howard, acting as the agent of Defendant
13  Nationwide Affordable Housing, did so in these affairs until he
14  changed the name of an existing entity under his sole control, to
15  Defendant Lifeline Media, an entity from which per diem payments to
16  Plaintiff would be made, which materialized only in petty cash
17  stipends for cigarettes and coffee breaks at the "Valley Market".
18
19  10.   From late June 2012 throughout early September 2012, Plaintiff
20  Arnett was delayed from filming Defendant Howard, due to him
21  abandoning work regularly, to pursue romantic relationships with
22  **Ms. Bonnie Carrigan, Ms. Angela Russel**, as well as his former wife,
23  **Mrs. Robin Howard,** which resulted in Plaintiff often searching for
24  lost special-needs children, essentially abandoned when Defendant
25  Howard and guest would disappear without warning, and other
26  impositionary, and elective delays of this type. To no effect,
27  Plaintiff objected to these delays as costing him extra time, which
28  had nothing to do with fulfilling his obligations on-schedule.

11.   Filming only became productive, once Plaintiff Arnett and Defendant Howard went to film the Idaho locations in mid July 2011. During this time, Defendant Howard provided loose tobacco and paper for Plaintiff to roll his own cigarettes, claiming that he was running out of money. However, once returned from Idaho filming, the same type of delays persisted. The original two month project Plaintiff had accepted had doubled in time and was threatening to go much longer by the unnecessary delays introduced by Defendant Howard.

12.   On or about 25 July 2011, Mr. Ard arrived in Salt Lake City, and resided at the same Eden, Utah location in order to design the Lifeline Media branding for the products, and to produce the graphics for the motion picture product. Mr. Ard was paid the same petty cash stipend amounts weekly, until he would invoice for the totality of his labor, once it could be calculated.

13.   Defendant Howard disclosed to Plaintiff Arnett that a Federal Judge had "ripped him off", "singled him out for persecution", "swindled him", by making a large Civil judgment against him (in Case 1:09-CV-02799-ODE for refusing to return $200,000 belonging to the plaintiffs of that Case, which is on Appeal), so he would not be able to make complete payment for Mr. Ard's services. Defendant Howard offered an equity ownership position in the products which Mr. Ard was manufacturing, in order to make up the outstanding balance to him. The details of which, Defendant Howard claimed he would work out at a later time, once all of the photography was completed. No such equity promises were fulfilled at that appointed time, nor any time thereafter.

14.   Defendant Howard represented the equity as having great
potential value, due to his access to celebrities "Glenn Beck" and
"Marie Osmond" through his publishing service provider, who he was
expecting to help him exploit the commercial potential of the
project. Defendant Howard offered Mr. Ard equity because he claimed
to Plaintiff and Mr. Ard that he was financially depleted and needed
the cooperation of Mr. Ard to complete the project. Defendant Howard
summarily reduced promised meals to once a day, left-overs, and
reduced per diems to $10 a day, which Defendant Howard often consumed
as he pleased, after returning from "lunch" meetings with his
publishing service provider, while Plaintiff and Mr. Ard labored.

15.   On or about 28 August 2011, Defendant Howard disclosed to
Plaintiff Arnett that he had no intention of providing Ms. Kalana her
"Associate Producer" credit in the film, nor reimburse any of her
expenses, stating that he felt no obligation to her whatsoever.

16.   Plaintiff Arnett and Mr. Ard immediately approached Defendant
Howard to finalize the equity interest promises in the project.
Defendant Howard claimed that assigning equity at that point was
premature and would interfere with his ability to make any
distribution agreement in the future, if he had formal partners. On
that basis, he again refused to assign Plaintiff and Mr. Ard equity.
Plaintiff and Mr. Ard countered, that if they were not formal
partners, then they needed to get paid for their professional
services. Defendant Howard agreed and promised to make everything
"good" by ultimately paying them their rates, if that were possible,
or by assigning equity to them, once he knew its "true" worth.

1   17.  Immediately following that meeting, Defendant Howard disclosed

2   to Plaintiff Arnett that he had no intention of providing Mr. Ard

3   with any equity, which he had promised to him. Defendant Howard

4   stated to Plaintiff that he intended to pay off Mr. Ard with a small

5   token fee, instead of paying him his full invoice amount, when the

6   labor was calculated. Defendant Howard stated that arrangement meant

7   more profit for himself and for Plaintiff. Plaintiff Arnett refused

8   diminishing Mr. Ard's consideration by any means.

9

10   18.  Plaintiff Arnett and Mr. Ard had exhausted their personal funds

11   by this time, receiving no payment for services, nor promised equity,

12   beyond Defendant Howard making payment to Plaintiff's and Mr. Ard's

13   Arizona rental units, in order to maintain the continued cooperation

14   of Plaintiff and Mr. Ard. Defendant Howard insisted the distribution

15   he was arranging would satisfy all payment issues. Deeply vested,

16   Plaintiff and Mr. Ard continued to labor in earnest, giving Defendant

17   Howard the benefit of the doubt.

18

19   19.  On or about 31 August 2011, Defendant Howard offered Plaintiff

20   Arnett his personal 1994 Suzuki 1400 Intruder motorcycle, that he had

21   possessed for over a decade, but was actually owned by the Ben Howard

22   Trust, which he represented as a "1995" model, "just serviced",

23   "safe", capable of "riding anywhere", as a "bonus" incentive to

24   continue labor until payment for services, or the equity

25   materialized. Defendant Howard also offered to pay Plaintiff the

26   expenses of riding home on it to Tucson, when the work in Utah was

27   completed. Defendant Howard represented the 1994 motorcycle as being

28   worth more than $3,000. Plaintiff accepted the bonus.

20.   Unknown to Plaintiff Arnett, The motorcycle brake pads were in fact, metal on metal, the padless metal backings making direct contact with the discs – deadly to take on a thousand mile journey. Defendant Howard also demanded to remove the only remaining safety equipment, the windshield. Defendant Howard provided a signed bill of sale, without any identification of the seller (the title named the Ben Howard Trust in Idaho as owner). Defendant Howard's "poor" financial condition still provided him with the disposable funds to impulse buy an identical motorcycle for $5,500 that was of much more recent manufacture, and without the electromechanical problems which the 1994 model suffered. Repair of those electromechanical problems, to make the vehicle safe and road-worthy, were discovered to be in fact, more costly than the value of the vehicle, rendering it as "totaled" condition, rather than "excellent" condition, as it was misrepresented by Defendant Howard. With Defendant Howard's new motorcycle having a windshield of its own, he had no more pretense for removing the windshield from the 1994 model, so Defendant Howard allowed Plaintiff to retain the last remaining safety device. But Defendant Howard removed the Idaho license plate from Plaintiff's motorcycle and installed it on his new motorcycle. When Plaintiff questioned him about the legitimacy of that action, Defendant Howard replied, "Sure, it's legal!". When Plaintiff questioned him about the liability of interstate highway travel to Tucson without a license plate, Defendant Howard replied, "You have three days to transport it, that's legal", then he provided Plaintiff with a Progressive Insurance Co. I.D. Card, insuring a 1994 Suzuki Intruder 1400.

21.   On or about 11 September 2011, Defendant Howard demanded

1   editorial changes, which he insisted were of special personal

2   importance to him, and quickly became a "special revelation from God"

3   to justify the changes. Those changes represented an obvious erosion

4   of the marketability of the motion picture and the value of its

5   equity to Plaintiff Arnett and Mr. Ard, who both refused the demands,

6   agreeing it was another pretense for justifying continued non-

7   payment. Defendant Howard then used intimidation to coerce these

8   changes, by shouting, throwing and breaking objects, declaring that

9   he would never pay neither Plaintiff nor Mr. Ard their rates, nor

10  equity. A commotion ensued. This was witnessed by Defendant Howard's

11  ex-wife, Mrs. Robin Howard. This resulted in more delays due to

12  additional demands at threat, followed by Defendant Howard's

13  apologies, but still no payment, nor equity materialized.

14

15  22.  By mid September, Defendant Howard's former wife, Mrs. Robin

16  Howard, had agreed to re-marry him immediately. Defendant Howard gave

17  his reason as his public assistance benefits for health insurance,

18  provided by the State of Utah, would soon expire and he needed to get

19  onto her medical plan immediately. Defendant Howard composed a

20  Prenuptial Agreement for his soon-to-be wife to sign, in order to

21  protect his assets from her, in case she discovered that he had never

22  terminated his relationships with Ms. Carrigan and Ms. Russel (both

23  of whom, persisted throughout the second marriage, ultimately

24  resulting in their separation and pending divorce). Defendant Howard

25  left his investment ledger open, revealing his assets to include in

26  his Prenuptial Agreement. Plaintiff found Defendant Howard's ledger

27  open in the work area, demonstrating to him an approximate $10,000

28  monthly income from a plurality of residential properties.

23.  On or about 27 September 2011, the voice track and picture track
of the motion picture were completed. The scope of the work was three
hours of specialized, "green screen" visual effects techniques to
superimpose Defendant Howard speaking in most every scene of the
motion picture, to create the illusion that he was in a many
locations, when in fact, he was filmed on a green screen, at a
property he owns at: 1087 S. 9275 E. Huntsville, UT 84317.

24.  At that time, Defendant Howard insisted that Plaintiff Arnett
complete the "ambiance" portion of the sound track, despite the
absence of audio speakers, from which to monitor subtle audio
ambiances. Plaintiff made an earnest attempt, however, the noise
level created by the restlessness of Defendant Howard made that task
impossible to do properly at broadcast standards using the built-in
computer speakers. Plaintiff stated that he would build the ambiance
track at his Tucson work studio, as originally planned, where he had
the proper equipment for broadcast standards.

25.  Defendant Howard insisted that the track be finished in Eden,
Utah, inexplicably panicked that Plaintiff Arnett may not be able to
complete the audio task, "for any reason". Plaintiff reassured
Defendant Howard that it was a simple task, that required audio
speakers, and a few representative speakers of sound systems the
motion picture may be exhibited. Mr. Ard, a qualified audio editor,
concurred. Regardless, Defendant Howard pressed vigorously, overly
concerned that something bad may happen to Plaintiff somewhere
between Eden and Tucson, never disclosing to anyone that the
condition of the motorcycle was deadly without brake pads.

26.   To alleviate concern, Plaintiff Arnett gave his audio recording equipment to Defendant Howard: a ProTools software suite and a DigiDesign Mbox2 digital audio hardware device, "if anything happens" to him. Defendant Howard sent his wife [by then re-married], Mrs. Robin Howard, to ask Plaintiff to remain in Utah to complete the ambient track. He explained his plan to conform the audio to broadcast standards in Tucson. Mrs. Howard accepted Plaintiff's reasoning and did not understand her husband's exaggerated concern.

27.   On or about 30 September 2011, Defendant Howard still had not provided Plaintiff Arnett with the title to the 1994 motorcycle, and wanted him to wait until he made it home to Tucson, when he promised he would post it to him by US Mail. Concerned that Defendant Howard may hold the title hostage in order to coerce him with more threats, Plaintiff demanded the title before leaving. Defendant Howard complied after excusing his "oversight". Plaintiff also demanded that Mr. Ard be provided with a plane ticket home, in his presence, before he left Mr. Ard behind to return home by airline. Defendant Howard purchased a ticket for Mr. Ard, to return home on 12 October 2011.

28.   On or about 1 October 2011, Defendant Howard demanded more editorial changes to the motion picture. Without the financial means to leave Utah independently, Plaintiff Arnett was held until Defendant Howard would provide him with the means to travel home. These editorial changes were made in compliance to the demands. This additional work went on, around the clock, in 20 hour shifts by Plaintiff until the morning of 3 October 2011 when a large storm was due to arrive that evening. Defendant Howard demanded more changes,

1   which delayed Plaintiff until the big storm struck. Fearing Defendant

2   Howard may never again provide a means out of Utah, Plaintiff

3   demanded and received his travel expenses in cash, then left late

4   that afternoon without full payment for his four months of labor, nor

5   promised equity.

6

7   29.  Even after Defendant Howard, Plaintiff Arnett and Mr. Ard prayed

8   together for a safe trip, Defendant Howard never mentioned, nor

9   warned Plaintiff that he would be riding into a storm covering both

10  Utah and Arizona on a motorcycle without brake pads. He also knew

11  that Plaintiff never rode a mile on an open freeway before. Defendant

12  Howard's financial obligations to Plaintiff would be at an end, if an

13  accident on the U.S. and Interstate highways of Utah and Arizona

14  occurred. Nevertheless, Defendant Howard elected to remain silent as

15  Plaintiff Arnett began a ride of nearly a thousand miles, in extreme

16  weather conditions.

17

18  30.  By 5 October 2011, Plaintiff Arnett survived the journey home to

19  Tucson, despite an electrical breakdown in Kanab, Utah. By 12 October

20  2012, Mr. Ard also made it home by airline. Plaintiff and Mr. Ard

21  waited for Defendant Howard to come to Tucson to complete the audio

22  mix, and bring the promised payment or equity. Defendant Howard moved

23  into another luxury home in Layton, Utah, and paid for classes to

24  attempt the audio mix himself. During this time, Defendant Howard did

25  not answer, nor return telephone calls from Mr. Ard.

26

27  31.  On or about 7 December 2011, Plaintiff Arnett received a call

28  back from Defendant Howard, then wishing to come to Tucson, two

1   months later than agreed. Plaintiff informed Defendant Howard that
2   eviction was imminent. Without getting paid, Plaintiff stated that he
3   would not be in a position to do anything but move. Defendant Howard
4   still did not offer any payment nor equity, however, he stated, "Good
5   luck with the move," then asked to stay at Plaintiff's mother's home
6   and do the work there, still, without offering or making any payment.
7   Plaintiff refused, then reminded Defendant Howard of his financial
8   obligation to Mr. Ard. Defendant Howard replied that he was "putting
9   together a holiday gift package with payment" for Mr. Ard. No "gift"
10  package ever arrived, nor payment, nor equity was ever delivered.

11

12  32.  On 8 December 2011, Defendant Howard uploaded the motion picture
13  for public exhibition on the Lifeline Media websites,
14  www.benshoward.com and www.benshoward.net, using the Vimeo service
15  at www.vimeo.com/33328737 without license to exhibit the unpaid
16  motion picture nor license for the music score, created by
17  **Mr. Robert A. Wolf,** of Evansville, Indiana.

18

19  33.  On or about 22 December 2011, Mr. Ard informed Plaintiff Arnett
20  that Defendant Howard still had not paid him anything since the token
21  payment upon leaving Utah. Neither had Plaintiff received any further
22  payment, nor equity. Plaintiff also discovered that Defendant Howard
23  solicited his music score composer, Mr. Wolf, and had engaged him to
24  compose, record and deliver the complete music score. Mr. Wolf
25  disclosed to Plaintiff that he still had not been paid by Defendant
26  Howard for those two months of work. Defendant Howard commissioned
27  music scoring for his seminar events. Mr. Wolf completed that music
28  composition too but he has not delivered it, due to non-payment.

34.  Plaintiff Arnett immediately demanded Defendant Howard pay both, Mr. Ard and Mr. Wolf $2,000 each, immediately before the Christmas holiday, at threat of using the motion picture as a portfolio piece. Defendant Howard threatened to retaliate by pirating a copy of Plaintiff's theatrical motion picture, "Blocked" online, which is in his possession. Defendant Howard then decided to pay Mr. Ard and Mr. Wolf only $1,000 each by Christmas. Mr. Wolf has not received any more payment by Defendant Howard, having received only $1,000 for producing a full length motion picture and event scores.

35.  On or about 26 January 2012, Plaintiff Arnett discovered that the front and rear brakes of the motorcycle had completely failed. Upon replacement of the $68 US Dollar disc brake pad set, Plaintiff examined the old pads. The brake pad assembly was worn-through, with the brake piston making direct contact with the braking disc, destroying them deep below the surfaces of front and read discs, rendering them irreparable. Plaintiff invoiced Defendant Howard for the balance of combined labor: $211,000. Plaintiff applied travel and "per diem" money as payment toward the invoice. Plaintiff also offered a five percent discount, if payment was settled within 30 days. Because Defendant Howard had doubled the term of the project for elective, personal reasons and continued to refuse to make payment, Plaintiff determined that paying a delinquent payment fee was fair and reasonable for two additional months of wasted time, hardships and the aggravation of each frustrated attempt to collect either promised payment, or promised equity in exchange for the great volume of labor. Plaintiff issued that delinquent payment fee of 37%, which brought the balance due to $289,070 following a 26 February

1   2012 deadline, upon which date, the motion picture would be used for
2   portfolio purposes. Defendant Howard had refused to make any payment,
3   while continuing to benefit from the unpaid labor in the promotion of
4   his books and seminar events, advertized on his Lifeline Media
5   websites at: http://www.benshoward.net and
6   http://www.benshoward.com, still using the Vimeo service at
7   www.vimeo.com/33328737.
8
9   36.   In response to two of Plaintiff Arnett's demands to remove the
10  motion picture from public exhibition, Defendant Howard did not
11  respond or comply. Plaintiff alleges that he then fraudulently filed
12  a United States Copyright on the same. Defendant Howard's copyright
13  to the intellectual property of his book does not extend into the
14  intellectual property rights of the motion picture, owned by
15  Plaintiff, Mr. Ard, or Mr. Wolf's music score, until those rights are
16  transferred for consideration.
17
18  37.   Therefore, Plaintiff makes the following CLAIMS FOR RELIEF:
19
20  38.   CLAIM 1: FAILURE OF CONSIDERATION. The allegations of Paragraphs
21  1 through 36 are incorporated into this Claim as if fully set forth
22  herein. For reason of Defendant Howard failing to assign any promised
23  equity, after luring Plaintiff, and later Mr. Ard, to his Utah
24  location to diligently perform and complete all labor required there,
25  under the promises of such equity or payment, Plaintiff alleges that
26  Defendant Howard et al, failed to provide the Consideration thereof,
27  despite receiving significant services, making him liable for damages
28  arising from his actions.

39.   CLAIM 2: BREACH OF CONTRACT. The allegations of Paragraph 10 are incorporated into this Claim as if fully set forth herein. For reason of Defendant Howard allegedly adding two additional months to the original two month term of service, due expressly to Defendant Howard's own negligence, Plaintiff and Mr. Ard were caused a significant addition of time and duress, making Defendant Howard liable for those damages.

40.   CLAIM 3: FRAUD. The allegations of Paragraphs 1 through 18, and 21, and 33, and 35 are incorporated into this Claim as if fully set forth herein. For reason of Defendant Howard allegedly soliciting valuable services, for making offers of Consideration in exchange for significant services, for luring Plaintiff and Mr. Ard into significant service, for which he had never demonstrated any intent of ever putting any equity into writing, nor ever rendering payment in lieu thereof, Plaintiff alleges that Defendant Howard did so, for the purpose of evading the delivery of Consideration promised, making Defendant Howard liable for [what is not merely a contractual dispute between parties, but] a premeditated and ongoing act of Fraud, committed against Plaintiff, Mr. Ard and Mr. Wolf by Defendant Howard, for the purpose of stealing valuable services, making Defendant Howard liable for damages arising from his actions.

41.   CLAIM 4: FRAUD. The allegations of Paragraph 17 are incorporated into this Claim as if fully set forth herein. For reason of Defendant Howard allegedly expressing his intent to defraud Mr. Ard from his Consideration, witnessed by Plaintiff Arnett, and allegedly carrying out such an admission, Plaintiff alleges that Defendant Howard

1   committed an act of Fraud against Mr. Ard, making Defendant Howard

2   liable for damages arising from his actions.

3

4   42.   CLAIM 5: FRAUD. The allegations of Paragraphs 19 through 20 are

5   incorporated into this Claim as if fully set forth herein. For reason

6   of Defendant Howard grossly misrepresenting the value and condition,

7   and also the year of the 1994 Suzuki Intruder motorcycle that he

8   transferred to Plaintiff Arnett as a "bonus", Plaintiff alleges that

9   Defendant Howard committed an act of Fraud, making Defendant Howard

10  liable for damages arising from his actions.

11

12  43.   CLAIM 6: MISREPRESENTATION OF MATERIAL FACTS. The allegations of

13  Paragraphs 14 and 22 are incorporated into this Claim as if fully set

14  forth herein. For reason of Defendant Howard's alleged claims of

15  inability to make payment, which caused Plaintiff and Mr. Ard duress,

16  are shown to be evidently false by his own Facebook.com page,

17  documenting his travels to Knotts Berry Farm in California, a Mexican

18  ocean cruise, and Snow Basin Ski Resort membership, exercised daily

19  during ski season, Plaintiff alleges that Defendant Howard et al, has

20  always had the means to make payment, just as it appeared in his

21  investment ledger, reflected in his Prenuptial Agreement with his

22  wife, making Defendant Howard liable for damages arising from his

23  actions.

24

25  44.   CLAIM 7: INTENTIONAL HARM. The allegations of Paragraphs 25

26  through 29 are incorporated into this Claim as if fully set forth

27  herein. For reason of Defendant Howard allegedly having foreknowledge

28  of the condition of the motorcycle brakes, yet knowingly and

1   willingly remaining silent, delaying departure until the worst
2   possible weather conditions, Plaintiff alleges that Defendant Howard
3   did so with aforethought, in order to deliberately place Plaintiff
4   Arnett in great mortal danger, as a means of covering up his alleged
5   acts of Fraud against Plaintiff, and as a means of eliminating the
6   individual with the major claim against him, specifically, Plaintiff
7   Arnett. Plaintiff further alleges that Defendant Howard schemed to
8   intentionally cause the catastrophic injury or death of Plaintiff
9   Arnett, by subtle means (which might never have be detected, and
10  determined to be an "accident" by authorities), making Defendant
11  Howard liable for damages and judgments arising from his actions.
12
13  45.  CLAIM 8: UNJUST ENRICHMENT. The allegations of Paragraphs 30
14  through 35 are incorporated into this Claim as if fully set forth
15  herein. Plaintiff alleges that Defendant Howard persistently made
16  false promises in order to gain Unjust Enrichment without any intent
17  to ever fulfill the obligations he had committed to provide in
18  Consideration. Despite Plaintiff Arnett surviving CLAIM 7, Defendant
19  Howard has still made no attempt to pay the balance of the Invoice,
20  nor made any payment plan, nor assign the promised equity. Defendants
21  continue to benefit from Plaintiff's unpaid services, and those
22  services of Mr. Ard and Mr. Wolf, with the attitude that he is beyond
23  their means and ability to collect, making Defendant Howard liable
24  for damages arising from his actions.
25
26  46.  CLAIM 9: COPYRIGHT INFRINGMENT. The allegations of Paragraph 36
27  are incorporated into this Claim as if fully set forth herein. For
28  reason of Defendant Howard allegedly filing a United States Copyright

1   against Plaintiff Arnett's original work, and that of Mr. Ard and Mr.

2   Wolf, Plaintiff alleges that Defendant Howard committed Copyright

3   Fraud, making Defendant Howard liable for damages arising from his

4   actions.

5

6   47.  (Plaintiff In Propria Persona is grateful to this Court for

7   condescending to accept this Complaint for its intended expression,

8   which may often fall short of the high professional grammatical and

9   typographical standards of this United States Court for the District

10  of Arizona.)

11

12                                    **Demand**

13  48.  Plaintiff hereby requests a Jury Trial on all issues raised in

14  this Complaint, and asks the Court for relief, in the following

15  DEMANDS:

16

17  49.  On CLAIM 1, that Plaintiff recover damages of the unpaid Invoice

18  balance of $211,000 US Dollars from Defendants, in order to render

19  the Consideration to Mr. Ard, Mr. Wolf, and to Plaintiff Arnett;

20

21  50.  On CLAIM 2, that Plaintiff recover damages of the unpaid

22  "Delinquent Payment" Fee of 37% of the Invoice balance (specified in

23  CLAIM 1), as an added $78,070 US Dollars from Defendants, who shall

24  then consider the Invoice "Paid In Full" upon receiving total payment

25  of $289,070 US Dollars. Only then shall the Intellectual Property

26  rights of the project materials be lawfully transferred to

27  Defendants, with no further claims against those rights;

28

1  51.  On CLAIM 3, that Plaintiff recover damages listed in CLAIMS 1

2  and 2 from Defendants, under the same terms, and such other and

3  further relief as the Court shall deem just and proper;

4

5  52.  On CLAIM 4, that Plaintiff recover from Defendants, the full

6  amount due from a resulting legal judgment against Mr. Ard for

7  delinquent payment on his student loans during his extended time of

8  service to Defendants, directly due to damages caused by Defendant

9  Howard's actions (Plaintiff shall collect on behalf of Mr. Ard, with

10  his full consent);

11

12  53.  On CLAIM 5, that Plaintiff recover damages of $3,500 US Dollars

13  from Defendants, for allegedly misrepresenting a "totaled" condition

14  motorcycle as "excellent" condition, and such other and further

15  relief as the Court shall deem just and proper;

16

17  54.  On CLAIM 6, that Plaintiff recover damages specified in CLAIMS 1

18  and 2, plus $50,000 US Dollars for Plaintiff Arnett, and $25,000 US

19  Dollars for Mr. Ard, (which shall be administered by Plaintiff to Mr.

20  Ard, and to himself) from Defendants, for aggravation, hardships,

21  deprivations, duress, and such other and further relief as the Court

22  shall deem just and proper;

23

24  55.  On CLAIM 7, Plaintiff demands no damages for pain and suffering,

25  as the decision to leave in the storm was his own decision, however,

26  doing so without a properly functioning brake system was Defendant

27  Howard's decision. Now, Plaintiff understands that a Punitive

28  Judgment is reserved as a deterrent to habitual behavior that is

1   damaging, especially that which causes catastrophic injury and death
2   to others for gain. Taking into account Defendant Howard's alleged
3   actions and history, Plaintiff asks that this Judicial tool to be
4   applied against Defendants, due to Defendant Howard's habitual
5   offenses against Plaintiff and others for alleged Fraud, and for the
6   alleged Intentional Harm he set into motion against Plaintiff Arnett,
7   which Plaintiff alleges, was intended to go undetected. To satisfy
8   any such judgment, Plaintiff asks for an amount, as high as the
9   estimated combined assets of Defendants ($3,000,000 US Dollars), in
10  order to provide the Court sufficient latitude, as it shall deem
11  necessary and just, to exercise the broad powers and authority of
12  this Court for the purpose of deterring the continuation of such
13  habitual behavior;

14

15  56.  On CLAIM 8, that Plaintiff recover damages listed in CLAIMS 1
16  and 2 from Defendants, under the same terms, and such other and
17  further relief as the Court shall deem just and proper;

18

19  57.  On CLAIM 9, that Plaintiffs recover the US Copyright for the
20  project materials from Defendants, by transferring rightful ownership
21  back to Plaintiff by Court Order, and such other and further relief
22  as the Court shall deem just and proper.

23

24  58.  Plaintiff demands that Defendants pay all costs associated with
25  this Court Case, and for all costs of Plaintiff preparing and
26  pursuing the same.

27

28                        [SIGNATURE ON NEXT PAGE]

Respectfully submitted this **24** day of **APRIL** 2012.




In Propria Persona

James Arnett

9288 N. Monmouth Court

Tucson, Arizona 85742

email: jamesarnettaz@gmail.com

(520)878-9779 (home)

(520)304-0129 (field)