FILED ___ LODGED ___
RECEIVED ___ COPY ___

**JAN 7 2013**

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

James Arnett,

      Plaintiff,

vs.

Benjamin Snow Howard,

Lifeline Media LLC,

Nationwide Affordable Housing Inc.,

The Ben Howard Trust,

      Defendants.

No. 4:12-CV-00311-DCB-DTF

**FIRST AMENDED COMPLAINT**

### Plaintiff's First Amended Complaint

Representing himself *Pro Se*, Plaintiff James Arnett filed his original Complaint [Doc. 1] against Defendants Howard, et al., in the United States District Court For The District Of Arizona on 24 April 2012. On 15 October 2012, Plaintiff motioned for Leave to Amend under Rule 15(a). On 19 December 2012, this honorable Court granted him Leave to do so [Doc. 34].

1     Pursuant to the ORDER [Doc. 34] of this honorable Court, Plaintiff respectfully

2    submits these Amendments, addressing: the Correction Of Typos and Errors (using

3    strikethrough and underlined corrections), the Addition Of Prima Facie Evidence (exhibits

4    added), and the Correction Of Claims (complete strike of Doc. 1, ¶37 through ¶58 and

5    replaced herein).

6                     **AMENDED COMPLAINT**

7

8

9                      **Jurisdiction**

10     Venue is proper in this Court pursuant to 28USC§1391 as Defendant Benjamin

11   Snow Howard (Defendant Howard), a resident of Layton, Utah, conducted business with

12   Plaintiff James Arnett (Plaintiff Arnett), a resident of Tucson, Arizona, soliciting services,

13   making offers to acquire labor, in person and remotely, within the jurisdiction of the

14   District of Arizona. Defendant Lifeline Media LLC is an entity registered in ~~Hurst, Texas~~

15   <u>Eden, Utah</u>; Defendant Nationwide Affordable Housing is a corporation registered in

16   Hurst, Texas; Defendant Ben Howard Trust is a trust registered in Idaho. Each registered

17   entity is directed and managed by their sole registered agent, Defendant Howard, who

18   may be served with Process at his residence, located at: 3580 N. 2225 E., Layton, UT

19   84040 [See Exhibits A – E, supporting Jurisdiction and Venue].

20

21                      **Complaint**

22   1.     BACKGROUND: <u>In November 2010, Defendant Howard contacted Plaintiff</u>

23   <u>Arnett via the Skype.com internet telephonic service to solicit help producing his website</u>

24   <u>at www.benshoward.net. Defendant Howard purchased and drop-shipped a Cricket field</u>

25   <u>phone [Exhibit C] directly to Plaintiff for consultation services in CSS coding methods</u>

26   <u>[Exhibit F] in order to assist building his website for an ambitious project based on his</u>

27   <u>"Trauma Release Coach" business for the purpose of mass marketing. To that end,</u>

28   <u>Plaintiff provided effective consultation.</u> On or about 5 February 2011, Defendant Howard

1   [author of "Overcoming Life's Trauma", and "Guilt Free Living", and "The Secret To

2   Prosperity"] visited the Tucson, Arizona work studio of Plaintiff Arnett, [producer and

3   director of the "September Eleventh" film series for the New York State Fraternal Order

4   Of Police] for the purpose of completing the design and finalizing construction of his

5   Internet venture, at his Web domain, http://www.benshoward.net.  Defendant Howard

6   asked Plaintiff to perform this service for him as a [gratis] personal favor, in order to help

7   him launch his plans to take his self-help seminar business from local events to the

8   national level, proposing published book [Exhibit G], audio-book and movie

9   embodiments of his "Overcoming Life's Trauma" live presentation, which Defendant

10  Howard was performing on a regular basis in the State of Utah. Plaintiff provided him

11  with a (CSS based) website design, from which, Defendant Howard could edit the

12  specifics of his proposed services and product lines.

13

14  2.      When Defendant Howard was staying at Plaintiff Arnett's Tucson work studio

15  [Exhibits A & B], located at: 7425 N. Mona Lisa Rd., unit 236, Tucson, Arizona ~~95741~~

16  85741, he had solicited Plaintiff Arnett's services to produce an audio-book [See DVD-1]

17  and a three hour motion picture for him [See DVD-2], over a two month period, both

18  products based upon Defendant Howard's live presentation of "Overcoming Life's

19  Trauma".

20

21  3.      Defendant Howard then offered Plaintiff Arnett assignment as a major equity

22  partner and the producer and director positions in the project (having the essential

23  expertise), in order to secure his cooperation to perform production in Utah. Plaintiff

24  Arnett agreed but would advise him of a later date, regarding his availability, due to his

25  obligation to complete the theatrical motion picture, "Blocked", he was then engaged in

26  producing. Satisfied, Defendant Howard returned to Utah and deployed the website

27  Plaintiff Arnett had coded for him.

28

4.     On or about, 21 May 2011, Plaintiff Arnett advised Defendant Howard that he was then available for his project. By telephone from Utah, Defendant Howard reiterated his offer that he made to Plaintiff Arnett in Tucson, offering assignment as a major equity partner and the producer and director positions in the project, and adding the additional promises to pay all of his expenses, including his Tucson work studio rent, meals, field phone, lodging, vehicle, a per diem for gas, food, coffee, cigarettes and round-trip air transportation. The parties were to formalize the agreement together in Utah. Plaintiff Arnett agreed. Defendant Howard booked a one-way flight to Salt Lake City, Utah for him [Exhibit D].

5.     On 5 June 2011, Plaintiff flew from Tucson, Arizona to Salt Lake City, Utah, to begin work at Defendant Howard's personal residence, located at: 6232 E. 1800 N. Eden, Utah 84310 (no conspicuous address remained on the property, making for some confusion as to an exact identification of address). Upon Plaintiff's arrival, Defendant Howard briefed him on the project, characterizing the project to Plaintiff as personally commissioned to him by "God", via direct revelation, due to his ordination in the "Melchisedek Priesthood", conferred by the Church of Jesus Christ of Latter Day Saints (LDS), with the notable distinction of possessing a "Temple Recommend", providing Plaintiff reason to have confidence that Defendant Howard was sincere in his motivations and practices.

6.     Another LDS member, a single mother from a local university film program, **Ms. Dawn Strate Kalana**, was engaged by Defendant Howard as "Associate Producer". He offered her that credit in the film and her expenses were to be paid by Defendant Howard. Ms. Kalana accepted and worked for Defendant Howard. To date, neither credit, nor reimbursement for her expenses have been known to have materialized. Defendant Howard stated to Plaintiff there was plenty of time to draft the equity agreement as the busy work schedule provided.

7.     On or about 8 June 2012, the graphic arts services of **Mr. Gerren Ard** [Exhibit H] were offered to Defendant Howard by Plaintiff Arnett. To that end, Plaintiff facilitated a telephone call, in order for Defendant Howard to speak with, and hire the services of Mr. Ard. Defendant Howard then purchased him an airline ticket, approximately seven weeks ahead of the scheduled flight.

8.     On or about 23 June 2011, Plaintiff Arnett had completed both, the audio book [See DVD-1] and a commercial television spot [See DVD-1]; and developed the final production plans, with digital pipeline for producing the full three-hour, high definition, motion picture for commercial distribution as a self-help "work shop" series of video discs [See DVD-2].

9.     On or about 25 June 2011, Plaintiff Arnett began location filming in Utah. Defendant Howard, acting as the agent of Defendant Nationwide Affordable Housing [Exhibit I], did so in these affairs until he changed the name of an existing entity under his sole control, to Defendant Lifeline Media [Exhibit J], an entity from which per diem payments to Plaintiff would <u>then</u> be made, which materialized only in petty cash stipends for cigarettes and coffee breaks at the "Valley Market".

10.     From late June ~~2012~~ <u>2011</u> throughout early September ~~2012~~ <u>2011</u>, Plaintiff Arnett was delayed from filming Defendant Howard, due to him abandoning work regularly, to pursue romantic relationships with **Ms. Bonnie Carrigan**, **Ms. Angela Russel**, as well as his former wife, **Mrs. Robin Howard**, which resulted in Plaintiff often searching for lost special-needs children, essentially abandoned when Defendant Howard and guest would disappear without warning, and other impositionary, and elective delays of this type. To no effect, Plaintiff objected to these delays as costing him extra time, which had nothing to do with fulfilling his obligations on-schedule<u>, as Defendant Howard had originally represented as being just a two month commitment.</u>

11.    Filming only became productive, once Plaintiff Arnett and Defendant Howard went to film the Idaho locations in mid July 2011. During this time, Defendant Howard provided loose tobacco and paper for Plaintiff to roll his own cigarettes, claiming that he was running out of money. However, once returned from Idaho filming, the same type of delays persisted. The original two month project Plaintiff had accepted had doubled in time and was threatening to go much longer by the unnecessary delays introduced by Defendant Howard.

12.    On or about 25 July 2011, Mr. Ard [Exhibit V] arrived in Salt Lake City, and resided at the same Eden, Utah location in order to design the Lifeline Media branding for the products, and to produce the graphics for the motion picture product. Mr. Ard was paid the same petty cash stipend amounts weekly, until he would invoice for the totality of his labor, once it could be calculated.

13.    Defendant Howard disclosed to Plaintiff Arnett that a Federal Judge had "ripped him off", "singled him out for persecution", "swindled him", by making a large Civil judgment against him (in Case 1:09-CV-02799-ODE for refusing to return $200,000 belonging to the plaintiffs of that Case, which is on Appeal – although the truth of the matter was later discovered to be quite different than described by Defendant in Case: 1:09-cv-02799-ODE, in the U.S. Northern District Court of Georgia, Atlanta Division where, in Document 101, filed 7 August 2012 [Exhibit L], Defendant Howard was materially tied as a defendant in what the honorable U.S. District Judge Orinda D. Evans described as "...a massive ponzi scheme that defrauded investors out of approximately $30 million.", pages 1&2), so he would not be able to make complete payment for Mr. Ard's services. Defendant Howard offered an equity ownership position in the products which Mr. Ard was manufacturing, in order to make up the outstanding balance to him. The details of which, Defendant Howard claimed he would work out at a later time, once all of the photography was completed. No such equity promises were fulfilled at that appointed

1   time, nor any time thereafter. <u>In fact, Defendants were actually in the process of</u>

2   <u>purchasing numerous real estate properties in Nevada [Exhibit K] with the monies he</u>

3   <u>should have been paying to Plaintiff and Mr. Ard.</u>

4

5   14.     Defendant Howard represented the equity as having great potential value, due to his

6   access to celebrities "Glenn Beck" and "Marie Osmond" through his publishing service

7   provider, who he was expecting to help him exploit the commercial potential of the

8   project. Defendant Howard offered Mr. Ard equity because he claimed to Plaintiff and Mr.

9   Ard that he was financially depleted and needed the cooperation of Mr. Ard to complete

10  the project. Defendant Howard summarily reduced promised meals to once a day, left-

11  overs, and reduced per diems to $10 a day, which Defendant Howard often consumed as

12  he pleased, after returning from "lunch" meetings with his publishing service provider,

13  while Plaintiff and Mr. Ard labored.

14

15  15.     On or about 28 August 2011, Defendant Howard disclosed to Plaintiff Arnett that he

16  had no intention of providing Ms. Kalana her "Associate Producer" credit in the film, nor

17  reimburse any of her expenses, stating that he felt no obligation to her whatsoever.

18

19  16.     Plaintiff Arnett and Mr. Ard immediately approached Defendant Howard to finalize

20  the equity interest promises in the project. Defendant Howard claimed that assigning

21  equity at that point was premature and would interfere with his ability to make any

22  distribution agreement in the future, if he had formal partners. On that basis, he again

23  refused to assign Plaintiff and Mr. Ard equity. Plaintiff and Mr. Ard countered, that if they

24  were not formal partners, then they needed to get paid for their professional services.

25  Defendant Howard agreed and promised to make everything "good" by ultimately paying

26  them their rates, if that were possible, or by assigning equity to them, once he knew its

27  "true" worth.

28

17.     Immediately following that meeting, Defendant Howard disclosed to Plaintiff Arnett that he had no intention of providing Mr. Ard with any equity, which he had promised to him. Defendant Howard  stated to Plaintiff that he intended to pay off Mr. Ard with a small token fee, instead of paying him his full invoice amount, when the labor was calculated. Defendant Howard stated that arrangement meant more profit for himself and for Plaintiff. Plaintiff Arnett refused diminishing Mr. Ard's consideration by any means.

18.     Plaintiff Arnett and Mr. Ard had exhausted their personal funds by this time, receiving no payment for services, nor promised equity, beyond Defendant Howard making payment to Plaintiff's and Mr. Ard's Arizona rental units, in order to maintain the continued cooperation of Plaintiff and Mr. Ard. Defendant Howard insisted the distribution he was arranging would satisfy all payment issues. Deeply vested, Plaintiff and Mr. Ard continued to labor in earnest, giving Defendant Howard the benefit of the doubt.

19.     On or about 31 August 2011, Defendant Howard offered Plaintiff Arnett his personal 1994 Suzuki 1400 Intruder motorcycle, that he had possessed for over a decade, but was actually owned by the Ben Howard Trust, which he represented as a "1995" model, "just serviced", "safe", capable of "riding anywhere", as a "bonus" incentive to continue labor until payment for services, or the equity materialized. Defendant Howard also offered to pay Plaintiff the expenses of riding home on it to Tucson, when the work in Utah was completed. Defendant Howard represented the 1994 motorcycle as being worth more than $3,000. Plaintiff accepted the bonus [Exhibit M].

20.     Unknown to Plaintiff Arnett, The motorcycle brake pads were in fact, metal on metal, the padless metal backings making direct contact with the discs - deadly to take on a thousand mile journey. Defendant Howard also demanded to remove the only remaining safety equipment, the windshield. Defendant Howard provided a signed bill of sale

1  [Exhibit N], without any identification of the seller (the title named the Ben Howard Trust
2  in Idaho as owner). Defendant Howard's "poor" financial condition still provided him
3  with the disposable funds to impulse buy an identical motorcycle for $5,500 that was of
4  much more recent manufacture, and without the electromechanical problems which the
5  1994 model suffered. Repair of those electromechanical problems, to make the vehicle
6  safe and road-worthy, were discovered to be in fact, more costly than the value of the
7  vehicle, rendering it as "totaled" condition, rather than "excellent" condition, as it was
8  misrepresented by Defendant Howard. With Defendant Howard's new motorcycle having
9  a windshield of its own, he had no more pretense for removing the windshield from the
10  1994 model, so Defendant Howard allowed Plaintiff to retain the last remaining safety
11  device. But Defendant Howard removed the Idaho license plate from Plaintiff's
12  motorcycle and installed it on his new motorcycle. When Plaintiff questioned him about
13  the legitimacy of that action, Defendant Howard replied, "Sure, it's legal!". When Plaintiff
14  questioned him about the liability of interstate highway travel to Tucson without a license
15  plate, Defendant Howard replied, "You have three days to transport it, that's legal", then he
16  provided Plaintiff with a Progressive Insurance Co. I.D. Card [Exhibit N], insuring a 1994
17  Suzuki Intruder 1400 – NOT a 1995 model as Defendants represented.
18
19  21.    On or about 11 September 2011, Defendant Howard demanded editorial changes,
20  which he insisted were of special personal importance to him, and quickly became a
21  "special revelation from God" to justify the changes. Those changes represented an
22  obvious erosion of the marketability of the motion picture and the value of its equity to
23  Plaintiff Arnett and Mr. Ard, who both refused the demands, agreeing it was another
24  pretense for justifying continued non-payment and a betrayal of Defendant's Fiduciary
25  Duties. Defendant Howard then used intimidation to coerce these changes, by shouting,
26  throwing and breaking objects, declaring that he would never pay neither Plaintiff nor Mr.
27  Ard their rates, nor equity. A commotion ensued. This was witnessed by Defendant
28  Howard's ex-wife, Mrs. Robin Howard. This resulted in more delays due to additional

1    demands at threat, followed by Defendant Howard's apologies, but still no payment, nor

2    equity materialized.

3

4    22.    By mid September, Defendant Howard's former wife, Mrs. Robin Howard, had

5    agreed to re-marry him immediately. Defendant Howard gave his reason as his public

6    assistance benefits for health insurance, provided by the State of Utah, would soon expire

7    and he needed to get onto her medical plan immediately. Defendant Howard composed a

8    Prenuptial Agreement for his soon-to-be wife to sign, in order to protect his assets from

9    her, in case she discovered that he had never terminated his relationships with Ms.

10   Carrigan and Ms. Russel (both of whom, persisted throughout the second marriage,

11   ultimately resulting in their separation and pending divorce). Defendant Howard left his

12   investment ledger open, revealing his assets to include in his Prenuptial Agreement.

13   Plaintiff found Defendant Howard's ledger open in the work area, demonstrating to him an

14   approximate $10,000 monthly income from a plurality of residential properties [Exhibit

15   K].

16

17   23.    On or about 27 September 2011, the voice track and picture track of the motion

18   picture were completed. The scope of the work was three hours of specialized, "green

19   screen" visual effects techniques to superimpose Defendant Howard speaking in most

20   every scene of the motion picture, to create the illusion that he was in a many locations,

21   when in fact, he was filmed on a green screen, at a property he owns at: 1087 S. 9275 E.

22   Huntsville, UT 84317 [Exhibit O].

23

24   24.    At that time, Defendant Howard insisted that Plaintiff Arnett complete the

25   "ambiance" portion of the sound track, despite the absence of audio speakers, from which

26   to monitor subtle audio ambiances. Plaintiff made an earnest attempt, however, the noise

27   level created by the restlessness of Defendant Howard made that task impossible to do

28   properly at broadcast standards using the built-in computer speakers. Plaintiff stated that

he would build the ambiance track at his Tucson work studio, as originally planned, where he had the proper equipment for broadcast standards.

25.     Defendant Howard insisted that the track be finished in Eden, Utah, inexplicably panicked that Plaintiff Arnett may not be able to complete the audio task, "for any reason". Plaintiff reassured Defendant Howard that it was a simple task, that required audio speakers, and a few representative speakers of sound systems the motion picture may be exhibited. Mr. Ard, a qualified audio editor, concurred. Regardless, Defendant Howard pressed vigorously, overly concerned that something bad may happen to Plaintiff somewhere between Eden and Tucson, never disclosing to anyone that the condition of the motorcycle was deadly without brake pads.

26.     To alleviate concern, Plaintiff Arnett gave his audio recording equipment to Defendant Howard: a ProTools software suite and a DigiDesign Mbox2 digital audio hardware device [Exhibit P], "if anything happens" to him. Defendant Howard sent his wife [by then re-married], Mrs. Robin Howard, to ask Plaintiff to remain in Utah to complete the ambient track. He explained his plan to conform the audio to broadcast standards in Tucson. Mrs. Howard accepted Plaintiff's reasoning and did not understand her husband's exaggerated concern.

27.     On or about 30 September 2011, Defendant Howard still had not provided Plaintiff Arnett with the title to the 1994 motorcycle, and wanted him to wait until he made it home to Tucson, when he promised he would post it to him by US Mail. Concerned that Defendant Howard may hold the title hostage in order to coerce him with more threats, Plaintiff demanded the title before leaving. Defendant Howard complied after excusing his "oversight". Plaintiff also demanded that Mr. Ard be provided with a plane ticket home, in his presence, before he left Mr. Ard behind to return home by airline. Defendant Howard purchased a ticket for Mr. Ard, to return home on or about 12 October 2011.

28.     On or about 1 October 2011, Defendant Howard demanded more editorial changes to the motion picture. Without the financial means to leave Utah independently, Plaintiff Arnett was held until Defendant Howard would provide him with the means to travel home. These editorial changes were made in compliance to the demands. This additional work went on, around the clock, in 20 hour shifts by Plaintiff until the morning of 3 October 2011 when a large storm was due to arrive that evening. Defendant Howard demanded more changes, which delayed Plaintiff until the big storm struck. Fearing Defendant Howard may never again provide a means out of Utah, Plaintiff demanded and received his travel expenses in cash, then left late that afternoon (at approximately 5:20PM) without full payment for his four months of labor, nor promised equity.

29.     Even after Defendant Howard, Plaintiff Arnett and Mr. Ard prayed together for a safe trip, Defendant Howard never mentioned, nor warned Plaintiff that he would be riding into a storm covering both Utah and Arizona on a motorcycle without brake pads. He also knew that Plaintiff never rode a mile on an open freeway before. Defendant Howard's financial obligations to Plaintiff would be at an end, if an accident on the U.S. and Interstate highways of Utah and Arizona occurred. Nevertheless, Defendant Howard elected to remain silent as Plaintiff Arnett began a ride of nearly a thousand miles, in extreme weather conditions.

30.     By 5 October 2011, Plaintiff Arnett survived the journey home to Tucson, despite an electrical breakdown in Kanab, Utah. ~~By~~ On or about 12 October ~~2012~~ 2011, Mr. Ard also made it home by airline. Plaintiff and Mr. Ard waited for Defendant Howard to come to Tucson to complete the audio mix, and bring the promised payment or equity. Defendant Howard moved into another luxury home in Layton, Utah, and paid for classes to attempt the audio mix himself. During this time, Defendant Howard did not answer, nor return telephone calls from Mr. Ard.

31.     On or about 7 December 2011, Plaintiff Arnett received a call back from Defendant Howard, then wishing to come to Tucson, two months later than agreed. Plaintiff informed Defendant Howard that eviction was imminent. Without getting paid, Plaintiff stated that he would not be in a position to do anything but move. Defendant Howard still did not offer any payment nor equity, however, he stated, "Good luck with the move," then asked to stay at Plaintiff's mother's home and do the work there, still, without offering or making any payment. Plaintiff refused, then reminded Defendant Howard of his financial obligation to Mr. Ard. Defendant Howard replied that he was "putting together a holiday gift package with payment" for Mr. Ard. No "gift" package ever arrived, nor payment, nor equity was ever delivered.

32.     On 8 December 2011, Defendant Howard uploaded the motion picture for public exhibition on the Lifeline Media websites, www.benshoward.com and www.benshoward.net, using the Vimeo service at www.vimeo.com/33328737 [Exhibit Q] without license to exhibit the unpaid motion picture nor license for the music score, created by **Mr. Robert A. Wolf,** of Evansville, Indiana.

33.     On or about 22 December 2011, Mr. Ard informed Plaintiff Arnett that Defendant Howard still had not paid him anything since the token payment upon leaving Utah. Neither had Plaintiff received any further payment, nor equity. Plaintiff also discovered that Defendant Howard solicited his music score composer, Mr. Wolf, and had engaged him to compose, record and deliver the complete music score. Mr. Wolf disclosed to Plaintiff that he still had not been paid by Defendant Howard for those two months of work. Defendant Howard commissioned music scoring for his seminar events. Mr. Wolf completed that music composition too but he has not delivered it, due to non-payment.

34.     Plaintiff Arnett immediately demanded Defendant Howard pay both, Mr. Ard and Mr. Wolf $2,000 each, immediately before the Christmas holiday, at threat of using the

1   motion picture as a portfolio piece. Defendant Howard threatened to retaliate by pirating a

2   copy of Plaintiff's theatrical motion picture, "Blocked" online, which is in his possession.

3   Defendant Howard then decided to pay Mr. Ard and Mr. Wolf only $1,000 each by

4   Christmas. Mr. Wolf has not received any more payment by Defendant Howard, having

5   received only $1,000 for producing a full length motion picture and <u>live</u> event scores.

6

7   35.    On or about 26 January 2012, Plaintiff Arnett discovered that the front and rear

8   brakes of the motorcycle had completely failed. Upon replacement of the $68 US Dollar

9   disc brake pad set, Plaintiff examined the old pads [Exhibit R]. The brake pad assembly

10   was worn-through, with the brake piston making direct contact with the braking disc,

11   destroying them deep below the surfaces of front and read discs, rendering them

12   irreparable. Plaintiff invoiced Defendant Howard for the balance of combined labor

13   [Exhibit S]: $211,000. Plaintiff applied travel and "per diem" money as payment toward

14   the invoice. Plaintiff also offered a five percent discount, if payment was settled within 30

15   days. Because Defendant Howard had doubled the term of the project for elective,

16   personal reasons and continued to refuse to make payment, Plaintiff determined that

17   paying a delinquent payment fee was fair and reasonable for two additional months of

18   wasted time, hardships and the aggravation of each frustrated attempt to collect either

19   promised payment, or promised equity in exchange for the great volume of labor. Plaintiff

20   issued that delinquent payment fee of 37%, which brought the balance due to $289,070

21   following a 26 February 2012 deadline, upon which date, the motion picture would be

22   used for portfolio purposes. Defendant Howard had refused to make any payment, while

23   continuing to benefit from the unpaid labor in the promotion of his books and seminar

24   events, advertized on his Lifeline Media websites at: http://www.benshoward.net  and

25   http://wwwbenshoward.com, still using the Vimeo service at www.vimeo.com/33328737.

26

27   36.    In response to two of Plaintiff Arnett's demands to remove the motion picture from

28   public exhibition, Defendant Howard did not respond or comply. ~~Plaintiff alleges that he~~

1  ~~then fraudulently filed a United States Copyright on the same.~~ Defendant Howard's

2  copyright to the intellectual property of his book does not extend into the intellectual

3  property rights of the motion picture, owned by Plaintiff, Mr. Ard, or Mr. Wolf's music

4  score, until those rights are transferred for consideration. <u>On 25 February 2012, Defendant</u>

5  <u>Howard attempted to induce Plaintiff Arnett to forbear seeking judicial relief</u> [Exhibit T].

6

7  37.     Therefore, Plaintiff makes the following CLAIMS FOR RELIEF:

8

9  38.                    **FIRST CAUSE OF ACTION**

10                       **BREACH OF CONTRACT**

11

12  <u>39.     All of the preceding and subsequent paragraphs of this Complaint are hereby</u>

13  <u>incorporated into this cause of action as though set forth in full herein.</u>

14

15  <u>40.     Upon information and belief, Defendants Howard, et al., had represented his</u>

16  <u>commercial project to Plaintiff Arnett as having substantial potential earning</u>

17  <u>power, built around the draft of his Book "Overcoming Life's Trauma" [Exhibit G]</u>

18  <u>(this is the final title of the Book, which went through several iterations of title but</u>

19  <u>with essentially the identical content).</u>

20

21  <u>41.     To induce Plaintiff Arnett into accepting a commission to produce the Motion</u>

22  <u>Picture, TV Commercial Spot and Audio Book ("Goods") based on said Book, Defendant</u>

23  <u>Howard, acting as the authorized agent for Defendant Nationwide Affordable Housing</u>

24  <u>Inc., who he stated was financing the venture, and Defendant Lifeline Media LLC, who</u>

25  <u>eventually was created to administrate the venture, made representations to Plaintiff that</u>

26  <u>he would be assigned as a major equity interest partner in shares of sales derived from</u>

27  <u>commercially exploiting the Goods Plaintiff produced, which would require two months</u>

28  <u>of dedicated labor to produce.</u>

42.   Defendant Howard's offers of major equity ownership of said Goods to Plaintiff, prior to his accepting of said commission, became the bargaining instruments to which the parties agreed.

43.   A lawful Contract was formed between the parties for the manufacture of said Goods, as defined under A.R.S. 47-2204 and by reason of Defendants Accepting and using Plaintiff's Goods on their web site, beginning on 8 December 2011 to date (and other online outlets), in whole or in part, which further constitute a lawful Contract, as defined under A.R.S 47-2201(C) and Plaintiff's performance met with Acceptance under A.R.S 47-2606. Thus, Defendants had accepted the Fiduciary Duty to Plaintiff.

44.   Plaintiff Arnett fulfilled his obligations under the Contract at issue, by completing the manufacture and delivery of said Goods, with the Motion Picture at the final assembly stage (the final audio mix was halted by Plaintiff, pursuant to A.R.S. 47-2705).

45.   Whereas, Defendant Howard had failed to perform, failing to either execute in writing the promised equity interest, or to make the promised payment for the Goods, in lieu of said equity, as Defendant represented to Plaintiff, and failed to perform his Fiduciary Duties to Plaintiff.

46.   Plaintiff seasonably notified Defendants of their non-performance and issued an Invoice on or around 26 January 2012.

47.   Defendant Howard ignored the Invoice and did not respond until the following month on 25 February 2012, denying any Contract for said Goods existed, and making other statements inconsistent with his Duty to Good Faith and Fair Dealings. That was the entirety of Defendant Howard's efforts to avoid litigation, he never responded to any other communication demanding payment for the Goods thereafter, resulting in this Case being

1  filed with this honorable Court.

2  48.    Defendant Howard breached the Contract at issue by failing to perform, by

3  withholding and refusing to make any substantial payment toward said Invoice for the

4  Goods manufactured expressly for Defendants' unique, commercial purpose, unsuitable

5  for resale to any other buyer.

6

7  49.    Defendants have publicly established Acceptance of Goods after a seasonable

8  period had passed, on 8 December 2011 without making any substantial or full payment,

9  as required under A.R.S. 47-2606  and A.R.S. 47-2607, and continue to violate these same

10  Arizona Revised Statutes.

11

12  50.    Pursuant to A.R.S. 47-2723, Plaintiff is eligible for damages to be awarded under

13  the "prevailing price" of Goods at the time. This prevailing price is $3,000.00 per finished

14  minute, per David L. Brown, Film Arts Foundation, January 2005 [Exhibit U].

15

16  51.    Total Running Time (TRT) of the Motion Picture is 175.5 minutes, totaling

17  $526,500.00 US Dollars in 2005. By the time of Acceptance in 2011, inflation increased

18  that figure by 15.18%, totaling $606,422.70 US Dollars as the prevailing price in the

19  market at the time.

20

21  52.    For producing the 30 second TV Commercial Spot for Defendants, Plaintiff

22  demands $3,800.00 US Dollars in payment.

23

24  53.    For producing the Audio Book of 134 minutes TRT for Defendants, Plaintiff

25  demands $3,500.00 US Dollars.

26

27  54.    Therefore, as a direct and proximate result, Plaintiff has been damaged by

28  Defendants in the amount of $613,722.70 US Dollars.

55.     Additionally, pursuant to A.R.S. 47-2710, Plaintiff is further entitled to all incidental and consequential damages, inclusive of (supporting documentation still being photographed and collected):

     (A)   At least $2,600.00 in incidental damages to cover storage, moving and re-establishing Plaintiff Arnett's work studio;

     (B)   The consequential damages from the inability to pay for air conditioning service in the summer heat that resulted in a $1,200.00 emergency room visit that Plaintiff suffered for a severe case of heat stroke;

     (C)   The consequential damages from the loss of an overheated computer system that terminally failed at $1,100.00;

     (D)   Said computer contained the complete development compiler software and source code for Plaintiff's proprietary "CineMatrix Industrial" filmmaking software suite [Exhibit W] (used as Plaintiff's primary production tool to produce all of his film productions), representing an investment of five years of development work, with an estimated cost of $540,000.00 to hire the re-development thereof by qualified computer programmers;

     (E)   The incidental damages of $3,800.00 in unpaid bridge loans, which ultimately need to be repaid with interest. These incidental and consequential damages would not have occurred, but for Defendants' Breach of Contract.

56.     Therefore, as a direct and proximate result, Plaintiff has been incidentally and consequentially damaged by Defendants in the amount of $548,7200.00 US Dollars, to be remedied as provided under A.R.S. 47-2710.

57.     Additionally, Plaintiff prays for an Injunction to halt the use, exhibition and distribution of said Goods by Defendants until Plaintiff collects and receives all monies from Defendants, as adjudicated and awarded by this honorable Court.

58.     Upon information and belief, Defendant Howard's conduct in refusing payment for Goods that he was in Acceptance of,  was wanton and/or reckless and/or shows a reckless indifference in the interests of others, and Plaintiff therefore also demands punitive damages for the acts alleged herein, to an amount deemed appropriate by this honorable Court.

59.     This action arises out of contract. Pursuant to A.R.S. 12-341, Plaintiff is entitled to recover his reasonable costs, to be determined if leave is granted to calculate that total.

60.     WHEREFORE, Plaintiff James Arnett, prays that judgment be entered in his favor on his First Cause of Action for a sum of up to $613,722.70 US Dollars for the Breech of Contract, together with $548,720.00 US Dollars in Consequential and Incidental Damages, with pre- and post-judgment interest, as well as up to $150,000.00 US Dollars in punitive damages, as set forth in this Complaint, including the costs of the preparation of this Case of no less than $1,500.00 in the event of default, and such other relief as this honorable Court may find appropriate.

61.     **SECOND CAUSE OF ACTION**

**FRAUD**

62.     All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

63.     Plaintiff alleges that the conduct of Defendants Howard, Nationwide Affordable Housing Inc., Life Line Media LLC, in regard to the issue of their Contracting Plaintiff for the manufacture of said Goods, qualifies as Fraud, meeting ALL NINE ELEMENTS OF FRAUD:

1   64.   (1)    A REPRESENTATION: Upon information and belief, Defendants made

2              material misrepresentations and/or omissions regarding himself being a

3              tortfeasor, pursued in a Federal Court in the District of Northern Georgia

4              Atlanta Division (SEC/Huddleston vs. Grafton Enterprises/Benjamin

5              Howard 1:09-CV-2799-ODE), which significantly devalued the major

6              equity ownership interest offered to induce Plaintiff into manufacturing

7              Goods under a lawful Contract, and when Defendants had failed to perform,

8              they offered full payment but further failed to make payment in lieu of said

9              equity, despite their Acceptance of Goods, as defined under A.R.S. 47-2606.

10

11   65.   (2)    ITS FALSITY: Despite Defendants having a surplus of means to perform,

12              Defendants misrepresented material facts, both to induce Plaintiff to

13              manufacture Goods, and thereafter to induce Plaintiff to forbear seeking

14              judicial relief, including Defendants knowing of facts materially affecting

15              their ability to fulfill their performance of the Contract, which it knew or

16              should have known, which were not known by Plaintiff, and failed to

17              disclose the same. Defendants had the means to make payment on demand,

18              or by surety, despite their ongoing denials to have any means to do so.

19

20   66.   (3)    ITS MATERIALITY: Upon information and belief, the misrepresentations

21              and/or omissions were vitally material, and Defendants knew them to be

22              so. The misrepresentations and/or omissions were sufficiently important to

23              influence, and did influence, Plaintiff's actions and performance under the

24              Contract, which were reasonable under the circumstances.

25

26   67.   (4)    THE SPEAKER'S KNOWLEDGE OF ITS FALSITY: Upon information

27              and belief, Defendants' representations were chronically false at the time

28              they were made, and Defendants knew them to be completely false.

68.  (5)    THE SPEAKER'S INTENT THAT IT BE ACTED UPON BY THE
            RECIPIENT IN THE MANNER REASONABLY CONTEMPLATED:
            Upon information and belief, Defendants intended that Plaintiff would act
            upon the representations and/or omissions such that Plaintiff would
            manufacture Goods, which he did produce, and/or that Plaintiff would
            foergo seeking immediate Equity or payment from Defendants.

69.  (6)    THE HEARER'S IGNORANCE OF ITS FALSITY: At the time the
            misrepresentations and/or omissions alleged herein were made by
            Defendants, Plaintiff was not aware of their falsity, and he justifiably
            relied upon them.

70.  (7)    THE HEARER'S RELIANCE ON ITS TRUTH: Plaintiff had traveled to
            Utah for the purpose of performing obligations under the Contract, and was
            dependent on relying upon Defendants for facilitating the manufacture of
            Goods, believing in the truthfulness of their dealings and for the means of
            returning back home to Tucson, Arizona.

71.  (8)    THE RIGHT TO RELY ON IT:  Plaintiff having traveled nearly 1,000 miles
            from Tucson, Arizona to Eden, Utah, for the purpose of manufacturing
            Goods at a remote work site, controlled exclusively by Defendants, Plaintiff
            justifiably relied upon their representation of material facts to be true.

72.  (9)    HIS CONSEQUENT AND PROXIMATE INJURY: As a direct and
            proximate result of Defendants' conduct under A.R.S. 44-1211, Plaintiff has
            been substantially damaged by Defendants, as defined in the First Cause of
            Action, defined in paragraphs 38 – 60 herein.

73.     Upon information and belief, Defendants' conduct was wanton and/or reckless and/or shows a reckless indifference in the interests of others, and Plaintiff therefore also demands Punitive Damages for the acts alleged herein.

74.     The amount Plaintiff prays for in Punitive Damages is up to a 100% penalty, which effectively DOUBLES the amount of the First Cause of Action.

75.     This action arises out of civil action. Pursuant to A.R.S. 12-341, Plaintiff is entitled to recover his reasonable costs.

75.     WHEREFORE, Plaintiff James Arnett, prays that judgment be entered in his favor on his Second Cause of Action for DOUBLE, meaning a sum of up to $1,227,445.40 US Dollars ($613,722.70 US Dollars multiplied by a factor of two) for Fraud, together with $1,097,440.00 US Dollars ($548,720.00 multiplied by a factor of two) in Consequential and Incidental Damages, with pre- and post-judgment interest, as set forth in this Complaint, including the costs of the preparation of this Case of no less than $1,500.00 in the event of default, and such other relief as this honorable Court may find appropriate.

76.                     **THIRD CAUSE OF ACTION**

                                **FRAUD**

77.     All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

78.     Plaintiff alleges that the conduct of Defendants Howard, Ben Howard Trust, in regard to the issue of their misrepresentation of the value, condition and year of manufacture of the motorcycle [VIN# JS1VX51LOR2102837] transferred to Plaintiff, qualifies as Fraud, meeting ALL NINE ELEMENTS OF FRAUD:

79.  (1)    A REPRESENTATION: Upon information and belief, Defendants made material misrepresentations and/or omissions regarding the electrical and mechanical condition, as well as the worth of said Motorcycle to induce Plaintiff into continuing labor to produce said Goods, as a "bonus" incentive, while Equity or payment were stalled for reasons known only to Defendants at the time – with the understanding that this was a "bonus" until Defendants could resolve their internal issues halting their performance of Fiduciary Duties to Plaintiff for the Contract referenced herein.

80.  (2)    ITS FALSITY: Defendants misrepresented material facts, which it knew or should have known, which were not known by Plaintiff, and failed to disclose the same. Defendants stated that the vehicle was a 1995 model, as it appears on the Bill Of Sale, but was in fact a 1994 model and not worth "more than $3,000.00 US Dollars, as Defendants claimed. Its real worth was approximately $1,200.00 US Dollars.  Defendants further stated that the vehicle was recently serviced from top to bottom and was capable of riding safely across the country, when in fact, the electromechanical condition of the vehicle was unsafe to the point of being extraordinarily dangerous without adequate brake pads and not dependable, as it made it as far as Kanab, Utah before failing and required battery service from a professional mechanic. The Brakes were indeed, grinding metal on metal.

81.  (3)    ITS MATERIALITY: Upon information and belief, the misrepresentations and/or omissions were vitally material, and Defendants knew them to be so. The misrepresentations and/or omissions were sufficiently important to influence, and did influence, Plaintiff's actions, which were reasonable under the circumstances.

82. (4)   THE SPEAKER'S KNOWLEDGE OF ITS FALSITY: Upon information and belief, Defendants' representations were false at the time they were made, and Defendants knew them to be completely false.

83. (5)   THE SPEAKER'S INTENT THAT IT BE ACTED UPON BY THE RECIPIENT IN THE MANNER REASONABLY CONTEMPLATED: Upon information and belief, Defendants intended that Plaintiff would act upon the representations and/or omissions such that Plaintiff would continue to manufacture Goods, which he did produce, and/or that Plaintiff would accept said "bonus" as a surety for Equity or payment.

84. (6)   THE HEARER'S IGNORANCE OF ITS FALSITY: At the time the misrepresentations and/or omissions alleged herein were made by Defendants, Plaintiff was not aware of their falsity, and he justifiably relied upon them.

85. (7)   THE HEARER'S RELIANCE ON ITS TRUTH: Plaintiff had traveled to Utah for the purpose of performing his obligations under the Contract, and was dependent on relying upon Defendants for facilitating his travel back to Tucson, Arizona. Defendants had offered this incentive in lieu of air travel. Plaintiff believed Defendant Howard that a warm, late summer ride from Utah to Arizona would be a scenic, leisurely adventure, even though Plaintiff was as inexperienced rider.

86. (8)   THE RIGHT TO RELY ON IT:  Due to Defendant Howard's recent marriage, he rented a new home in Layton, Utah. Remaining at the Eden, Utah residence was no longer an option so Plaintiff had to leave the premises in the immediate future. Because Plaintiff was uncertain about transporting

a motorcycle over such a long distance, he inquired in great detail about the condition of the vehicle before agreeing to ride it nearly 1,000 miles home. Defendant Howard attested to the truthfulness of the facts he represented. Therefore, Plaintiff justifiably relied upon their representation of material facts to be true.

87.   (9)   HIS CONSEQUENT AND PROXIMATE INJURY: As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged by Defendants to the amount they represented, $3,500.00 US Dollars, for what Plaintiff was led to believe by Defendants that he was receiving.

88.   Additionally, pursuant to A.R.S. 47-2710, Plaintiff is further entitled to all incidental and consequential damages, inclusive of an additional $750.00 for repairs and parts.

89.   Upon information and belief, Defendants' conduct was wanton and/or reckless and/or shows a reckless indifference in the interests of others, and Plaintiff therefore also demands Punitive Damages for the acts alleged herein.

90.   The amount Plaintiff prays for in Punitive Damages is up to a 100% penalty, which effectively DOUBLES the amount of the First Cause of Action.

91.   This action arises out of civil action. Pursuant to A.R.S. 12-341, Plaintiff is entitled to recover his reasonable costs.

92.   WHEREFORE, Plaintiff James Arnett, prays that judgment be entered in his favor on his Third Cause of Action for DOUBLE, meaning a sum of up to $7,000.00 US Dollars ($3500.00 US Dollars multiplied by a factor of two) for Fraud, together with $1,500.00 US Dollars ($750.00 US Dollars multiplied by a factor of two) in

1    Consequential and Incidental Damages, with pre- and post-judgment interest, as set forth

2    in this Complaint, including the costs of the preparation of this Case of no less than

3    $1,500.00 in the event of default, and such other relief as this honorable Court may find

4    appropriate.

5

6    93.                 **FORTH CAUSE OF ACTION**

7                       **ENDANGERMENT**

8

9    94.      All of the preceding and subsequent paragraphs of this Complaint are hereby

10    incorporated into this cause of action as though set forth in full herein.

11

12    95.      Plaintiff alleges that the conduct of Defendants Howard, Nationwide Affordable

13    Housing Inc., Life Line Media LLC, and the Ben Howard Trust, in regard to the issue of

14    Endangering Plaintiff , qualifies as such, under A.R.S. 13-1201, meeting BOTH

15    ELEMENTS FOR ENDANGERMENT:

16

17    96.    **(1)**      **Recklessly endangering another person,**

18        **(2)**      **with a substantial risk of imminent death or physical injury.**

19

20    97.      Plaintiff alleges that Defendants' conduct was wanton and/or reckless and/or shows

21    a reckless indifference in the interests and safety of Plaintiff. For reason of Defendant

22    Howard allegedly having foreknowledge of the condition of the motorcycle brakes, yet

23    knowingly and willingly remaining silent, delaying departure until the worst possible

24    weather conditions, Plaintiff's allegation is the following: That Defendant Howard did so

25    with aforethought, in order to deliberately place Plaintiff James Arnett in great mortal

26    danger, as a means of covering up his alleged acts of Fraud against Plaintiff, and as a

27    means of eliminating the individual with a significant debt owed to him, specifically,

28    Plaintiff James Arnett.

98.    Plaintiff further alleges that Defendant Howard schemed to intentionally cause the catastrophic injury or death of Plaintiff James Arnett, by subtle means (which might never have been detected, and determined to be an "accident" by authorities), making Defendant Howard liable for Endangerment under A.R.S. 13-1201.

99.    The amount Plaintiff prays for in Punitive Damages is an amount, as high as the estimated combined assets of Defendants ($4,000,000 US Dollars), in order to provide the Court sufficient latitude, as it shall deem necessary and just, to exercise the broad powers and authority of this honorable Court, for the purpose of deterring the continuation of such habitual behavior by Defendants, by awarding a commensurate and effective amount to Plaintiff to achieve that deterrent result.

100.   This action arises out of civil action. Pursuant to A.R.S. 12-341, Plaintiff is entitled to recover his reasonable costs.

101.   WHEREFORE, Plaintiff James Arnett, prays that judgment be entered in his favor on his Forth Cause of Action for any amount up to $4,000,000.00 US Dollars, with pre- and post-judgment interest, as set forth in this Complaint, including the costs of the preparation of this Case of no less than $1,500.00 in the event of default, and such other relief as this honorable Court may find appropriate.

102. Additionally, Plaintiff prays for the power of Subpena in order to unseal Utah State Court records of cash awards made to Defendant Howard in 2007, to demonstrate said estimated, combined assets of Defendants, in order to justify the amount of Punitive Damages.

103.   Upon information and belief, Plaintiff prays that this honorable Court forward copies of those same records to Utah State Law Enforcement investigators in order to

1  compare to Defendant Howard's alleged applications for State public assistance and for

2  receiving the benefit thereof for substantial medical payments over several years, which he

3  may have defrauded from the same. Currently, Utah investigators do not have Probable

4  Cause to unseal those records, based on Plaintiff's reported allegations alone.

5

6

7  Respectfully submitted this 7th day of January 2013.

8

9

10

11

12

13

14

15

16  James Arnett, In Propria Persona (I.F.P.)

17  9288 N. Monmouth Court

18  Tucson, Arizona 85742

19  (520)878-9779 (home)

20  (520)304-0129 (field)

21  jamesarnettaz@gmail.com (email)

22

23

24

25

26

27

28

**4:12-CV-00311-DCB-DTF**

**FIRST AMENDED COMPLAINT PRIMA FACIE**

**EXHIBIT LIST**

**7 JANUARY 2013**

| | | | | |
|---|---|---|---|---|
| (A) | Affidavit: Steven M. Adelson | | (L) | Doc. 101 Huddleston vs. Howard |
| (B) | Affidavit: Edgar A. Ybarra | | (M) | Motorcycle |
| (C) | Field Phone Records | | (N) | Bill Of Sale & Insurance Card |
| (D) | Plane Reservations | | (O) | Huntsville Property |
| (E) | Payment Into Forum | | (P) | DigiDesign Mbox2 |
| (F) | CSS Emails Into Forum | | (Q) | Motion Picture On Vimeo |
| (G) | Defendants Book | | (R) | Motorcycle Brake Pad |
| (H) | Affidavit: Gerren B. Ard | | (S) | Invoice |
| (I) | NAH Corporate Record | | (T) | Defendants Negotiation Email |
| (J) | Life Line Corporate Record | | (U) | Prevailing Price |
| (K) | Nevada Real Estate | | (V) | James Arnett with Gerren Ard |
| | | | (W) | CineMatrix Software Suite |

# EXHIBIT "A"

## MR. ADELSON'S STATEMENT

In or around February 2011, I attended a gathering of individuals in the apartment of James Arnett of Tucson, Arizona. At the time, Mr. Arnett was editing his feature motion picture BLOCKED. The purpose of this gathering was to look over the progress of this movie and offer comments.

I recognize the individual in the two photographs below. Although I do not recall his name, I do recall seeing him at the apartment on the evening Mr. Arnett presented his film. I also recall Edgar A. Ybarra was also there on the same occasion.

State of Arizona
County of Pima
On this _9th_ day of _OCT_ 20_12_, _STEVEN M. ADELSON_ personally appeared before me whose identity I proved on the basis of satisfactory evidence to be the signer of the above instrument and he/she acknowledged that he/she executed it

_Lauren Day_
Notary Public

OFFICIAL SEAL
LAUREN DAY
NOTARY PUBLIC-ARIZONA
PIMA COUNTY
My Comm. Exp. Sept. 6, 2016

Steven M. Adelson
(520)721-4233

AZ-DL B14644601
AZ License

10-9-12
Date




Photographs of Ben S. Howard from his Facebook.com page at http://www.facebook.com/benshoward

# EXHIBIT "B"

### MR. YBARRA'S STATEMENT

I recognize the individual in the two photographs below from James Arnett's apartment in Tucson, Arizona, where I saw him, in or around February 2011.

I also recall Steven M. Adelson there on the same occasion, as we were looking over the progress of Arnett's "Blocked" film.

State of Arizona
County of Pima

On this _9th_ day of _OCT_ 20_12_, _EDGAR A. YBARRA_ personally appeared before me whose identity I proved on the basis of satisfactory evidence to be the signer of the above instrument and he/she acknowledged that he/she executed it.

_____
Notary Public

OFFICIAL SEAL
LAUREN DAY
NOTARY PUBLIC-ARIZONA
PIMA COUNTY
My Comm. Exp. Sept. 6, 2016

Edgar A. Ybarra
(520)480-8943

AZ DL D01404643   9/45
AZ License

10-9-12
Date

 

Photographs of Ben S. Howard from his Facebook.com page at http://www.facebook.com/benshoward

# EXHIBIT "C" 1 of 2

## Payment History     Inbox   x

AL-MUNT CORP cellphonecity1@yahoo.com          2:08 PM (10 minutes ago)
to me

*Khalifa Riad Muntasser*

Office: 520-579-6679

Corporate Headquarters
3720 W Ina Rd, Suite 134
Tucson, AZ 85741

📄 **Payment History List.docx**
   35K   View   Download

### account summary

| Name | BEN HOWARD | | Amount Due | $0.00 |
|------|-----------|---|-----------|-------|
| **Account Number** | 340-9367508-1 | | **Future Charges** 10/09/2012 | $70.76 |
| **Billing Address** | PO BOX 223 HUNTSVILLE, UT 84317   Edit | | **My Bill** | View |
| **Status** | Active | | | |
| **Automatic Bill Pay** | Not Enrolled | | | |
| | | | | BridgePay Request |

**Current Lines of Services**
Wireless Lines: 2          Broadband Lines: 0

(520) 304-0129
(520) 358-3638

Top of Form

/» EPD» UKLTcz\

Payment History List

🖥 Re-print Receipt  ⊗ Cancel

## EXHIBIT "C" 2 of 2

| Provider | Product | Date | Account ID | Confirmation ID | Payment | LD | Fee | Total | User | Payment Method | C H e d | e d | Action |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cricket | Service Payment | 6/12/2012 1:10:34 PM | 5203040129 | QPAYWP327000285 | $34.00 | $0.00 | $3.00 | $37.00 | 12350041 | Cash | | | |
| Cricket | Service Payment | 5/10/2012 1:41:41 PM | 5203040129 | QPAYWP318931571 | $70.76 | $0.00 | $3.00 | $73.76 | 12350041 | Cash | | | |
| Cricket | Service Payment | 4/12/2012 1:57:49 PM | 5203040129 | QPAYWP311738909 | $70.76 | $0.00 | $3.00 | $73.76 | 12350041 | Cash | | | |
| Cricket | Service Payment | 1/11/2012 2:25:31 PM | 5203040129 | QPAYWP287903708 | $70.76 | $0.00 | $3.00 | $73.76 | 12350041 | Cash | | | |
| Cricket | Service Payment | 3/1/2011 4:46:03 PM | 5203040129 | QPAYWP208041189 | $117.00 | $0.00 | $3.00 | $120.00 | 12350041 | Cash | | | |
| Cricket | Service Payme | 2/9/2011 5:56:07 PM | 5203040129 | QPAYWP203002596 | $38.00 | $0.00 | $3.00 | $41.00 | 12350041 | Cash | | | |
| Cricket | Service Payment | 1/11/2011 4:57:31 PM | 5203040129 | QPAYWP196039484 | $37.40 | $0.00 | $3.00 | $40.40 | 12350041 | Cash | | | |
| Cricket | Service Payme | 12/30/2010 5:01:59 PM | 5203040129 | QPAYWP193102386 | $39.78 | $0.00 | $3.00 | $42.78 | 12350041 | Cash | | | |

# EXHIBIT "D"

**Changes have been made to your 6/5/2011 flight**      BEN x 

Expedia Travel Services notifications@expedia.com     5/28/11
to me

### Your Flight Details Have Changed

**Passenger(s):** ARNETT/JAMES
**Expedia Itinerary Number:** 137137017384
**United Airlines confirmation code:** T1FX7M

Dear Expedia Traveler,

United Airlines made the following change(s) to your itinerary:

* Changed the flight number for 2 of your flights.

Airlines will occasionally adjust flight schedules. United Airlines has done their best to find an alternative that offers minimal disruption to your trip and we have updated your itinerary accordingly. It is not necessary to call us regarding the change.

Your updated flight itinerary is below, and you can always view your most up-to-date itinerary at Expedia.

**Tucson to Denver**

| Flight Change Details | Sunday, Jun 05, 2011 at 8:42 AM | Change in Flight |
|---|---|---|
| | United Airlines | Flight Number: UA6279 6858 (change) |
| | From: (TUS) Tucson AZ, USA | Depart: 8:42 AM |
| | To: (DEN) Denver CO, USA | Arrive: 11:40 AM |
| | Status: CONFIRMED | Class: Coach |
| | Equipment: CRJ-700 Canadair Regional Jet | Seat: 13B |
| | Operated By: /UNITED EXPRESS/SKYWEST AIRLINES(UA) | |

**Denver to Salt Lake City**

| Flight Change Details | Sunday, Jun 05, 2011 at 1:56 PM | Change in Flight |
|---|---|---|
| | United Airlines | Flight Number: UA6727 6617 (change) |
| | From: (DEN) Denver CO, USA | Depart: 1:56 PM |
| | To: (SLC) Salt Lake City UT, USA | Arrive: 3:27 PM |
| | Status: CONFIRMED | Class: Coach |
| | Equipment: CRJ-700 Canadair Regional Jet | Seat: |
| | Operated By: /UNITED EXPRESS/SKYWEST AIRLINES(UA) | |

Sincerely,
The Expedia Travel Team

---

Please do not reply to this e-mail as this mailbox is not monitored.

You are receiving this transactional email based on a recent booking or account-related update on Expedia.com.

CONTACT US
To contact us or send feedback, please click here or contact us via postal mail at: Expedia, Inc., attn: EMC Team, 333 108th Avenue NE, Bellevue, WA 98004. For additional assistance, visit the Expedia Customer Support Center, or call 1-800-Expedia.

CST# 2029030-40

@2009 Expedia, Inc. All rights reserved. ... plane logos are registered trademarks, or trademarks ... entioned herein may be trademarks of their respec...

For internal use only
* TPID: 1
* TUID: 230468985
* Itinerary Number: 137137017384

OQPOTG

| from: | James Arnett jamesarnettaz@gmail.com |
|---|---|
| to: | B Howard <elderb123@gmail.com> |
| date: | Sat, May 28, 2011 at 9:52 AM |
| subject: | Fwd: Changes have been made to your 6/5/2011 flight |
| mailed-by: | gmail.com |

**EXHIBIT "E"**



# EXHIBIT "F"

| Sender | Subject / Preview | Date |
|---|---|---|
| me | Want to read my story? - Don't share it with anyone. | 11/15/11 |
| Jason, me (2) | Jason Mallory - 2004 Robot Movie Project - Hi Jason, I want over your material. I saw that video for the exoskeleton before and I want o... | 11/1/11 |
| B Howard | File names - Promo01 DSC_6163.mov promo 01.wav Promo02 DSC_6164.mov promo 02.wav Promo03 DSC_6165.mov promo 03.wav | 10/21/11 |
| me | Utah film directory - http://kut.reel-scout.com/crew_login.aspx | 8/31/11 |
| Kimber, me (3) | Fwd: This is about funding anything... Info from Kimber Forwarded message From: Kimber-leigh <kimberaleigh@mac.com... | 6/27/11 |
| DAWN, Connie (3) | FW: SPECIAL GUEST FILMMAKER Available- Free of charge - Thank you kindly for your offer. Dawn, but there's more to finishing the g... | 6/11/11 |
| Expedia, me (2) | Changes have been made to your 6/5/2011 flight - Forwarded message From: Expedia Travel Services <notifications@expedia.com... | 5/28/11 |
| Expedia, me (3) | Expedia travel confirmation - Salt Lake City, UT (2) - Jun 05, 2011 - (Itin# 1371737011384) - Forwarded message From: Expedia Travel S... | 5/24/11 |
| me | Extensions - See if these get there! | 2/4/11 |
| B, me (8) | Web - Here are two Dreamweaver Extensions you need to install from within Dreamweaver. You will need two | 1/25/11 |
| B Howard | Cleaned up version - Cleaned up version | 11/14/10 |
| B Howard | more - more | 11/14/10 |
| B Howard | Web stuff - Web Stuff | 11/14/10 |
| B Howard | Covers - Covers | 11/12/10 |
| me | Examples - See if you like the samples of this type of content presentation. http://www.projectseven.com/ | 11/12/10 |
| me | Look - http://www.jamesarnett.com/sites/dac.kit/images.html | 11/9/10 |
| me, B (4) | Cell Test - What happened to you? On Mon, Aug 9, 2010 at 9:47 AM, James Arnett <jamesarnettaz@gmail.com> | 8/9/10 |
| me, B (2) | Skype - Tried to reach you but you didn't show up online. my skype is on and will stay on for the evening | 5/24/10 |
| me | Great News! - Hi Ben, My friend Robert wanted to know more about the real estate collateral behind the film. Can | 5/4/10 |
| me, Robert (17) | | |
| me (2) | New Images - More :) On Thu Apr 29, 2010 at 1:55 PM, James Arnett <jamesarnettaz@gmail.com> wrote: Cool | 4/29/10 |

**EXHIBIT "G"**



# EXHIBIT "H"

## MR. ARD'S STATEMENT

I, Gerren Ard, am a graphic artist and designer for multimedia production. I have a Bachelor of Arts degree in the field of Video Game Art and Design (GAD) and a Bachelor of Science Degree in Computer Information Systems (CIS). I have been an artist in the field for many years and worked directly with Mr. James Arnett on several successful projects since 2007, and I know his character very well.

I make the following statements under oath, swearing them to be the truth, which I can testify to honestly because I was a firsthand witness, directly involved with the matter of this case. I have read the complaint (**Document 1**) written by Mr. Arnett.

**I testify to the accuracy of paragraph 7.** I was called by telephone, by Mr. Arnett, who introduced me to Mr. Ben S. Howard on the telephone around June 8[*], 2011. At that time, I had accepted the offer of a job working on Mr. Howard's project in Utah. He bought me an airline ticket and I flew to Utah to work for him several weeks later.

**I testify to the accuracy of paragraph 10.** I was in Utah from July 25[*], 2011 to or around October 13th 2011, around a week after Mr. Arnett's departure from Utah in early October 2011. I can attest to everything he described after my arrival in Utah.

**I testify to the accuracy of paragraphs 12 through 34.** I was a firsthand witness. I saw and heard everything in the complaint, while living at the work site in Utah with Mr. Howard and Mr. Arnett until about October 13[*], 2011, and also afterwards while working with Mr. Arnett in Tucson.

The complaint from Mr. Arnett, while extensive and detailed, still doesn't fully convey the scope of Mr. Howard's petty actions, irresponsibility and deceptions. There are many more things I have to add, that will wait upon my opportunity to formally testify about not being paid-in-full for the work I have done for Mr. Howard. This complaint and testimony, I believe, would further illustrate the bad faith Mr. Howard practiced at what seemed to be any and every opportunity to take advantage of Mr. Arnett and myself.

STATE OF ARIZONA }ss
COUNTY OF PIMA }

This instrument was acknowledged before me this 19th day of
October, 20 12, by Gerren B. Ard.
In witness whereof I hereunto set my hand and official seal.
NOTARY PUBLIC

MIRIAM K. PATINO
NOTARY PUBLIC - ARIZONA
PIMA COUNTY
My Commission Expires
June 30, 2014

Gerren B. Ard
(520) 792-1847

B14922374
AZ License

10/19/12
Date

## EXHIBIT "I" 1 of 3

Link to Window on State Government - Susan
Combs, Texas Comptroller of Public
Accounts

Susan Combs, Texas Comptroller of Public
Accounts

. image of star

<u>Taxable Entity Search Results</u>

# Franchise Tax Certification of Account Status

### This Certification Not Sufficient for Filings with Secretary of State

<u>Obtain a certification</u> for filings with the Secretary of State.

It takes up to two weeks for this search to update when payment is made through the mail or
at a taxpayer service office. This agency may manually issue a Certificate of Account Status
(good standing) when an entity makes a payment to bring its account current. The paper
certificate issued by our office is valid and represents the entity's status with our office as of
the date of the certificate.

| Certification of Account Status | Officers And Directors Information |
|---|---|
| Entity Information: | **NATIONWIDE AFFORDABLE HOUSING, INC.**<br>2324 CHEEK SPARGER RD<br>BEDFORD, TX 76021-2678 |
| Status: | **NOT IN GOOD STANDING** |
| Registered Agent: | BEN S HOWRAD<br>1100 WEST PIPELINE STE. 202<br>HURST, TX 76053 |
| Registered Agent Resignation Date: | |
| State of Formation: | TX |
| File Number: | 0135849400 |
| SOS Registration Date: | June 8, 1995 |
| Taxpayer Number: | 30117844982 |

**Susan Combs**, Texas Comptroller • Window on State Government • Contact Us
Privacy and Security Policy | Accessibility Policy | Link Policy | Public Information Act | Compact with
Texans

## EXHIBIT "I" 2 of 3

Link to Window on State Government - Susan
Combs, Texas Comptroller of Public
Accounts

Susan Combs, Texas Comptroller of Public
Accounts

image of star

Taxable Entity Search Results

# Officers and Directors

### NATIONWIDE AFFORDABLE HOUSING, INC.

Return to: Taxable Entity Search Results

Officer and director information on this site is obtained from the most recent Public Information Report (PIR) processed by
the Secretary of State (SOS). PIRs filed with annual franchise tax reports are forwarded to the SOS. After processing, the
SOS sends the Comptroller an electronic copy of the information, which is displayed on this web site. The information will
be updated as changes are received from the SOS.

You may order a copy of a Public Information Report from open.records@cpa.state.tx.us or Comptroller of Public
Accounts, Open Government Division, PO Box 13528, Austin, Texas 78711.

| Title | Name and Address | Expiration/Resignation Date |
|-------|------------------|------------------------------|
| PRESIDENT | REN S HOWARD<br>2324 CHEEK SPARGER RD<br>BEDFORD , TX 76021 | |

texas.gov | Statewide Search from the Texas State Library | State Link Policy | Texas Homeland
Security

**Susan Combs**, Texas Comptroller • Window on State Government • Contact Us
Privacy and Security Policy | Accessibility Policy | Link Policy | Public Information Act | Compact with
Texans

# EXHIBIT "I" 3 of 3

Texas Comptroller Stationary

September 30, 2012

## CERTIFICATE OF ACCOUNT STATUS

This is in response to your inquiry about the status of

**NATIONWIDE AFFORDABLE HOUSING, INC.**

This entity is not in good standing as it has not satisfied all franchise tax requirements.

If you need any additional information or assistance, please contact the Texas State Comptroller's field office in your area or call (800) 252-1381, toll free, nationwide. The Austin number is (512) 463-4600.

Taxpayer number: 30117844982
File number: 0135849400

Form 05-342 (Rev. 12-07/14)

## EXHIBIT "J" 1 of 2

A Secure Online Service from Utah.gov

# Utah Business Search - Details

# LIFELINE MEDIA, LLC

Update this Business

**Entity Number:** 7977714-0160
**Company Type:** LLC - Domestic
**Address:** 6204 E 1800 N Eden, UT 84310
**State of Origin:**
**Registered Agent:** BEN HOWARD
**Registered Agent Address:**
6204 E 1800 N(EDEN UT 84310) PO BOX 223
Huntsville, UT 84317

View Management Team

**Status: Active**

Purchase Certificate of Existence

**Status:** Active *as of 04/21/2011*
**Renew By:** 04/21/2013
**Status Description:** Good Standing
**Employment Verification:** Not Registered with Verify Utah

**History**

View Filed Documents

**Registration Date:** 04/21/2011
**Last Renewed:** 05/08/2012

**Additional Information**

**NAICS Code:** 9999 **NAICS Title:** 9999-Nonclassifiable Establishment

**Former Business Names**

RFA FINANCIAL UT, LLC

« Back to Search Results

## EXHIBIT "J" 2 of 2

Rfa Financial Ut, LLC
Claim this Profile
**Address:**
6204 E 1800 N
Eden, Utah
84310-9508
Phone:
Website:
Category:
No Information Provided
No Information Provided
Investment Advice,
Investment Advice
This is My Company

Research This Company

- Summary
- Photos

Contact:      Ben Howard Est. Total Employees: 2
State of Inc: UT          Year Established:      2011
                         Est. Total Sales:      $ 91,000.00

# Basic Review

No Information Provided
RFA FINANCIAL UT, LLC

# EXHIBIT "K"

| ENTITY NAME | NEVADA ID | REG. NUMBER | FILE DATE |
|---|---|---|---|
| 4113 JEFFS HOLDINGS LLC | NV20111311527 | E0263972011-9 | 5/9/2011 |
| 4113 JEFFS PROPERTIES LLC | NV20111311536 | E0263982011-0 | 5/9/2011 |
| COUNT FLEET PROPERTIES LLC | NV20111343144 | E0291042011-2 | 5/20/2011 |
| COUNT FLEET ENTERPRISES LLC | NV20111344176 | E0291922011-8 | 5/20/2011 |
| 181 EAST HOLDINGS LLC | NV20111357905 | E0303792011-6 | 5/26/2011 |
| 181 EAST PROPERTIES LLC | NV20111358023 | E0303902011-1 | 5/26/2011 |
| 6622 WEST HOLDINGS LLC | NV20111369434 | E0313612011-8 | 6/1/2011 |
| 6622 WEST PROPERTIES LLC | NV20111369512 | E0313692011-6 | 6/1/2011 |
| 655 SOUTH HOLDINGS LLC | NV20111430635 | E0367982011-5 | 6/28/2011 |
| 655 SOUTH PROPERTIES LLC | NV20111430690 | E0368032011-3 | 6/28/2011 |
| SUMMER MEADOW ENT. LLC | NV20111470892 | E0402792011-6 | 7/18/2011 |
| SUMMER MEADOW PROP. LLC | NV20111470918 | E0402812011-0 | 7/18/2011 |
| BIRCHTREE HOLDINGS LLC | NV20111497223 | E0426782011-3 | 7/28/2011 |
| BIRCHTREE PROPERTIES LLC | NV20111497299 | E0426842011-1 | 7/28/2011 |
| WILD MAPLE HOLDINGS LLC | NV20111498130 | E0427602011-4 | 7/29/2011 |
| WILD MAPLE PROPERTIES LLC | NV20111498239 | E0427682011-2 | 7/29/2011 |
| SNOW PEAK HOLDINGS LLC | NV20111502143 | E0431202011-2 | 8/1/2011 |
| SNOW PEAK PROPERTIES LLC | NV20111502213 | E0431272011-9 | 8/1/2011 |
| DUSKYWING HOLDINGS LLC | NV20111502519 | E0431532011-1 | 8/1/2011 |
| DUSKYWING PROPERTIES LLC | NV20111502617 | E0431582011-6 | 8/1/2011 |
| CRIMSON PATCH HOLDINGS LLC | NV20111502798 | E0431692011-3 | 8/1/2011 |
| CRIMSON PATCH PROPERTIES LLC | NV20111502849 | E0431732011-5 | 8/1/2011 |
| EAST CIRCLE HOLDINGS LLC | NV20111518479 | E0445692011-5 | 8/7/2011 |
| 3114 SOUTH HOLDINGS LLC | NV20111530094 | E0455922011-6 | 8/11/2011 |
| 3114 SOUTH PROPERTIES LLC | NV20111530115 | E0455942011-8 | 8/11/2011 |
| SOUTH SILVERADO HOLDINGS LLC | NV20111613114 | E0529902011-3 | 9/24/2011 |
| SOUTH SILVERADO PROP. LLC | NV20111613133 | E0529912011-4 | 9/24/2011 |
| BURNING OAK HOLDINGS LLC | NV20111653889 | E0566512011-1 | 10/14/2011 |
| BURNING OAK ENTERPRISES LLC | NV20111654062 | E0566622011-4 | 10/14/2011 |
| 4819 ENOCH HOLDINGS LLC | NV20111671845 | E0582432011-1 | 10/25/2011 |
| 4819 ENOCH PROPERTIES LLC | NV20111671924 | E0582492011-7 | 10/25/2011 |
| 3839 WEST HOLDINGS LLC | NV20111677091 | E0587232011-2 | 10/27/2011 |
| 3839 WEST PROPERTIES LLC | NV20111677129 | E0587252011-4 | 10/27/2011 |
| 138 SOUTH HOLDINGS LLC | NV20111679001 | E0588982011-2 | 10/28/2011 |
| 138 SOUTH PROPERTIES LLC | NV20111679038 | E0589022011-9 | 10/28/2011 |
| 530 EAST HOLDINGS LLC | NV20111679064 | E0589042011-1 | 10/28/2011 |
| 530 EAST PROPERTIES LLC | NV20111679103 | E0589082011-5 | 10/28/2011 |

## EXHIBIT "L" 1 of 2

FILED IN CHAMBERS
U.S.D.C. - Atlanta

AUG 0 7 2012

James N. Hatten, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PAT HUDDLESTON, II,

          Plaintiff

v.

                    CIVIL ACTION NO.
                    1:09-CV-2799-ODE

GRAFTON ENTERPRISES MIDWAY
LLC, BENJAMIN HOWARD, and
GRAFTON ENTERPRISES, LLC,

          Defendants

### ORDER

    This breach of contract case is before the Court on Defendant Benjamin Howard's ("Howard's") Renewed Motion for Summary Judgment [Doc. 95], to which Plaintiff Pat Huddleston II ("Huddleston") has responded in opposition [Doc. 99] and Howard has replied in support [Doc. 100].

    For the reasons discussed below, Howard's Renewed Motion for Summary Judgment [Doc. 95] is DENIED.

I.   Case History

    As detailed in the Court's February 17, 2011 and June 28, 2009 orders [Docs. 89, 62], this case is an ancillary proceeding to Civil Action No. 1:08-CV-0011-ODE, in which the United States Securities and Exchange Commission ("SEC") filed suit against James A. Jeffrey ("Jeffrey"), Thomas E. Repke ("Repke"), and several entities known in this case as the "Coadum Defendants" (including Mansell Capital Partners III, LLC ("Mansell")). The SEC alleged that the Coadum Defendants, which Jeffrey and Repke controlled and directed, operated a massive Ponzi scheme that

## EXHIBIT "L" 2 of 2

defrauded investors out of approximately $30 million. On January 3, 2008, the Court issued a temporary restraining order in Civil Action No. 1:08-CV-0011-ODE, in which it appointed Plaintiff Huddleston as Receiver for the estates of the Coadum Defendants.

Huddleston, as Receiver, brought this action to hold Defendants Howard, Grafton Enterprises Midway LLC ("Grafton Midway"),[1] and Grafton Enterprises, LLC ("Grafton") liable for events that occurred prior to the establishment of the Receivership. In or around May 2007, Mansell — one of the Coadum Defendants — sought to acquire a parcel of real property located in Midway, Utah (the "Property"), owned at that time by Harbor Capital Partners ("Harbor") [Doc. 51-7]. Mansell decided to use Grafton as a straw buyer to conceal from Harbor its involvement in the transaction: Grafton would purchase the Property from Harbor on Mansell's behalf and would then transfer the Property to Mansell [Id.]. At that time, it is undisputed that Howard at least served as a manager for Grafton [Doc. 95-2 at 5; Doc. 99-1 at 3]. Mansell agreed in a signed contract to pay Grafton $25,000 regardless of whether the transaction was successful, as well as an additional $175,000 in commission if Grafton successfully bought and transferred the property to Mansell [Doc. 51-7].

---

[1]Although the existence of Grafton Midway is not in dispute, it is not clear that the company was involved in the events that formed the basis for this civil action. Grafton Midway is represented by the same counsel retained by Howard, but has filed no pleadings in this case since the April 21, 2010 answer, filed by Grafton Midway and Howard, to Huddleston's complaint [Doc. 25]. Further, Huddleston's first and second amended complaints do not specifically allege that Grafton Midway was involved in the events for which Huddleston seeks damages.

**EXHIBIT "M"**





**EXHIBIT "N"**



Utah State Tax Commission

TC-843
Rev 7/06

# Bill of Sale

Division of Motor Vehicles - 210 North 1950 West - Salt Lake City, Utah 84134 - Telephone (801) 297-7780

| Automobile | Light Truck, Van or Util. | Heavy Truck (over 12,000 lbs) | Trailer |
| ✔ Motorcycle | Off-Highway Vehicle | Snowmobile | Boat |

In consideration of _____ Dollars ($_____)

paid to me by   JAMES ARNETT
_____
Buyer

I, _____ do hereby sell and convey to the
Seller

buyer the following vehicle, as is:   1995   SUZUKI      VS1400
                                      Year      Make            Model

JS1VX51LOR2102837 and _____
Vehicle Identification Number          License Number

I, warrant to the Buyer that the said vehicle is free and clear of any lawful claims and demand of all and every person, whatsoever.

Used vehicles are sold as accepted and are not guaranteed.

This form does not represent documentary evidence of ownership unless accompanied by the outstanding certificate of title.

Seller's Signature _____      Date signed  8-31-11

---

## INSURANCE IDENTIFICATION CARD - Utah

**Policy Number:** 37128338-2          **Effective Date:** 09/01/2011 to 09/01/2012

**Insurer:**   Progressive Classic Insurance Co
               P.O. Box 6807 Cleveland, OH 44101

**Your Agent:**
               HEINERS INS CENTER
               801-621-2620

**Named Insured:**
               BEN S HOWARD

| Vehicles: Year | Make | Model | VIN |
|---|---|---|---|
| 1994 | Suzuki | VS1400GLP | JS1VX51L0R2102837 |
| 2004 | Suzuki | DR-Z400S | JS1SK43A742100356 |
| 2007 | Yamaha | WR450F | JYACJ12YX7A802731 |

Form 4950 (12/07)

EXHIBIT "O"



# EXHIBIT "P"



| Description: | | Ships: | Price: |
|---|---|---|---|
| Digidesign Mbox 2 (MBOX2) | | Same Day | $449.00 |
| | | Supply Limited: **1 available** | |

**WRITE A REVIEW**
Be one of the first to review this item!

| Add to Your Basket: | Return to Last Page: |
|---|---|
| $449.00 | Go Back |

## MBox 2

Say hello to the most affordable Pro Tools LE systems from Digidesign: Meet the Mbox 2 family. Characterized by their totally portable designs, diverse yet flexible feature sets, and ultra-affordable prices, the Mbox 2, Mbox 2 Pro and Mbox 2 Mini each offer professional features to complement your recording and mixing needs in a studio that easily fits into your backpack. For Pro Tools professionals and musicians on the go, ultra-small Mbox 2 Micro allows Pro Tools editing, sequencing, and mixing anywhere you go.

Mbox® 2 is a next-generation USB-powered audio/MIDI production system that builds on the performance and simplicity of the original Mbox — Digidesign's most popular personal studio system ever. Featuring a wide range of connection options, including analog, digital, and MIDI I/O, Mbox 2 delivers professional performance in an incredibly compact package. Mbox 2 also includes award-winning, easy-to-use Pro Tools LE™ software, which offers many of the same features that top studios rely on to produce Grammy®-winning albums and Academy Award®-winning film sound. Projects created with Mbox 2 and Pro Tools LE software also open on Pro Tools|HD® and Pro Tools M-Powered™ systems — providing instant compatibility with countless Pro Tools®-equipped project and professional studio around the globe.





# EXHIBIT "Q"



**EXHIBIT "R"**



# EXHIBIT "S" 1 of 2

| INVOICE DATE: 26 JANUARY 2012 | INVOICE NUMBER: 260112 |
|---|---|
| Ben S. Howard<br>3580 N. 2225 E.<br>Layton, UT 84040<br>RE: Motion Picture Production Services | Project: "Overcoming Life's Trauma"<br>Running Time: Three Hours<br>Description: High-Definition, Color, Stereo |
| | |
| Service:   Creative Development<br>Days:   12<br>Rate:   $1,500USD<br>Subtotal:   $18,000USD | Service:   Audio Assembly Editorial<br>Days:   28<br>Rate:   $400USD<br>Subtotal:   $11,200USD |
| Service:   Multi-State Exterior Cinematography<br>Days:   37<br>Rate:   $600USD<br>Subtotal:   $22,200USD | Service:   Compositing (2.8 hours running time)<br>Days:   28 Days<br>Rate:   $2,200USD<br>Subtotal:   $61,600USD |
| Service:   Data Management & Collation<br>Days:   25<br>Rate:   $400USD<br>Subtotal:   $10,000.USD | Services:   Animation<br>Days:   6<br>Rate:   $3,500USD<br>Subtotal:   $21,000USD |
| Service:   Production Audio Recording<br>Days:   25<br>Rate:   $400USD<br>Subtotal:   $10,000USD | Services:   Rotoscoping<br>Days:   7<br>Rate:   $2,500USD<br>Subtotal:   $17,500USD |
| Service:   Roughcut Editorial<br>Days:   28<br>Rate:   $500USD<br>Subtotal:   $14,000USD | Services:   Titles, Branding, Graphic Design<br>Vendor:   Gerren Ard<br>Subtotal:   $10,000USD |
| Service:   Final Editorial<br>Days:   21<br>Rate:   $600USD<br>Subtotal:   $12,600USD | Services:   Music Score Production<br>Vendor:   Robert A. Wolf<br>Subtotal:   $6,500USD |
| | Total:   $214,600USD<br>Received To Date:   $3,600USD<br>Balance Due:   $211,000USD |

Hard copy to follow via USPS. Please keep all correspondence limited to email and mailed hard copy for documentation purposes.

## EXHIBIT "S" 2 of 2

If this invoice is paid in full before 30 days of the invoice date listed above, a 5% discount will apply.

Due to the lack of good faith, and your possession of all the masters of the work performed to date, we are ceasing production until full payment for the work already delivered and itemized above, has been paid and received. Only then shall we complete the last of delivery of the final mixed audio. The rate for studio audio mixing is $500 per day.

If you have no intent of making payment, or we have not received the Balance Due by 26 February 2012, we will consider this project a total loss, wherefore, it shall be used as an portfolio piece, exhibited online in full, in order to generate paying work, which may offset the loss on this project.

If, beyond 26 February 2012, you wish to make payment and take ownership of my work, there will be a 37% delinquent payment processing fee.

Please remit payment by cashiers check only to:

James Arnett
9288 N. Monmouth Ct.
Tucson, AZ 85742

Thank you and have a nice day.

**EXHIBIT "T"**

 **Ben S Howard** elderb123@gmail.com                  Feb 25  

to me

James,

I am not sure why you have chosen to do this. You were never contracted as you claim. I have received legal counsel on this matter and what you are doing constitutes extortion by very definition which holds serious *criminal* and *civil* penalties. I have been advised that the texts and e-mails you have sent me make this an open and shut extortion case.

extortion |ik'stôrSHən|
noun
the practice of obtaining something, esp. money, through force or threats.
DERIVATIVES
**extortioner** noun

I suggest you seriously consider your next course of action since the consequences can be sever.

James, you've been one of my best friends for years am I have no interest in becoming enemies. I love you and I just don't understand. I would welcome a call from you.

 **James Arnett** jamesarnettaz@gmail.com           Feb 25

to Ben

## EXHIBIT "U" 1 of 4

**SOURCE: ww.tonylevelle.com/documents/28.html**
**NOTE: Plaintiff has no connection to the website or author.**

## Realistic Budgeting for Documentaries by David L. Brown.

## Written for <u>Release Print</u>, Film Arts Foundation, January 2005.

Crafting a realistic budget for your documentary is important to avoid a host of financial headaches, and to avoid presenting a red flag to funders. It is best achieved only after a detailed treatment (or script) is completed to enable a good estimate of the number of shooting days and locations required. The closer you, as producer, can come to a detailed shooting script (which then enables listing all elements of prep, production, and post) the more accurate your estimate of shooting days (and other line items) will be and the more realistic your budget will be. Since most documentary-makers don't develop a full script and shooting script before production, you will most likely need to develop the most detailed treatment possible that can be broken down into locations, interviewees, verite scenes, travel expenses and total shooting days. Then, you'll need to estimate the number of pre-production and post-production days, and research current rates for crew, gear and post-production facilities, and any other line items you're unsure about. You should most definitely be prepared to use a spreadsheet program like Excel.

Among the other initial questions to answer before beginning to budget are: film or video; and if video, what format? For this article, I'll assume that you're shooting in digital video (mini-DV or DVCAM— by far, the most popular [and sensible] formats for low-budget docs). If you're planning to shoot in Betacam, HD or 16mm, you're most likely very experienced with budgeting and documentary-making, and don't need much advice (or shouldn't). With a 20 to 1 shooting ratio (very low for most docs), a 16mm film budget could total at least twice that of a mini-DV budget (unless you own your own Eclair NPR, Nagra and flatbed). Film and processing can be budget busters.

To estimate post-production time, know that most hour-long documentaries (with paid pro editors) take about 14-20 weeks in editing after logging and transcribing. Some take a year, but no funder likes to see that in a budget. Most half-hour docs would take slightly over half as long, 8-11 weeks. But if you've shot 100 hours of video, it may take you four months to log and transcribe your footage. And it's extremely difficult to edit interviews without transcripts. To save money, transcribe only selects, but don't neglect to budget for transcribing. (pros get $50/hr. and take 4 hrs. to transcribe one hour of interview. Thus, transcribing 10 hours of interviews = $2,000) An intern willing to use your foot pedal transcribing machine is golden, even at $10/hr.

The now quaint guidelines of $2,000 per completed minute are obsolete by at least 50%, but most broadcast-quality hour-long docs with good production values seem to cost around $150K to $250K (although the range is much wider), when paying the crew (and yourself!) standard professional (documentary, not Hollywood feature) rates. Frontline docs cost around $350,000 for about 26 days of shooting and 16 weeks of editing. Of course, if you own your own camcorder and Final Cut Pro system and you don't need a lot of crew, music, travel, graphics and archival material, you can complete an hour doc for much less, well under $1,000 per completed minute.

**EXHIBIT "U" 2 of 4**

Jonathan Caouette claims to have made his acclaimed doc Tarnation for under $300 on his iMovie, even though he later spend over $100,000 on archival clearances. Even if he paid himself well for his time, it's still an incredibly low budget for a doc that received an international theatrical release. Let's assume, though, that you're not going to donate 3,000 hours of your time to the project, along with use of your edit system, even though too many of us do it.

You should budget for professional documentary rates, (and media funders expect them) knowing that you can and should negotiate the lowest discounted rates you can. For example, an experienced Director of Photography/ Camera person might normally get $750 for 10 hours on commercial projects but asks $500 for 10 on documentaries, and might be willing to work for a flat $3,000 for ten days of shooting (if he or she likes you and your project), and might throw in a digital camcorder and some lights, flags and silks. You should shop around and try to negotiate multiple-day rates on camera, lighting, grip and sound gear and on all services.

Before drafting your first budget, it's very helpful to consult a pre-production checklist with every possible budget line item. You can find a good line item checklist in Simon and Wiese's book, Film and Video Budgets in the Film Arts Foundation library.

There are several acceptable formats for documentary budgets. ITVS has a good template that you can download from www.itvs.org. It separates "Staff" (Producer, Director, Writer, Associate Producer, but not Narrator) from "Crew" salaries. The other categories are: Pre-production/Research; Production, including Materials, Crew, Equipment, Location Expenses and Services; Post-Production, including Staff, Facilities and Services, Acquisitions/Rights/Talent (narrator), Masters and Dubs, and Administrative/Overhead; and Distribution (very important to include, perhaps 30-35% of your production budget).

Some higher end producers, including Wiese, recommend using "Above the Line" (Exec. Producer, Producer, Director, Writer, Narrator, Consultants) and "Below the Line" (everything else) format. I know very few who use this for doc budgets. I often use the ITVS model but, if there are no union benefits to consider, I include all personnel under "Personnel." Crew, gear and post rates will be different in Denver, Austin, New York and Peoria. Again, do your research on every line item, and for all rates for crew, gear, and services. Discuss length of day with crew, and have them sign deal memos that specify rate, overtime, and credits. Here are some ballpart rates (with a range from novice to Oscar-winner) for skilled and experienced Bay Area crew, along with gear and services.

Executive Producer: $400-500 per day, usually for just a few days, if needed at all.

Producer: $150-400/day, $600-2,000/wk depending on experience.

Director: about the same rates as producer. DGA rates could apply for a guild director. If you're Producer/ Director, budget for paying yourself $600-1,500/ week, depending on your experience.

Writer: $40-50/hr., $300-400/day.

Associate Producer: $150-200/day, $750-1,000/ wk.

Consultants: $200-500/day depending on their expertise. $75/hr. a reasonable average.

Director of Photography/ camera person: $350–500/10 hr. day, without camera.

Sound recordist: $350-400/ 10 hr. day without gear. Audio gear rental (mixer, mics, cables, stands) will be around $75/day depending on number of wireless mics ($75/day each). Boom person: same or $50 less than recordist

**EXHIBIT "U" 3 of 4**

Production Manager: $350-450/ day.

Location Manager: $350-450/ 10 hr. day plus expenses, mileage.

Gaffer/Key Grip: $350-450/ 10 hr. day.

Utility person: $200-250/ 10 hr. day

Production assistant/ craft service: $100-175/ day.

Assistant editor: $18-22/hr.

Editor: $350-450/8 hr. day; 1,800- 2,200 wk.

Narrator: $350-400 for 2 hr. session. Well-known actors may ask $1,000 or more, but often they work pro-bono for projects they support (with permission of their union, usually AFTRA).

Small (1 ton) grip truck w/ doc grip and lighting package: $200-250. Doc grip and lighting package without truck: $75-100. 3-Tota or Omni kit: $40

DVCAM or Mini-DV camcorder package w/ tripod: $150-250.

Betacam package w/ tripod: $400-600/ day.

Videotape stock (DVCAM or Mini-DV): Estimate your shooting ratio first. 30 to 1 is a low average for non-verite docs. Surfing for Life was 50 to 1. Stock: $6-$15 per hour. Window dubbing: $25-27/ hr. You might shoot 2-3 hours a day to get 5-6 useable minutes of footage.

Final Cut Pro, Media 100 and Avid editing system rental: Allow $1,000-1,600/ wk. for longer than an 8-week rental, knowing you can buy your own for the cost of a month rental, but never budget for equipment purchase! If you purchase, you rent it to the project at going rates, and you do not report a purchase as an expense to a funder.

For union personnel (IATSE, SAG, AFTRA), you should budget for pension and health (P&H) benefits at 18%. Most docs don't deal with union benefits, but you will often want to include them for budgets submitted to CPB, NEA, NEH and union-affiliated funders. If in doubt, contact the union for rates. Usually, its wise to budget 10% overtime for union personnel or any crew on a 10 hour day..

Other line items to remember:

Any special gear such as water housings, dollies (wheel chairs), jibs, Tyler mounts.

Travel, lodging, auto rental, crew meals, overtime, excess baggage (contact the airlines P.R. dept. a month before your flight to request an excess baggage waiver—$50 per bag adds up). Travel days for crew are usually paid at half the day rate.

Music. A good, experienced composer might receive $6,000 to $8,000 for scoring an hour doc. Using musicians rather than synthesizers adds to the cost. Copyrighted music is very expensive: licensing Surfing Safari cost me $3,500. Pre-recorded library music ("needle drops"—through audio post houses) are surprising good and inexpensive ($200-300 per cue depending on rights, plus research and dubbing fees).

Archival footage: If not public domain (eg. National Archive), average $20-45/sec. or $1,200-2,500/ min. and higher, depending on rights. Archival researcher: $300-350/day. Music and archival clearance person. $200-250/day.

## EXHIBIT "U" 4 of 4

Sound sweetening, mix: $150-175/hr., average about $1,500-3,000 for hour docs.

On-line editing/ color correction. $200-275/hr. With the blurring of off-line and on-line, budget conscious docmakers now use high end facilities only for severe color correction,or to master to Digital Betacam, not for on-lining every shot. Now, it's usually 4-5 hours instead of 35 at a facility like Video Arts.

Graphics: budget perhaps $1,500-2,000 per minute for fairly basic graphics, animated logos and maps, etc.

Office/Admin/Overhead—office, telephone, xerox, shipping (avoid overnight if possible. Fed Ex bills can mount and hurt you badly) Budget about 15% of total.

Insurance, including Errors and Omissions coverage. Budget $4,000 for a producers annual package that will include liability.

Accounting. Add 5-10% for many project.s

Legal. If you're doing contracts or other non-standard legal documents, or trying for "Fair Use." Richard Lee, the FAF attorney, has discounted rates for members. Perhaps $450-$1,500.

Fiscal sponsor fees: usually 7.5% added to the final budget total.

In-kind. Discounts or donations of anything from gear to crew to photocopying count as "In-kind contributions," and can be listed in a separate column. They are usually treated as funds raised.

Contingency: Most funders do not understand the concept, so build in about 10% throughout the budget, rather than a separate line item.

Build in an Income section divided into "Actual to-Date" and "Projected." The total income should equal your budget total with Distribution. Your categories might be Foundations, Corporations, Individual Donors, Special Fundraising Events. You might include your own funds spent under "Miscellaneous Individual Donations."

To summarize, the keys to a realistic documentary budget are: a detailed treatment to closely estimate number of shooting days and locations; a checklist to help you include every relevant line item; and research to identify appropriate rates for local crew, gear and services. Then, build in contingency and negotiate everything. Also, consulting with experienced docmakers can help make your budget more realistic, and your proposal more fundable.

David L. Brown has been producing and directing documentaries since 1971. His recent work included Seniors for Peace and Surfing for Life. He teaches Documentary Filmmaking at CCSF and UC Berkeley Extension, and History of Documentary at Film Arts. His website is http://www.dlbfilms.com/

**EXHIBIT "V"**



Gerren Ard & James Arnett at Harkins Theaters
where their feature film "Blocked" opened 8 June 2012.

## EXHIBIT "W" 1 of 19



**New Product News**

**CineMatrix™ Industrial 5.0**

**Platform:** Microsoft Windows XP™
**Development Phase:** ALPHA 7 of 7 Completed
**Product Status:** Beta 2of 2 - Feature Film Implementation
**Implementation Date :** 26 June 2006

As you read through this, the momentum of our work continues with great anticipation of reaching our new product release because the advances we have made in our Development Lab are truly remarkable. This last Beta is being put through the wringer on a full scale test on our lastest feature film, Mary Shelley's "*THE LAST MAN*" in production now.

Recently, **CineMatrix™ Industrial 5.0** and **CineMatrix™ Standard 5.0** have been incorporated into a single product with a toggling menu as a single, on-the-fly, mode switching application that will be marketed as **CineMatrix™ Industrial 5.0**.



Everything you know about filmmaking software is about to change.

**EXHIBIT "W" 2 of 19**

**The Revolution Is About To Begin**

Just when you thought the most advanced filmmaking software on the planet had pushed the bounds of technological advancement to its pinnacle, the **Fifth Generation** of **CineMatrix**™ is once again setting the bar for Filmmaking Software lightyears ahead of anything else ever conceived of in the marketplace. This is an industry changing Revolution, a paradigm shift that changes everything you know about filmmaking software.

By the time you finish absorbing this new product news, you will understand the full scope and impact this Revolution in Filmmaking Software can have on you, and every other filmmaker, from "A" List production companies to individual filmmakers, personally, the day it is released.

**CineMatrix**™ has done the unthinkable - we've made **CineMatrix**™ **Industrial 5.0** available to filmmakers worldwide, regardless of economic level at **No Cost**. That's right, the **CineMatrix**™ User license that once cost several hundred U.S. dollars will soon be **FREE** to every filmmaker on the planet, studio and independent filmmaker alike. Whether you're making movies in Hong Kong, Los Angeles or London, you will soon be able to load a fully licensed copy of **CineMatrix**™ **Industrial 5.0** on as many PCs as you have on your production office network - without ever touching your production capital.

This is a big part of what makes the release of **CineMatrix**™ **Industrial 5.0** far more than just a major upgrade to an industry leading product - it's a true Revolution that will benefit *you* directly. You will soon be able to download **CineMatrix**™ **Industrial 5.0** and it won't cost you a dime.

**The Economic Revolution**

We're not just dropping a small stone into a still pond, we're nuking the status quo with unprecedented new technology and a completely new business model that blasts through the one last barrier no one had ever broken, not until now - the high cost of Filmmaking Software.

Many developers say they are filmmakers producing software for other filmmakers as their qualification. But what we know firsthand as filmmakers is that other costs, starting with production insurance, have far greater priority over budgeting and scheduling software. So as we approached the financial break-even point on this software project, we considered the many customers whose purchases have fuelled our development and asked, "*Is it possible to generate revenue to sustain this project without having to continue charging filmmakers for our software? Can we solve that problem with creativity and advanced technology?*"

**EXHIBIT "W" 3 of 19**

In a flash of inspiration, we had an answer, a resounding *yes*! We designed an exciting new business model that would afford us the opportunity to give even more to our customers than anyone has ever dared and advance the arts and sciences of our industry in the process.

Yet some might claim, "*You get what you pay for*", while others might balk, "*How good could it be if it's free*?" But if influencing your opinion represents a several hundred-dollar sale to them, you won't have to wonder why, just ask them, what have they done for *you* lately.

We have developed the most advanced Filmmaking Software on the planet in one of the most aggressive development projects in the history of the industry over the past three years then we will ultimately bring it to the market for free. Understand, this means that *you* will have already won this Revolution because soon you will have a *real* choice. Filmmaking Software prices will now either have to drop significantly for your direct benefit or they will quietly go the way of the dinosaur. That's what **CineMatrix**™ will be doing for you.

And with this new choice, we are confident that sooner or later, you will determine the difference between the facts and mere sales hype because we're not selling **CineMatrix**™ and you don't have to buy it to find out if it lives up to its reputation. So whether you use **CineMatrix**™ as your primary production system now or a year from now that choice will never impact our bottom line.

This isn't some limited time promotional stunt or mild student discount, creating the most advanced filmmaking software on the planet that meets the demands of the Motion Picture Industry is what we've been doing since the beginning. This time, we have even out done ourselves by extending our commitment to keep **CineMatrix**™ **Industrial 5.0** a free license product from here on out, continuing to advance this technology far into the 21st century.


**The Technological Revolution**

But there is a lot more to the **CineMatrix**™ Revolution than just the economic front, the technological front is equally exciting. While our technology gets more powerful, its benefits to feature motion picture production don't merely blow away everything else on the market, **CineMatrix**™ **Industrial 5.0** renders obsolete everything you have ever paid money to use in the past. That's right, you can soon put every other filmmaking software you ever bought into the same museum as your old daisy wheel printer - the Revolution is about to begin.

**EXHIBIT "W" 4 of 19**

What has always set **CineMatrix**™ far and above its competition has never been the development of a clutter of new gimmickery but developing the high concept functionality and utility that makes **CineMatrix**™ far more practical in actual Motion Picture production.

Because we generally have not advertised to keep our operating costs down in order to dedicate our capital to development, you may not be aware that **CineMatrix**™ pioneered the integration of content, scheduling and budgeting, the three foundations of production. But no one has ever matched the design, functionality or performance of our proprietary AIA Data Matrix. **CineMatrix**™ also pioneered the integration of the Talent Casting process, the integration of the Purchasing System and the Rented Line Item Inventory Control System and much, much more, including many smaller innovations that our competitors have picked up on over the years. Today, nothing has changed. **CineMatrix**™ **Industrial 5.0** revolutionizes the role software plays in motion picture production by deploying the first *extensible* command and control system for the production of major motion pictures.

For this generation's filmmakers, there's only **CineMatrix**™
It's unparalleled 21st century technology.

### The Visual Information System

**CineMatrix**™ is the premiere visual project management system for major motion picture production, providing visual timelines and overviews of your project's progress and the status of its time-critical processes, presenting complex production information visually, the way you need to see it - in terms of time, money and content.

As you might expect, **CineMatrix**™ is also loaded with too many smaller features, conveniences and tools to list, that you would naturally expect from the most advanced filmmaking software on the planet. But below is a brief description of the major features offered by **CineMatrix**™ **Industrial 5.0**

## EXHIBIT "W" 5 of 19

**DEPARTMENTAL DELEGATION**

This is the next high concept **CineMatrix**™ technological innovation that will leave our competitors bewildered: Departmental Delegation. This is not merely the popular program access levels we innovated two years ago, this is individual-specific Departmental access that allows you to delegate the operations of any Department within your Budget to your Department Heads so the burden of data entry, administration and control can be shared by the individuals responsible for their Departments for sourcing, hiring, purchasing, and rental returns without affecting anything beyond their scope of responsibility.

A Department Head can even delegate receiving and rental returns to a subordinate. That means you and your Department Heads can delegate with confidence and get back to the business of completing your film.

Imagine a local area network, all working off the same **CineMatrix**™ project file so your Department Heads can source and order all of their Line Items so your goods and services arrive on set, on time.

Program access for Department Heads is limited exclusively to the numerical range of their Department, as defined by your Budget so a Department Head cannot see or affect any Line Item, Vendor or Labor information that is not immediately within their Department.

Unparalleled practicality for filmmakers in the real world separates **CineMatrix**™ from everything else on the market.


**MULTI-LEVEL SECURITY, INDUSTRIAL GRADE ENCRYPTION**

Okay, you're not exactly a "top secret" operation but the confidentiality of the personal information of your Cast and Crew absolutely needs to be protected.

Our proprietary AIA Data Matrix is more than an encrypted file, it is the other "half" of the program. It's a layered matrix featuring a diverse plurality of more than fifty file drivers that's almost impossible to decypher with a hex editor even if it wasn't encrypted. Nevertheless, we have protected the file with a file encryption scheme to make it even more difficult to hack. For even more security, you can further encrypt your Data Matrix with Industrial Grade encryption for an added layer of protection.

But that's not all. Every Data Matrix file has a password and identification function that limits access to your project exclusively to those to whom you have delegated authority.

**EXHIBIT "W" 6 of 19**

## LOCKOUT SHIELD

What good is all of this security if you can't go to the restroom or just get up for a cup of coffee without having to log out of the system and lose your place? That's why we developed the convenience of a Lockout Shield that allows you to tap the AIA emblem on the Program Header and your computer monitor screen is blocked by a vector shield from prying eyes and unauthorized browsing of your high level information.

If any one attempts to lower your shield, it will challenge them for your password. If a correct response is not received within sixty seconds, the program will automatically shut itself down. When you get back, you can just enter your password and pick up right where you left off. What else did you expect from the most advanced filmmaking software on the planet?

## NETWORK READY

**CineMatrix™ Industrial 5.0** is network ready. That means if your production office has two or more PCs networked together, you can have multiple, concurrent Users, such as your Department Heads, working on the same AIA Motion Picture Project file at the same time so there is never any waiting to get important work finished on time.

## INTER-PERSONNEL MESSAGE SYSTEM

Once you have delegated the responsibilities of your production to your other Principals and Department Heads, you and your people will need to communicate with one another in both real time as well as posted messages held until they return to their computer. **CineMatrix™** offers an interpersonnel message system to keep everyone on the same page from Pre-Production to the end of Post.

But when it's just you doing the initial setup of your project, this feature is automatically deactivated to keep it out of your way. Once you begin delegating, the message system automatically comes online.

## EXPEDITING SYSTEM

Because the production of a feature length motion picture demands the coordination of a small army of vendors and suppliers, **CineMatrix™ Industrial 5.0** has a built-in Expediting System to track production issues and their progress so you always know where you left an issue you need to resolve with your vendors and other third party contractors. The call back list keeps you on track so you can keep up with the volume of expediting that every production demands of you.

EXHIBIT "W" 7 of 19

## SCRIPT RE-IMPORTATION

Whether your Screenplay or Shooting Script is originated in Final Draft® or any other industry standard screenplay formatting software, you can not only import files generated by those products, you can also do something no other software product can do: RE-IMPORT.

Reimportation is a very important technological breakthrough specifically because script changes are not only inevitable but on many productions, script changes can quickly become a daily challenge. After the first script change or two, you're out of the software because the information is no longer valid with other products, making the time invested into operating the software wasted effort in an actual production environment.

But **CineMatrix**™ deploys reimport capability to absorb even daily script changes and resolves its impact on your production system-wide. This makes **CineMatrix**™ **Industrial 5.0** the only practical software for feature motion picture production.

## PROGRAM CUSTOMIZATION

The **CineMatrix**™ program banner is the default. Clicking on it will bring you to our Web Site. But you can easily load your own production letterhead or graphic to replace the **CineMatrix**™ banner and enter the URL for your own production Web site. Your production company also appears in the first position of the status bar and prints out as the letterhead on all of your reports and PDF files for total graphic program customization that features your individuality rather than ours.

## REGIONAL PRODUCTION INCENTIVES

It's no secret that many regions offer Producers various financial incentives to film within their area. Incentives play a larger role today than ever before in determining the locations chosen for production, so we built-in the means to gage its impact on your production. Whether its a sales tax rebate, matching funds or labor credits, **CineMatrix**™ exports incentive related data for your own financial impact analysis.

**EXHIBIT "W" 8 of 19**

## INTEGRATED SCHEDULING

While there are many production Scheduling solutions available on the market, not a single one does what **CineMatrix**™ does, which no production can afford to go without.

**CineMatrix**™ is the only solution that offers the obvious - a Line Item "go" or "no go" status for each production day. What good is it to have every Line Item scheduled if you have no idea if it has ever been received, or if it's even been put on order or if it just fell through the cracks and might never appear on set when it's needed?

**CineMatrix**™ takes the guess work and communication breakdowns out of managing a production by collating and summarizing an incredible volume of information so you know with certainty whether there are any potential problems before they have a chance to become actual problems that threaten to delay your production.

## GRAPHIC PRODUCTION ANALYSIS & OPTIMIZATION TOOL

**CineMatrix**™ helps you consolidate Line Items in your Schedule that can cost a premium. Suppose you needed to design your schedule to squeeze all four days of a "name" talent into one week, rather than paying the whole rate for two weeks.

Now suppose that's complicated by other premium Line Items that may conflict with your goal. **CineMatrix**™ graphs the allocation of your resources visually so you can see a graphic overview of how they're scheduled and help you refine your plan accordingly.

Whether optimizing Crew, Cast, On Camera Elements, Production Equipment, Production Support or Filming Locations, this graphic analysis tool will help you optimize the way you allocate your resources in your Schedule into the most efficient form possible.

And the list of high concept technological advances in **CineMatrix**™ **Industrial 5.0** goes on.

**EXHIBIT "W" 9 of 19**

## INTELLIGENT SCHEDULING

**CineMatrix**™ does an extraordinary job of mining your data. Since **CineMatrix**™ already knows what Scenes you need to film on each movie set during its import analysis of your Script, all you need to do is select the Stage or Location you will be filming on a particular Production Day and **CineMatrix**™ will tell you what Scenes and Shots you need to Schedule, so you don't have to sift through the entire Script or miss Scheduling a single Shot.

Not only that but **CineMatrix**™ also tells you what Characters and On Camera Elements need to be Scheduled that Day too - and do that for you with just the click of a button.

Tabs on the Schedule allow you to create a real world Production Schedule complete with First Unit, Second Unit, Plate Unit, Prep and Wrap Units as well as a Pickups Unit and Rehearsal days.

## PRODUCTION UNIT SCHEDULING

You can also create Production Units for not only your First Unit but also Production Equipment and Support Packages so you can Schedule entire Units and Packages of Line Items with just a button click. The Call Times you set can be edited for those Units just as easily at any time later.

## PRE-PRODUCTION AND POST PRODUCTION SCHEDULING

How come no other Scheduling Software seems to be aware that Pre-Production and Post Production have processes that cost money and need to be scheduled and incorporated into the Budget just like those of Production? **CineMatrix**™ addresses those Processes elegantly, seamlessly weaving together your entire production from its beginning to its completion.

From a graphic overview screen, you can instantly recognize the status of each Pre-Production and Post Production Process that needs to be completed, and any associated Line Items, factoring all Labor, Goods and Services into the Budget.

Once a Process goes past its completion date, it changes color so you know it needs to be expedited right away.

**EXHIBIT "W" 10 of 19**

## INTEGRATED PRODUCTION SCHEDULING & BUDGETING

Before the turn of the century, you had to export static data from scheduling software into a separate budgeting software. That limited the practicality of budgeting software to mere estimation because once any real world changes were made to the production schedule, the budget was no longer valid.

Back in 2002, **CineMatrix™** pioneered the integrated Scheduling and Budgeting engine that shares data dynamically, rendering the static export obsolete. Today, **CineMatrix™ Industrial 5.0** represents the refinement of this breakthrough technology that originally launched our product to now include Budget Actuals for Purchasing and Labor.

## AUTOMATED BUDGET SYNCING

But what if you added or changed an element to your Schedule? If you are using **CineMatrix™**, you never need to "fix" the Budget or actually do anything else but click one button to reconcile the entire Budget and put it into total sync with the Schedule. **CineMatrix™** creates building your initial Budget automatically. All **CineMatrix™** needs to know is what a Line Item costs and its delivery lead time from its Vendor.

Once you Schedule that Line Item, **CineMatrix™** not only knows what it will ultimately cost but also tells you when need to order it by for it to arrive on Set in time and also tells you when it needs to be returned to its Vendor if it's a Rented Line Item, so you never get overcharged for extended rental fees on late return Line Items.

The Program Status Bar displays the time and date of the last Sync event so you always know how current your Budget data happens to be.

## FRINGES

Applying Fringes, whether Accrued contributions or Withholdings, can be applied either Line Item by Line Item or to an entire group of Line Items. As you would expect from **CineMatrix™**, you can even update the Fringe definition and it will be resolved system-wide the next time you Sync the Budget.

## BREATHTAKING ADVANCEMENTS

If your breath hasn't been taken completely away yet, it will be. Read on. **CineMatrix™ Industrial 5.0** just keeps getting better and better!

**EXHIBIT "W" 11 of 19**

**BUDGET LOCKING**

Okay, the Estimated Budget you submitted has been "green-lighted" and the Production funding is now in place. At this point, you can Lock the Budget. Locking the Budget provides a fixed spending reference for each Department so when you start spending actual money, **CineMatrix**™ will keep a running gage of Actuals spending within each Department. Now, your Department Heads will know exactly what they have to work with and know when they're coming close to their Budget Limit.

And even more importantly, you will know which Departments are approaching their Budget Limit *before* it becomes a problem, not after it becomes a crisis. You can review Departments individually or from a graphic overview of the entire production. You can even reallocate those limits between Departments, as necessary, on the fly. Now you can understand why we call this a Revolution, not a mere product release.

**AUTOMATED ORDERING SCHEDULE**

Considering the incredible volume of Line Items you and your Department Heads need to put on order for your production, imagine if you had a screen that told you everything you needed to order and it also told you when the last day you could order things that had a delivery lead time that required it to be ordered days, weeks or months in advance. You don't have to imagine it, that small miracle is already part of **CineMatrix**™ **Industrial 5.0**

Expect more. This is **CineMatrix**™, the most advanced filmmaking software on the planet.

**PURCHASE ORDER SYSTEM**

If you've ever tried tracking down all of the loose and missing Purchase Orders after an intense production for your audit, you already know how much you hate chasing down missing and lost P.O. records from Department Heads who may be on location in Albania by the time you need to ask them to search everywhere for their goldenrod copies.

**CineMatrix**™ has an integral Purchase Order System that communicates with your Line Items, your Schedule, your Budget and you. Purchase Orders can be created by either you as a Principal, or by your Department Heads so you will never have to search for lost paper ever again. Your P.O.'s print out professionally with your distinctive Production Company Letterhead right across the top.

**CineMatrix**™ also indicates when a late order has past its delivery date so you know it needs to be expedited. When you Sync the Budget, just check the Actuals option box so your Department spending totals are updated in the Actuals Budget.

## EXHIBIT "W" 12 of 19

### AUTOMATED RENTAL RETURN SCHEDULE

Here's where **CineMatrix**™ can also save you another big bundle of money. The automated Rental Return Schedule keeps returns from incinerating your Post Production Budget because you and your Department Heads know exactly when to return Rented Line Items before you start accruing big late return fees.

### RENTED LINE ITEM BARCODE LABELING

To put sanity into the return process, **CineMatrix**™ prints out adheasive stickers for all of your Rented Line Items. Everything from equipment cases to wardrobe tags can easily be identified by Department, Category, Line Item and Vendor on a barcoded sticker that says who it goes back to and when, taking the guesswork and revenue loss out of your returns.  We will soon be deploying the **CineMatrix**™ barcode reader hardware that works with **CineMatrix**™ so you can zap your way through more returns with far more accuracy and expediency than ever before.

### LABOR TRACKING TIME CARD SYSTEM

Since your Accounting or Payroll firm will need to pay your Labor and Talent, you need to keep track of their hours, days or weeks of payment due them, along with any Withholding deductions and Fringes. **CineMatrix**™ provides for all that and it can be handled from the Department level so you're not shackled behind your computer but be about the business of completing your motion picture project.

### ACTUALS EXPORT

**CineMatrix**™ exports a variety of useful data, including Budget Actuals for Purchasing, Labor, and Fringes for your Production Accountant and Payroll firms. Export formats include Adobe Acrobat PDF, MS Excel spreadsheet XLS, HTML, DB4, character separated text, and plain text for compatible import into any industry standard accounting software.

### DIRECTING UTILITIES

It's not all business, so before you start thinking that **CineMatrix**™ ignores the creative and the content aspects of motion picture production, we totally understand that content goals drive the production goals. We really get that part. That's why Directors love **CineMatrix**™. Not because it forces them into any system but by offering many creative options and tools that are purely elective.

- Graphic Storyboard Utilities (aspect ratio adjusting)
- Graphic Planview Setup Utilities
- Graphic Script Coverage Analysis
- Tech Script Printing (with coverage markers)

**EXHIBIT "W" 13 of 19**

## TALENT CASTING

Because productions are very closely involved with casting the perfect talent into the roles of their movies, **CineMatrix**™ offers a Casting and Audition Scheduling System that's unparalleled. Print out sign-in sheets, headshots and your Audition Schedule. You can even publish your casting requirements to HTML for the Web to handle the entire submission process online on your own Web site.

## TOGGLING MENU

The moment you see the **CineMatrix**™ interface, you won't see any nifty consumer level icons that look like your kid's Instant Message software. Immediately, you will notice that the distinctive design of **CineMatrix**™ looks like Industrial level software because that's exactly what it is. But if you feel overwhelmed by the power of **CineMatrix**™ **Industrial 5.0** at first, don't worry, You can turn off many of the more advanced features easily by toggling the Menu from Industrial Mode to the simpler Standard Mode. Rather than releasing two distinct products for studio and independent productions, **CineMatrix**™ **Industrial 5.0** has merged those two products into one.

Simply by clicking on the Mode choice on the program menu, right next to Help, you can toggle the complexity of the Menu between Standard Mode and Industrial Mode for the more advanced Users who require the Industrial strength features demanded by professional productions without the need to upgrade this comprehensive, breakthrough technology for the maximum convenience of all skill levels.

## Our Proprietary .AIA Motion Picture Project File Format

At the core of **CineMatrix**™ is our proprietary **\*.AIA** Motion Picture Project file format, an encrypted, password protected data file supported by an internal array of high speed data drivers. What all of that technology means to you is that no matter how radically you reschedule anything from stage assignments or overtime to union liabilities, the budget will keep up with every one of your changes just as soon as you press the 'sync' button. That also means there's no more labor involved in maintaining a current budget from Pre-Production to Post. All you need to do is maintain the base cost of the Line Items and **CineMatrix**™ extrapolates that against the schedule to build and maintain the budget. That means you can concentrate on making progress instead of counting beans. Of course, the **CineMatrix**™ budget intelligently maintains Pre-Production, Production and Post Production Line Items within the same dynamic budget.

**EXHIBIT "W" 14 of 19**

### Powerful Information Plugins

**CineMatrix**™ offers an entire system of Information Plugins so you can load Vendor Lists, Budget Line Items, Budget Templates, Talent Databases and Fringe Definitions. Plugin information can be loaded into your project by "cherry-picking" specific elements using simple drag-n-drop to bring them directly into your motion picture project.

 **TAC Plugin - Budget Templates**

 **FAL Plugin - Fringe Definitions**

 **VIN Plugin - Vendor Lists**

 **RAP Plugin - Line Item Lists with graphics storage capability**

 **ACT Plugin - Talent Lists with graphics storage capability**

Just imagine the convenience of downloading a free plugin that is localized for your area that contains headshots and resumes of Talent in your region, as well as plugins with entire catalogues of production equipment complete with images and Web links so you can locate sources for all of your motion picture production needs whether you're in New York or Berlin.

### A New Business Model For The Information Age

To remove the burden of high cost software from the backs of filmmakers, our new business model not only solves that fundemental problem but will also solve the sustainability problem without resorting to anything as unbecoming as the spamming methods that plague the Information Age.

Free **CineMatrix**™ **Plugins** will be the financial engine that will continue to drive the maintenance and development of **CineMatrix**™ filmmaking software.

Our business model works like this: Actors, Craftspeople, Technicians, and Vendors worldwide can list their goods and services in **CineMatrix**™ **Plugins**, including entire Catalogues of equipment rentals for a fraction of the cost of any other option available in the industry. Filmmakers can download **CineMatrix**™ **Plugins** for free and plug-in all of the goods and services they need to produce their motion pictures right into their **CineMatrix**™ project file. Sure, there is already a hodge-podge of printed and online directories but not only are these options not always affordable but the information is always static, and not always up-to-date, and is not always available worldwide.

## EXHIBIT "W" 15 of 19

By contrast, **CineMatrix**™ **Plugins** are the only worldwide option that allows filmmakers to drag-n-drop resources and people right into their project budgets or right into their casting call. Nothing else in the industry provides that immediacy, plugging resources and people directly into motion picture projects that use **CineMatrix**™ filmmaking software.

With internet connectivity to the Internet Movie Database at **IMDB.com**, Actors, Craftspeople and Technicians can point their IMDB listing right at those making the hiring and casting decisions. Worldwide access is what the Information Age is all about and we're making the most of it to continue bringing you the most advanced filmmaking software on the planet.

Now you know how this new business model makes **CineMatrix**™ Filmmaking Software free and why it's so exciting. **CineMatrix**™ **Plugin** listings will reach Filmmakers, Casting Directors and Producers worldwide because the entire Industry can afford to standardize the software system they use. That's great news if you're an American production filming in India and you need to find a Grip House or a Costumer in downtown Bombay or a Horse Wrangler in Bakersfield.

Getting listed in **CineMatrix**™ **Plugins** will be so affordable that everyone, everywhere can afford to get listed for the spare change in their pocket and Filmmakers will benefit from using the most advanced filmmaking software available anywhere for free so subscribers know they're getting seen by as many of the right people as possible, and getting seen by the right people is the name of the game.

Our innovative, new business model offers a lot of risk to our organization but playing it safe has never been who we are. We have the daring and the technology to compete more aggressively, more strategically, and in the process, rock the status quo for the benefit of those who make motion pictures worldwide.

**CineMatrix**™ **Industrial 5.0** is that *Revolution*.

We mean it.

## CineMatrix™ Development Lab

## EXHIBIT "W" 16 of 19

Storyboard Console

11:05 Storyboard Slideshow

| Shot Number | Sound | Int/Ext | Header Synopsis | Shot Header | Day/Night | Story Day | Coverage Framing | Camera Movement | Lighting Style |
|---|---|---|---|---|---|---|---|---|---|
| 003 | Sync Set 2 | INT | INTERVIEW ROOM Lisa is Interviewed By Agent Harrison | | NIGHT | 1 | Master Shot | | |
| 004 | Sync Set 3 | INT | OBSERVATION ROOM | | NIGHT | 1 | Master Shot | | |
| 005 | MOS Set 4 | INT | M.G.'S SEDAN - FREEWAY | | NIGHT | 1 | Master Shot | | |
| 006 | MOS Set 5 | EXT | REST STOP - NIGHT | | NIGHT | 1 | Master Shot | | |
| 007 | MOS Set 6 | EXT | PUBLIC REST ROOM | | NIGHT | 1 | Master Shot | | |
| 008 | MOS Set 7 | INT | REST STOP | | NIGHT | 1 | Master Shot | | |
| 009 | MOS Set 7 | INT | M.G.'S SEDAN - FREEWAY | | NIGHT | 1 | Master Shot | | |
| 010 | MOS Set 8 | EXT | DESERT HIGHWAY - MONTAGE | | NIGHT | 1 | Master Shot | | |
| 011 | MOS Set 9 | EXT | DESERT HIGHWAY | | NIGHT | 1 | Master Shot | | |
| 012 | MOS Set 10 | INT | LORDSBURG MOTEL | | NIGHT | 1 | Master Shot | | |
| | | | LORDSBURG MOTEL ROOM | | | | | | |

Shot Header

003

Sync   INTERVIEW ROOM
Lisa is Interviewed By Agent Harrison

Coverage   Master Shot
Focal Length   Wide Lens
Camera Movement   Tripod Static
Camera Height   Directors Eating Level
Lighting Style   Normal High Key Contrast
Ambience Color   Night
Camera Lens   High
Camera Line Level   USA
Camera Line Right   NORMAL

NIGHT

Add Shot   Edit Shot   Delete Shot   Close

**EXHIBIT "W" 17 of 19**

## EXHIBIT "W" 18 of 19



## EXHIBIT "W" 19 of 19

## CERTIFICATE OF SERVICE

JAN 7 2013

I hereby certify that on this day, Monday the 7th of January 2013, I physically filed the preceding FIRST AMENDED COMPLAINT, EXHIBITS, and 2 DVD Discs with the Office of the Clerk of the Court, pursuant to the ORDER of this honorable Court [Doc. 34].

I also hereby certify that I have mailed these identical materials via United States Postal Service, to the following Attorneys for Defendants Howard, et al.:

DAVIS MILES MCGUIRE GARDNER, PLLC

Scott F. Gibson

80 E. Rio Salado Pkwy., Ste. 401

Tempe, AZ 85281

Respectfully submitted this 7th day of January 2013.

James Arnett, In Propria Persona (I.F.P.)

9288 N. Monmouth Court

Tucson, Arizona 85742

(520)878-9779 (home)

(520)304-0129 (field)

jamesarnettaz@gmail.com (email)