FILED
U.S. DISTRICT COURT

2013 SEP 11 ⸱ 12: 04

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

James Arnett
Plaintiff, In Propria Persona (I.F.P.)
9288 N. Monmouth Court
Tucson, Arizona  85742
Telephone: (520)304-0129
Email: jamesarnettaz@gmail.com

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JAMES ARNETT,<br><br>    Plaintiff,<br><br>v.<br><br>BENJAMIN SNOW HOWARD;<br>LIFELINE MEDIA LLC, a Utah<br>entity; NATIONWIDE AFFORDABLE<br>HOUSNG, a Texas corporation; and the<br>BEN HOWARD TRUST, an Idaho<br>trust,<br><br>    Defendants. | **SECOND AMENDED COMPLAINT**<br><br>Presiding Judge Ted Stewart<br><br>Referred to Magistrate Judge Dustin Pead<br><br>Case 2:13-CV-00591-TS-DBP |

Plaintiff James Arnett, representing himself Pro Se, hereby WITHDRAWS his Motion For Leave [Doc. 57] and replaces it with this request for Leave to propose his Second Amended Complaint to this Honorable Court, contained herein.

Pursuant to the Order [Doc. 49] of the Honorable United States District Judge David C. Bury for the District of Arizona, this case [formerly 4:12-CV-00311-TUC-DCB] was transferred on 24 June 2013 into this Forum of the United States District Court for the District of Utah, and assigned to the Honorable United States District Judge Ted Stewart, and subsequently referred [Doc. 61] to the Honorable United States Magistrate Judge Dustin B. Pead on 15 August 2013 for the pretrial phase of this case.

This Honorable Court held a Status Meeting for this case on Tuesday, 30 July 2013, where Plaintiff orally moved for Leave to Amend. Plaintiff was instructed to file his Leave with the Clerk [Doc. 57] and did so on that same day, immediately following the Status Meeting. Plaintiff requested 45 days to Amend, and to concurrently seek representation admitted to this Forum. Plaintiff's Motion For Leave [Doc. 57] merely outlined his proposed amendments, reserving their development by qualified representation or pro se.

Because no Decision has yet been rendered on Plaintiff's Motion For Leave [Doc. 57], Plaintiff respectfully WITHDRAWS his Motion For Leave [Doc. 57], and resubmits this Leave herein, in this fully developed, proposed Second Amended Complaint, developed pro se, within those 45 days, for the purpose of:

**(1)** Conforming citations of Arizona Law to Utah Law and/or Common Law in the expression of Plaintiff's Claims, due to the change in Venue;

**(2)** Reactivating two original Claims [Doc. 1], which were retired in Plaintiff's First Amended Complaint [Doc. 35], specifically, the Claims for "Unjust Enrichment" and for "Copyright Infringement", which are now supported by new prima facie;

**(3)** Adding and reactivating allegations (supported by new prima facie);

**(4)** Adding the supporting prima facie;

**(5)** Qualifying additionally named Defendant as Alter-Egos under Utah Law;

**(6)** Correcting typos, errors and omissions.

## SECOND AMENDED COMPLAINT

### Jurisdiction

Venue is proper in this Court pursuant to 28USC§1391 (and as Ordered [Doc. 49]), as Defendant Benjamin Snow Howard (Defendant Howard), a resident of Layton, Utah, conducted business with Plaintiff James Arnett (Plaintiff Arnett), a resident of Tucson, Arizona, soliciting services, making offers to acquire labor, in person and remotely, within the jurisdiction of the District of Arizona. Defendant Lifeline Media LLC is an entity registered in Eden, Utah; Defendant Nationwide Affordable Housing is a corporation registered in Hurst, Texas; Defendant Ben Howard Trust is a trust registered in Idaho. Each registered entity is directed and managed by their sole registered agent, Defendant Howard, who may be served with Process at his residence, located at: 3580 N. 2225 E., Layton, UT 84040 [See Exhibits A – E, supporting Jurisdiction and Venue].

### Complaint

1.     BACKGROUND: In November 2010, Defendant Howard contacted Plaintiff Arnett via the Skype.com internet telephonic service to solicit help producing his website at www.benshoward.net. Defendant Howard purchased and drop-shipped a Cricket field phone [Exhibit C] directly to Plaintiff for consultation services in CSS coding methods [Exhibit F] in order to assist building his website for an ambitious project based on his "Trauma Release Coach" business for the purpose of mass marketing. To that end, Plaintiff provided effective consultation. On or about 5 February 2011, Defendant Howard [author of "Overcoming Life's Trauma", and "Guilt Free Living", and "The Secret To Prosperity"] visited the Tucson, Arizona work studio of Plaintiff Arnett, [producer and director of the "September Eleventh" film series for the New York State Fraternal Order Of Police] for the purpose of completing the design and finalizing construction of his Internet venture, at his Web domain, http://www.benshoward.net.  Defendant Howard asked Plaintiff to perform this service for him as a [gratis] personal favor, in order to help

him launch his plans to take his self-help seminar business from local events to the national level, proposing published book [Exhibit G], audio-book and movie embodiments of his "Overcoming Life's Trauma" live presentation, which Defendant Howard was performing on a regular basis in the State of Utah. Plaintiff provided him with a (CSS based) website design, from which, Defendant Howard could edit the specifics of his proposed services and product lines.

2.    When Defendant Howard was staying at Plaintiff Arnett's Tucson work studio [Exhibits A & B], located at: 7425 N. Mona Lisa Rd., unit 236, Tucson, Arizona 85741, he had solicited Plaintiff Arnett's services to produce an audio-book [See DVD-1] and a three hour motion picture for him [See DVD-2], over a two month period, both products based upon Defendant Howard's live presentation of "Overcoming Life's Trauma".

3.    Defendant Howard then offered Plaintiff Arnett assignment as a major equity partner and the producer and director positions in the project (having the essential expertise), in order to secure his cooperation to perform production in Utah. Plaintiff Arnett agreed but would advise him of a later date, regarding his availability, due to his obligation to complete the theatrical motion picture, "Blocked", he was then engaged in producing. Satisfied, Defendant Howard returned to Utah and deployed the website Plaintiff Arnett had coded for him.

4.    On or about, 21 May 2011, Plaintiff Arnett advised Defendant Howard that he was then available for his project. By telephone from Utah, Defendant Howard reiterated his offer that he made to Plaintiff Arnett in Tucson, offering assignment as a major equity partner and the producer and director positions in the project, and adding the additional promises to pay all of his expenses, including his Tucson work studio rent, meals, field phone, lodging, vehicle, a per diem for gas, food, coffee, cigarettes and round-trip air transportation. Defendant Howard insisted that it was more efficient for the parties were-

to formalize the agreement together in Utah. Plaintiff Arnett agreed. Defendant Howard booked a one-way flight to Salt Lake City, Utah for ~~him~~ Plaintiff [Exhibit D].

5.      On 5 June 2011, Plaintiff flew from Tucson, Arizona to Salt Lake City, Utah, to begin work at Defendant Howard's personal residence, located at: 6232 E. 1800 N. Eden, Utah 84310 (no conspicuous address remained on the property, making for some confusion as to an exact identification of address). Upon Plaintiff's arrival, Defendant Howard briefed him on the project, characterizing the project to Plaintiff as personally commissioned to him by "God", via direct revelation, due to his ordination in the "Melchisedek Priesthood", conferred by the Church of Jesus Christ of Latter Day Saints (LDS), with the notable distinction of possessing a "Temple Recommend", providing Plaintiff reason to have confidence that Defendant Howard was sincere in his motivations and practices.

6.      Another LDS member, a single mother from a local university film program, **Ms. Dawn Strate Kalana**, was engaged by Defendant Howard as "Associate Producer". He offered her that credit in the film and her expenses were to be paid by Defendant Howard. Ms. Kalana accepted and worked for Defendant Howard. To date, neither credit, nor reimbursement for her expenses have been known to have materialized. <u>However, a subsequent conversation with Ms. Strate in August 2013, more than a year following the filing of this law suit, produced a conflicting story than originally documented. She now claims credit as "Executive Producer", "Investor" and "Writer", rather than school intern, sponsored by Deseret Industries of Ogden, Utah.</u> Defendant Howard stated to Plaintiff there was plenty of time to draft the equity agreement as the busy work schedule provided.

7.      On or about 8 June 2012, the graphic arts services of **Mr. Gerren Ard** [Exhibit H] were offered to Defendant Howard by Plaintiff Arnett. To that end, Plaintiff facilitated a telephone call, in order for Defendant Howard to speak with, and hire the services of Mr.

Ard. Defendant Howard then purchased him an airline ticket, approximately seven weeks ahead of the scheduled flight.

8.    On or about 23 June 2011, Plaintiff Arnett had completed both, the audio book [See DVD-1] and a commercial television spot [See DVD-1]; and developed the final production plans, with digital pipeline for producing the full three-hour, high definition, motion picture for commercial distribution as a self-help "work shop" series of video discs [See DVD-2].

9.    On or about 25 June 2011, Plaintiff Arnett began location filming in Utah. Defendant Howard, acting as the agent of Defendant Nationwide Affordable Housing [Exhibit I], did so in these affairs (financing the venture and making what few payments toward petty cash he disbursed to Plaintiff), until he changed the name of an existing entity under his sole control (RFA Financial LLC), to Defendant Lifeline Media [Exhibit J], an entity from which per diem payments to Plaintiff would then be made, which materialized only in petty cash stipends for cigarettes and coffee breaks at the "Valley Market".

10.    From late June 2011 throughout early September 2011, Plaintiff Arnett was delayed from filming Defendant Howard, due to him abandoning work regularly, to pursue romantic relationships with **Ms. Bonnie Carrigan**, **Ms. Angela Russel**, as well as his former wife, **Mrs. Robin Howard**, which resulted in Plaintiff often searching for lost special-needs children, essentially abandoned when Defendant Howard and guest would disappear without warning, and other impositionary, and elective delays of this type. To no effect, Plaintiff objected to these delays as costing him extra time, which had nothing to do with fulfilling his obligations on-schedule, as Defendant Howard had originally represented as being just a two month commitment.

11.     Filming only became productive, once Plaintiff Arnett and Defendant Howard went to film the Idaho locations in mid July 2011. During this time, Defendant Howard provided loose tobacco and paper for Plaintiff to roll his own cigarettes, claiming that he was running out of money. However, once returned from Idaho filming, the same type of delays persisted. The original two month project Plaintiff had accepted had doubled in time and was threatening to go much longer by the unnecessary delays introduced by Defendant Howard.

12.     On or about 25 July 2011, Mr. Ard [Exhibit V] arrived in Salt Lake City, and resided at the same Eden, Utah location in order to design the Lifeline Media branding for the products, and to produce the graphics for the motion picture product. Mr. Ard was paid the same petty cash stipend amounts weekly, until he would invoice for the totality of his labor, once it could be calculated.

13.     Defendant Howard disclosed to Plaintiff Arnett that a Federal Judge had "ripped him off", "singled him out for persecution", "swindled him", by making a large Civil judgment against him (in Case 1:09-CV-02799-ODE for refusing to return $200,000 belonging to the plaintiffs of that Case, which is on Appeal – although the truth of the matter was later discovered to be quite different than described by Defendant in Case: 1:09-cv-02799-ODE, in the U.S. Northern District Court of Georgia, Atlanta Division where, in Document 101, filed 7 August 2012 [Exhibit L], Defendant Howard was materially tied as a defendant in what the honorable U.S. District Judge Orinda D. Evans described as "...a massive Ponzi scheme that defrauded investors out of approximately $30 million.", pages 1&2), so he would not be able to make complete payment for Mr. Ard's services. Defendant Howard offered an equity ownership position in the products which Mr. Ard was manufacturing, in order to make up the outstanding balance to him. The details of which, Defendant Howard claimed he would work out at a later time, once all of the photography was completed. No such equity promises were fulfilled at that

appointed time, nor any time thereafter. In fact, Defendants were actually in the process of purchasing numerous real estate properties in Nevada [Exhibit K] with the monies he should have been paying to Plaintiff and Mr. Ard.

14.     Defendant Howard represented the equity as having great potential value, due to his access to celebrities "Glenn Beck" and "Marie Osmond" through his publishing service provider, who he was expecting to help him exploit the commercial potential of the project. Defendant Howard offered Mr. Ard equity because he claimed to Plaintiff and Mr. Ard that he was financially depleted and needed the cooperation of Mr. Ard to complete the project. Defendant Howard summarily reduced promised meals to once a day, left-overs, and reduced per diems to $10 a day, which Defendant Howard often consumed as he pleased, after returning from "lunch" meetings with his publishing service provider, while Plaintiff and Mr. Ard labored.

15.     On or about 28 August 2011, Defendant Howard disclosed to Plaintiff Arnett that he had no intention of providing Ms. Kalana her "Associate Producer" credit in the film, nor reimburse any of her expenses, stating that he felt no obligation to her whatsoever.

16.     Plaintiff Arnett and Mr. Ard immediately approached Defendant Howard to finalize the equity interest promises in the project. Defendant Howard claimed that assigning equity at that point was premature and would interfere with his ability to make any distribution agreement in the future, if he had formal partners. On that basis, he again refused to assign Plaintiff and Mr. Ard equity. Plaintiff and Mr. Ard countered, that if they were not formal partners, then they needed to get paid for their professional services. Defendant Howard agreed and promised to make everything "good" by ultimately paying them their rates, if that were possible, or by assigning equity to them, once he knew its "true" worth.

17.     Immediately following that meeting, Defendant Howard disclosed to Plaintiff Arnett that he had no intention of providing Mr. Ard with any equity, which he had promised to him. Defendant Howard  stated to Plaintiff that he intended to pay off Mr. Ard with a small token fee, instead of paying him his full invoice amount, when the labor was calculated. Defendant Howard stated that arrangement meant more profit for himself and for Plaintiff. Plaintiff Arnett refused diminishing Mr. Ard's consideration by any means.

18.     Plaintiff Arnett and Mr. Ard had exhausted their personal funds by this time, receiving no payment for ~~services~~ expenses, nor promised equity, beyond Defendant Howard making payment to Plaintiff's and Mr. Ard's Arizona rental units, in order to maintain the continued cooperation of Plaintiff and Mr. Ard. Defendant Howard insisted the distribution he was arranging would satisfy all payment issues. Deeply vested, Plaintiff and Mr. Ard continued to labor in earnest, giving Defendant Howard the benefit of the doubt.

19.     On or about 31 August 2011, Defendant Howard offered Plaintiff Arnett his personal 1994 Suzuki 1400 Intruder motorcycle, that he had possessed for over a decade, but was actually owned by the Ben Howard Trust, which he represented as a "1995" model, "just serviced", "safe", capable of "riding anywhere", as a "bonus" incentive to continue labor until payment for ~~services~~ the completed Goods, or the equity materialized. Defendant Howard also offered to pay Plaintiff the expenses of riding home on it to Tucson, when the work in Utah was completed. Defendant Howard represented the 1994 motorcycle as being worth more than $3,000. Plaintiff accepted the bonus [Exhibit M].

20.     Unknown to Plaintiff Arnett, The motorcycle brake pads were in fact, metal on metal, the padless metal backings making direct contact with the discs - deadly to take on a thousand mile journey. Defendant Howard also demanded to remove the only remaining safety equipment, the windshield. Defendant Howard provided a signed bill of sale

[Exhibit N], without any identification of the seller (the title named the Ben Howard Trust in Idaho as owner). Defendant Howard's "poor" financial condition still provided him with the disposable funds to impulse buy an identical motorcycle for <u>approximately $5,500</u> that was of much more recent manufacture, and without the electromechanical problems which the 1994 model suffered. Repair of those electromechanical problems, to make the vehicle safe and road-worthy, were discovered to be in fact, more costly than the value of the vehicle, rendering it as "totaled" condition, rather than "excellent" condition, as it was misrepresented by Defendant Howard. With Defendant Howard's new motorcycle having a windshield of its own, he had no more pretense for removing the windshield from the 1994 model, so Defendant Howard allowed Plaintiff to retain the last remaining safety device. But Defendant Howard removed the Idaho license plate from Plaintiff's motorcycle and installed it on his new motorcycle. When Plaintiff questioned him about the legitimacy of that action, Defendant Howard replied, "Sure, it's legal!". When Plaintiff questioned him about the liability of interstate highway travel to Tucson without a license plate, Defendant Howard replied, "You have three days to transport it, that's legal", then he provided Plaintiff with a Progressive Insurance Co. I.D. Card [Exhibit N], insuring a 1994 Suzuki Intruder 1400 – NOT a 1995 model as Defendants represented. <u>Defendant Howard had insured the motorcycle under his own name the following day, not in the Plaintiff's name, despite having just released the property to Plaintiff the day before.</u>

21.     On or about 11 September 2011, Defendant Howard demanded editorial changes, which he insisted were of special personal importance to him, and quickly became a "special revelation from God" to justify the changes. Those changes represented an obvious erosion of the marketability of the motion picture and the value of its equity to Plaintiff Arnett and Mr. Ard, who both refused the demands, agreeing it was another pretense for justifying continued non-payment and a betrayal of Defendant's Fiduciary Duties. Defendant Howard then used intimidation to coerce these changes, by shouting,

throwing and breaking objects, declaring that he would never pay Plaintiff nor Mr. Ard their rates, nor equity. A commotion ensued. This was witnessed by Defendant Howard's ex-wife, Mrs. Robin Howard. This resulted in more delays due to additional demands at threat, followed by Defendant Howard's apologies, but still no payment, nor equity materialized.

22.    By mid September, Defendant Howard's former wife, Mrs. Robin Howard, had agreed to re-marry him immediately. Defendant Howard gave his reason as his public assistance benefits for health insurance, provided by the State of Utah, would soon expire and he needed to get onto her medical plan immediately. Defendant Howard composed a Prenuptial Agreement for his soon-to-be wife to sign, in order to protect his assets from her, in case she discovered that he had never terminated his relationships with Ms. Carrigan and Ms. Russel (both of whom, persisted throughout the second marriage, ultimately resulting in their separation and divorce). Defendant Howard left his investment ledger open, revealing his assets to include in his Prenuptial Agreement. Plaintiff found Defendant Howard's ledger open in the work area, demonstrating to him an approximate $10,000 monthly income from a plurality of residential properties [Exhibit K].

23.    On or about 27 September 2011, the voice track and picture track of the motion picture were completed. The scope of the work was three hours of specialized, "green screen" visual effects techniques to superimpose Defendant Howard speaking in most every scene of the motion picture, to create the illusion that he was in many locations, when in fact, he was filmed on a green screen, at a property he owns at: 1087 S. 9275 E. Huntsville, UT 84317 [Exhibit O].

24.    At that time, Defendant Howard insisted that Plaintiff Arnett complete the "ambiance" portion of the sound track, despite the absence of audio speakers, from which to monitor subtle audio ambiances. Plaintiff made an earnest attempt, however, the noise

level created by the restlessness of Defendant Howard made that task impossible to do properly at broadcast standards using the built-in computer speakers. Plaintiff stated that he would build the ambiance track at his Tucson work studio, as originally planned, where he had the proper equipment for <u>meeting</u> broadcast standards.

25.    Defendant Howard insisted that the track be finished in Eden, Utah, inexplicably panicked that Plaintiff Arnett may not be able to complete the audio task, "for any reason". Plaintiff reassured Defendant Howard that it was a simple task, that required audio speakers, and a few representative speakers of sound systems the motion picture may be exhibited. Mr. Ard, a qualified audio editor, concurred. Regardless, Defendant Howard pressed vigorously, overly concerned that something bad may happen to Plaintiff somewhere <u>on the highway</u> between Eden and Tucson, never disclosing to anyone that the condition of the motorcycle was deadly without brake pads.

26.    To alleviate concern, Plaintiff Arnett gave his audio recording equipment to Defendant Howard: a ProTools software suite and a DigiDesign Mbox2 digital audio hardware device [Exhibit P], "if anything happens" to him. Defendant Howard sent his wife [by then re-married], Mrs. Robin Howard, to ask Plaintiff to remain in Utah to complete the ambient track. He explained his plan to conform the audio to broadcast standards in Tucson. Mrs. Howard accepted Plaintiff's reasoning and did not understand her husband's exaggerated concern. <u>Defendant Howard never returned Plaintiff's audio equipment to him after making it home alive.</u>

27.    On or about 30 September 2011, Defendant Howard still had not provided Plaintiff Arnett with the title to the 1994 motorcycle, and wanted him to wait until he made it home to Tucson, when he promised he would post it to him by US Mail. Concerned that Defendant Howard may hold the title hostage in order to coerce him with more threats <u>(specifically, to eliminate the potential for Defendant Howard to threaten to report the</u>

motorcycle stolen by Plaintiff, in order to force Plaintiff to sign away his rights to the Goods and thereby prevent him from seeking Judicial Relief), Plaintiff demanded the title before leaving. Defendant Howard complied after excusing his "oversight". Plaintiff also demanded that Mr. Ard be provided with a plane ticket home, in his presence, before he left Mr. Ard behind to return home by airline. Defendant Howard purchased a ticket for Mr. Ard, to return home on or about 12 October 2011.

28.     On or about 1 October 2011, Defendant Howard demanded more editorial changes to the motion picture. Without the financial means to leave Utah independently, Plaintiff Arnett was held until Defendant Howard would provide him with the means to travel home. These editorial changes were made in compliance to the demands. This additional work went on, around the clock, in 20 hour shifts by Plaintiff until the morning of 3 October 2011 when a large storm was due to arrive that evening. Defendant Howard demanded more changes, which delayed Plaintiff until the big storm struck. Fearing Defendant Howard may never again provide a means out of Utah (since he was scheduled to move to a new home that month), Plaintiff demanded and received his travel expenses in cash, then left late that afternoon (at approximately 5:20PM) without full payment for his four months of labor, nor promised equity.

29.     Even after Defendant Howard, Plaintiff Arnett and Mr. Ard prayed together for a safe trip, Defendant Howard never mentioned, nor warned Plaintiff that he would be riding into a storm covering both Utah and Arizona on a motorcycle without brake pads. He also knew that Plaintiff never rode a mile on an open freeway before. Defendant Howard's financial obligations to Plaintiff would be at an end, if an accident on the U.S. and Interstate highways of Utah and Arizona occurred. Nevertheless, Defendant Howard elected to remain silent as Plaintiff Arnett began a ride of nearly a thousand miles, in extreme weather conditions.

30.     By 5 October 2011, Plaintiff Arnett survived the journey home to Tucson, despite an electrical breakdown in Kanab, Utah. On or about 12 October 2011, Mr. Ard also made it home by airline, <u>carrying the computer hard drive, containing all of the element files and finished tracks of the Motion Picture, Audio Book and TV Commercial Spot, authored by Plaintiff, for the audio mix to be completed in Tucson [Exhibit Z].</u> Plaintiff and Mr. Ard waited for Defendant Howard to come to Tucson to complete the audio mix, and bring the promised payment or equity. Defendant Howard moved into another luxury home in Layton, Utah, and paid for classes to attempt the audio mix himself. During this time, Defendant Howard did not answer, nor return telephone calls from Mr. Ard.

31.     On or about 7 December 2011, Plaintiff Arnett received a call back from Defendant Howard, then wishing to come to Tucson, two months later than agreed. Plaintiff informed Defendant Howard that eviction was imminent. Without getting paid, Plaintiff stated that he would not be in a position to do anything but move. Defendant Howard still did not offer any payment nor equity, however, he stated, "Good luck with the move," then asked to stay at Plaintiff's mother's home and do the work there, still, without offering or making any payment. Plaintiff refused, then reminded Defendant Howard of his financial obligation to Mr. Ard. Defendant Howard replied that he was "putting together a holiday gift package with payment" for Mr. Ard. No "gift" package ever arrived, nor payment, nor equity was ever delivered.

32.     On 8 December 2011, Defendant Howard uploaded the motion picture for public exhibition on the Lifeline Media websites, www.benshoward.com and www.benshoward.net, using the Vimeo service at www.vimeo.com/33328737 [Exhibit Q] without license to exhibit the unpaid motion picture nor license for the music score, created by **Mr. Robert A. Wolf,** of Evansville, Indiana.

33.     On or about 22 December 2011, Mr. Ard informed Plaintiff Arnett that Defendant Howard still had not paid him anything since the token payment upon leaving Utah. Neither had Plaintiff received any further payment, nor equity. Plaintiff also discovered that Defendant Howard solicited his music score composer, Mr. Wolf, and had engaged him to compose, record and deliver the complete music score. Mr. Wolf disclosed to Plaintiff that he still had not been paid by Defendant Howard for those two months of work. Defendant Howard commissioned music scoring for his seminar events. Mr. Wolf completed that music composition too but he has not delivered it, due to non-payment.

34.     Plaintiff Arnett immediately demanded Defendant Howard pay both, Mr. Ard and Mr. Wolf $2,000 each, immediately before the Christmas holiday, at threat of using the motion picture as a portfolio piece. Defendant Howard threatened to retaliate by pirating a copy of Plaintiff's theatrical motion picture, "Blocked" online, which is in his possession. Defendant Howard then decided to pay Mr. Ard and Mr. Wolf only $1,000 each by Christmas. Mr. Wolf has not received any more payment by Defendant Howard, having received only $1,000 for producing a full length motion picture and live event scores.

35.     On or about 26 January 2012, Plaintiff Arnett discovered that the front and rear brakes of the motorcycle had completely failed. Upon replacement of the $68 US Dollar disc brake pad set, Plaintiff examined the old pads [Exhibit R]. The brake pad assembly was worn-through, with the brake piston (calipers is the parts catalog term) making direct contact with the braking disc, destroying them deep below the surfaces of front and read discs, rendering them irreparable. Plaintiff invoiced Defendant Howard for the balance of combined labor [Exhibit S]: $211,000. Plaintiff applied travel and "per diem" money as payment toward the invoice. Plaintiff also offered a five percent discount, if payment was settled within 30 days. Because Defendant Howard had doubled the term of the project for elective, personal reasons and continued to refuse to make payment, Plaintiff determined that paying a delinquent payment fee was fair and reasonable for two additional months of

wasted time, hardships and the aggravation of each frustrated attempt to collect either promised payment, or promised equity in exchange for the great volume of labor manufacturing the Goods. Plaintiff issued that delinquent payment fee of 37%, which brought the balance due to $289,070 following a 26 February 2012 deadline, upon which date, the motion picture would be used for portfolio purposes. Defendant Howard had refused to make any payment, while continuing to benefit from the unpaid labor in the promotion of his books and seminar events, advertized on his Lifeline Media websites at: http://www.benshoward.net and http://wwwbenshoward.com, still using the Vimeo service at www.vimeo.com/33328737.

36.     In response to two of Plaintiff Arnett's demands to remove the motion picture from public exhibition, Defendant Howard did not respond or comply. Plaintiff alleges that he then fraudulently filed a United States Copyright on the same. In reaction to "cease and desist" notices, first emailed by Plaintiff to Defendant Howard on or about 31 January 2013, Defendant Howard raced to file Copyright Pau003684884 for Plaintiff's Goods (issued on 15 February 2013), without any written agreement with Plaintiff, as required by Federal Law (Section 101 of the Copyright Act [Title 17 of the U.S. Code]), claiming authorship of the "entire motion picture" and as an "employer for hire", without specifying who his employees or independent contractors had signed away their rights. No such agreements exist, as Defendant Howard successfully evaded putting anything in writing throughout the commission of his alleged fraud and misrepresentations to Plaintiff. Defendant Howard's copyright to the intellectual property of his book does not extend into the intellectual property rights of the motion picture, owned by Plaintiff, Mr. Ard, or Mr. Wolf's music score, until those rights are transferred for consideration. On 25 February 2012, Defendant Howard attempted to induce Plaintiff Arnett to forbear seeking judicial relief [Exhibit T]. Defendant Howard thereafter denied his agreed-upon obligations to Plaintiff, allegedly believing that his Copyright claims had bookended a successfully executed fraud, since Defendant Howard had left Plaintiff in a financial condition where

he may never have the wherewithal to litigate and recover any of his rightful Claims – except the United States Court System does accommodate pro se and I.F.P litigants for justice to prevail. This is where this case stands today unsettled, 16 months later, with Defendant Howard maintaining that merely filing an allegedly fraudulent copyright alone justifies his tortious acts and behavior toward Plaintiff Arnett, continually praying for this Honorable Court to allow him to abscond by Dismissal of Plaintiff's Claims for no apparent, justifiable reason.

37.     Plaintiff alleges that Defendant Life Line Media, Defendant Nationwide Affordable Housing, and Defendant Ben Howard Trust meet the vast majority (if not all) of the Colman factors (Colman v. Colman, 743 P.2d 782, 786 Utah Ct. App. 1987) establishing Alter-Ego: **(1)** Undercapitalization of a one-man corporation; **(2)** Failure to observe corporate formalities; **(3)** Nonpayment of dividends; **(4)** Siphoning of corporate funds by the dominant stockholder; **(5)** Nonfunctioning of other officers or directors; **(6)** Absence of corporate records; **(7)** The use of the corporation as a facade for operations of the dominant stockholder or stockholders; and **(8)** the use of the corporate entity in promoting injustice or fraud. Therefore, Plaintiff makes the following CLAIMS FOR RELIEF, each severable as interpreted, and may be liberally constructed by this Honorable Court:

38.                          **FIRST CAUSE OF ACTION**
                             **BREACH OF CONTRACT**

39.     All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

40.     Upon information and belief, Defendants Howard, ~~et al.~~ Defendant Lifeline Media, and Defendant Nationwide Affordable Housing, had represented his commercial project to Plaintiff Arnett as having substantial potential earning

power, built around the draft of his Book "Overcoming Life's Trauma" [Exhibit G] (this is the final title of the Book, which went through several iterations of title but with essentially the identical content). <u>Herein, said Defendants meet all Four Elements Of Breach Of Contract, under Utah and/or Common Law.</u>

41.     To induce Plaintiff Arnett into accepting a commission to produce the Motion Picture, TV Commercial Spot and Audio Book ("Goods") based on said Book, Defendant Howard, acting as the authorized agent for Defendant Nationwide Affordable Housing Inc., who he stated was financing the venture, and Defendant Lifeline Media LLC, who eventually was created to administrate the venture, made representations to Plaintiff that he would be assigned as a major equity interest partner in shares of sales derived from commercially exploiting the Goods Plaintiff produced, which would require two months of dedicated labor to produce.

42.     Defendant Howard's offers of major equity ownership of said Goods to Plaintiff, prior to his accepting of said commission, became the bargaining instruments to which the parties agreed.

43.     A lawful Contract was formed between the parties for the manufacture of said Goods, as defined under A.R.S. 47-2204 <u>(and under Utah and/or Common Law)</u> and by reason of Defendants Accepting and using Plaintiff's Goods on their web site, beginning on 8 December 2011 to date (and other online outlets), in whole or in part, which further constitute a lawful Contract, as defined under A.R.S 47-2201(C) <u>(and under Utah and/or Common Law)</u> and Plaintiff's performance met with Acceptance under A.R.S 47-2606 <u>(and under Utah and/or Common Law)</u>. Thus, Defendants had accepted the Fiduciary Duty to Plaintiff. <u>This is the first element of the Breach – a Contract.</u>

44.     Plaintiff Arnett fulfilled his obligations under the Contract at issue, by completing the manufacture and delivery of said Goods, with the Motion Picture at the final assembly stage {the final audio mix was halted by Plaintiff,  pursuant to A.R.S. 47-2705 (and under Utah and/or Common Law)}. This is the second element of the Breach – Performance by the party seeking recovery.

45.     Whereas, Defendant Howard had failed to perform, failing to either execute in writing the promised equity interest, or to make the promised payment for the Goods (at full rate), in lieu of said equity, as Defendant represented to Plaintiff, and failed to perform his Fiduciary Duties to Plaintiff.

46.     Plaintiff seasonably notified Defendants of their non-performance and issued an Invoice on or around 26 January 2012. Plaintiff then emailed Defendant Howard a cease and desist letter on 31 January 2012 to cease exhibition, distribution and sales of the Motion Picture.

47.     Defendant Howard ignored the Invoice and did not respond until the following month on 25 February 2012, denying any Contract for said Goods existed, and making other statements inconsistent with his Duty to Good Faith and Fair Dealings, made evident by the official  United States Copyright record demonstrating that Defendant Howard filed for, and received Copyright Pau003684884 on 15 February 2012, speciously claiming authorship for the entire Motion Picture, and the claim to be the "employer for hire", with the unmixed version of said Motion Picture submitted on DVD. That was the entirety of Defendant Howard's efforts to avoid litigation, he never responded to any other communication demanding payment for the Goods thereafter, resulting in this Case being filed with this honorable Court (originally filed in the District of Arizona).

48.     Defendant Howard breached the Contract at issue by failing to perform, <u>failing to execute a written equity partnership agreement and by</u> withholding and refusing to make any substantial payment toward said Invoice for the Goods manufactured expressly for Defendants' unique, commercial purpose, unsuitable for resale to any other buyer. <u>This is the third element of the Breach – Breach of the contract by Defendants.</u>

49.     Defendants have publicly established Acceptance of Goods after a seasonable period had passed, on 8 December 2011 <u>via continuous public exhibition</u> without making any substantial or full payment, as required under A.R.S. 47-2606  and A.R.S. 47-2607, and continue to violate these same Arizona Revised Statutes <u>(and under Utah and/or Common Law)</u>.

50.     Pursuant to A.R.S. 47-2723 <u>(and under Utah and/or Common Law)</u>, Plaintiff is eligible for damages to be awarded under the "prevailing price" of Goods at the time. This prevailing price is $3,000.00 per finished minute, per David L. Brown, Film Arts Foundation, January 2005 [Exhibit U].

51.     Total Running Time (TRT) of the Motion Picture is 175.5 minutes, totaling $526,500.00 US Dollars in 2005. By the time of Acceptance in 2011, inflation increased that figure by 15.18%, totaling $606,422.70 US Dollars as the prevailing price in the market at the time.

52.     For producing the 30 second TV Commercial Spot for Defendants, Plaintiff demands $3,800.00 US Dollars in payment.

53.     For producing the Audio Book of 134 minutes TRT for Defendants, Plaintiff demands $3,500.00 US Dollars.

54.    Therefore, as a direct and proximate result, Plaintiff has been damaged by Defendants in the amount of $613,722.70 US Dollars. <u>This is the forth element of the Breach – Damages, whereby, all four elements of Breach of Contract are established, under Utah and/or Common Law.</u>

55.    Additionally, pursuant to A.R.S. 47-2710 <u>(and under Utah and/or Common Law)</u>, Plaintiff is further entitled to all incidental and consequential damages, inclusive of (supporting documentation still being photographed and collected):

    (A)    At least $2,600.00 in incidental damages to cover storage, moving and re-establishing Plaintiff Arnett's work studio;

    (B)    The consequential damages from the inability to pay for air conditioning service in the summer heat that resulted in a $1,200.00 emergency room visit that Plaintiff suffered for a severe case of heat stroke;

    (C)    The consequential damages from the loss of an overheated computer system that terminally failed at $1,100.00;

    (D)    Said computer contained the complete development compiler software and source code for Plaintiff's proprietary "CineMatrix Industrial" filmmaking software suite [Exhibit W] (used as Plaintiff's primary production tool to produce all of his film productions), representing an investment of five years of development work, with an estimated cost of $540,000.00 to hire the re-development thereof by qualified computer programmers;

    (E)    The incidental damages of $3,800.00 in unpaid bridge loans, which ultimately need to be repaid with interest. These incidental and consequential damages would not have occurred, but for Defendants' Breach of Contract.

56.    Therefore, as a direct and proximate result, Plaintiff has been incidentally and consequentially damaged by Defendants in the amount of $548,7200.00 US Dollars, to be remedied as provided under A.R.S. 47-2710 <u>(and under Utah and/or Common Law)</u>.

57.     Additionally, Plaintiff prays for an Injunction to halt the use, exhibition and distribution of said Goods by Defendants until Plaintiff collects and receives all monies from Defendants, as adjudicated and awarded by this honorable Court.

58.     Upon information and belief, Defendant Howard's conduct in refusing payment for Goods that he was in Acceptance of, was wanton and/or reckless and/or shows a reckless indifference in the interests of others, and Plaintiff therefore also demands punitive damages for the acts alleged herein, to an amount deemed appropriate by this honorable Court.

59.     This action arises out of contract. Pursuant to A.R.S. 12-341 (and under Utah and/or Common Law), Plaintiff is entitled to recover his reasonable costs, to be determined if leave is granted to calculate that total.

60.     WHEREFORE, Plaintiff James Arnett, prays that judgment be entered in his favor on his First Cause of Action for a sum of up to $613,722.70 US Dollars for the Breech of Contract, together with up to $548,720.00 US Dollars in Consequential and Incidental Damages, with pre- and post-judgment interest, as well as up to $150,000.00 US Dollars in punitive damages, as set forth in this Complaint, including the costs of the preparation of this Case of no less than $1,500.00 $3,500.00 in the event of default, and such other relief as this honorable Court may find appropriate.

61.                      **SECOND CAUSE OF ACTION**
                                **FRAUD**

62.     All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

63.    Plaintiff alleges that the conduct of Defendants Howard, Nationwide Affordable Housing Inc., Life Line Media LLC, in regard to the issue of their ~~Contracting~~ alleged defrauding of Plaintiff for the manufacture of said Goods, qualifies as Fraud, under Utah and/or Common Law, meeting ALL NINE ELEMENTS OF FRAUD:

64.    (1)    A REPRESENTATION: Upon information and belief, Defendants made material misrepresentations and/or omissions regarding himself being a tortfeasor, pursued in a Federal Court in the District of Northern Georgia Atlanta Division (SEC/Huddleston vs. Grafton Enterprises/Benjamin Howard 1:09-CV-2799-ODE), which significantly devalued the major equity ownership interest offered to induce Plaintiff into manufacturing Goods under a lawful Contract, and when Defendants had failed to perform, they offered full payment but further failed to make payment in lieu of said equity, despite their Acceptance of Goods, as defined under A.R.S. 47-2606 (and under Utah and/or Common Law). Additionally, Defendant Howard allegedly and grossly misrepresented his inability to make said payment to Plaintiff, made evident by financial income from a plurality of significant and officially documented sources. Furthermore, Defendant Howard maintained a series of pretenses for failing to execute the Contract in writing as agreed – until he allegedly filed a fraudulent Copyright prior to claiming that no Contract ever existed.

65.    (2)    ITS FALSITY: Despite Defendants having a surplus of means to perform, Defendants misrepresented material facts, both to induce Plaintiff to manufacture Goods, and thereafter to induce Plaintiff to forbear seeking judicial relief, including Defendants knowing of facts materially affecting their ability to fulfill their performance of the Contract, which it knew or should have known, which were not known by Plaintiff, and failed to

disclose the same. Defendants' agreement to put said Contract into writing was evidently false, made evident by Defendant Howard ultimately filing an alleged Copyright for the Motion Picture, falsely claiming authorship for the complete work and claiming to be the employer for hire, thereafter claiming that no Contract existed, and he had no obligations to make payment for the right to exhibit, sell or otherwise distribute Plaintiff's created work. Defendants had the means to make payment on demand, or by surety, despite their ongoing denials to have any means to do so.

66.   (3)   ITS MATERIALITY: Upon information and belief, the misrepresentations and/or omissions were vitally material, and Defendants knew them to be so. The misrepresentations and/or omissions were sufficiently important to influence, and did influence, Plaintiff's actions and performance under the Contract, which were reasonable under the circumstances. Defendants' ongoing misrepresentations to Plaintiff to induce him to forgo payment (and all performance in compliance to their original agreement to put said Contract into writing) was material to compelling performance from Plaintiff. Defendants' alleged filing of a Copyright of Plaintiff's created work was profoundly material to defrauding Plaintiff, evident from the beginning to the completely executed act of Fraud.

67.   (4)   THE SPEAKER'S KNOWLEDGE OF ITS FALSITY: Upon information and belief, Defendants' representations were chronically false at the time they were made, and Defendants knew them to be completely false – made unequivocally evident by Defendants' alleged filing of a fraudulent Copyright for Plaintiff's created work and refusing to provide consideration for Plaintiff's intellectual property rights.

68.   (5)   THE SPEAKER'S INTENT THAT IT BE ACTED UPON BY THE RECIPIENT IN THE MANNER REASONABLY CONTEMPLATED: Upon information and belief, Defendants intended that Plaintiff would act upon the representations and/or omissions such that Plaintiff would manufacture Goods, which he did produce, and/or that Plaintiff would foergo seeking immediate Equity or payment from Defendants, and to induce Plaintiff to forbear seeking Judicial Relief.

69.   (6)   THE HEARER'S IGNORANCE OF ITS FALSITY: At the time the misrepresentations and/or omissions alleged herein were made by Defendants, Plaintiff was not aware of their falsity, and he justifiably relied upon them.

70.   (7)   THE HEARER'S RELIANCE ON ITS TRUTH: Plaintiff had traveled to Utah for the purpose of performing obligations under the Contract, and was dependent on relying upon Defendants for facilitating the manufacture of Goods, believing in the truthfulness of their dealings and for the means of returning back home to Tucson, Arizona, where Defendants' would complete their performance, as Defendant Howard agreed.

71.   (8)   THE RIGHT TO RELY ON IT:  Plaintiff having traveled nearly 1,000 miles from Tucson, Arizona to Eden, Utah, for the purpose of manufacturing Goods at a remote work site, controlled exclusively by Defendants, Plaintiff justifiably relied upon their representation of material facts to be true. Defendant Howard's chronic miserly behavior in all of his dealings created the pretense that he was indeed in need of Plaintiff's cooperation to perform, which Plaintiff rightfully acted upon to safeguard the venture as a whole, for all parties, by the direct pleas for help from Defendant Howard to do so.

72.     (9)     HIS CONSEQUENT AND PROXIMATE INJURY: As a direct and
                proximate result of Defendants' conduct under A.R.S. 44-1211 (and under
                Utah and/or Common Law), Plaintiff has been substantially damaged by
                Defendants, as defined in the First Cause of Action, defined in paragraphs
                38 – 60 herein.

73.     Upon information and belief, Defendants' conduct was wanton and/or reckless
and/or shows a reckless indifference in the interests of others, and Plaintiff therefore also
demands Punitive Damages for the acts alleged herein.

74.     The amount Plaintiff prays for in Punitive Damages is up to a 100% penalty, which
effectively DOUBLES the amount of the First Cause of Action.

75.     This action arises out of civil action. Pursuant to A.R.S. 12-341 (and under Utah
and/or Common Law), Plaintiff is entitled to recover his reasonable costs.

76.     WHEREFORE, Plaintiff James Arnett, prays that judgment be entered in his favor
on his Second Cause of Action for up to DOUBLE, meaning a sum of up to
$1,227,445.40 US Dollars ($613,722.70 US Dollars multiplied by a factor of two) or
more for Fraud, together with up to  $1,097,440.00 US Dollars ($548,720.00 multiplied
by a factor of two) or more in Consequential and Incidental Damages, with pre- and post-
judgment interest, as set forth in this Complaint, including the costs of the preparation of
this Case of no less than $1,500.00 $3,500.00 in the event of default, and such other relief
as this honorable Court may find appropriate.

## THIRD CAUSE OF ACTION
## FRAUD

77.    All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

78.    Plaintiff alleges that the conduct of Defendants Howard, Ben Howard Trust, in regard to the issue of their misrepresentation of the value, condition and year of manufacture of the motorcycle [VIN# JS1VX51LOR2102837] transferred to Plaintiff, by the authorized Agent of said trust, qualifies as Fraud, under Utah and/or Common Law, meeting ALL NINE ELEMENTS OF FRAUD:

79.    (1)    A REPRESENTATION: Upon information and belief, Defendants made material misrepresentations and/or omissions regarding the electrical and mechanical condition, as well as the worth of said Motorcycle to induce Plaintiff into continuing labor to produce said Goods, as a "bonus" incentive, while Equity or payment were stalled for reasons known only to Defendants at the time – with the understanding that this was a "bonus" until Defendants could resolve their internal issues halting their performance of Fiduciary Duties to Plaintiff for the Contract referenced herein.

80.    (2)    ITS FALSITY: Defendants misrepresented material facts, which it knew or should have known, which were not known by Plaintiff, and failed to disclose the same. Defendants stated that the vehicle was a 1995 model, as it appears on the Bill Of Sale, but was in fact a 1994 model and not worth "more than $3,000.00 US Dollars", as Defendants claimed. Its real worth was approximately $1,200.00 US Dollars. Defendants further stated that the vehicle was recently serviced from top to bottom and was capable of riding

safely across the country, when in fact, the electromechanical condition of the vehicle was unsafe to the point of being extraordinarily dangerous without adequate brake pads and not dependable, as it made it as far as Kanab, Utah before failing and required battery service from a professional mechanic. The Brakes were indeed, grinding metal on metal.

81.   (3)   ITS MATERIALITY: Upon information and belief, the misrepresentations and/or omissions were vitally material, and Defendants knew them to be so. The misrepresentations and/or omissions were sufficiently important to influence, and did influence, Plaintiff's actions, which were reasonable under the circumstances.

82.   (4)   THE SPEAKER'S KNOWLEDGE OF ITS FALSITY: Upon information and belief, Defendants' representations were false at the time they were made, and Defendants knew them to be completely false.

83.   (5)   THE SPEAKER'S INTENT THAT IT BE ACTED UPON BY THE RECIPIENT IN THE MANNER REASONABLY CONTEMPLATED: Upon information and belief, Defendants intended that Plaintiff would act upon the representations and/or omissions such that Plaintiff would continue to manufacture Goods, which he did produce, and/or that Plaintiff would accept said "bonus" as a surety for Equity or payment.

84.   (6)   THE HEARER'S IGNORANCE OF ITS FALSITY: At the time the misrepresentations and/or omissions alleged herein were made by Defendants, Plaintiff was not aware of their falsity, and he justifiably relied upon them.

85.   (7)   THE HEARER'S RELIANCE ON ITS TRUTH: Plaintiff had traveled to Utah for the purpose of performing his obligations under the Contract, and was dependent on relying upon Defendants for facilitating his travel back to Tucson, Arizona. Defendants had offered this incentive in lieu of air travel. Plaintiff believed Defendant Howard that a warm, late summer ride from Utah to Arizona would be a scenic, leisurely adventure, even though Plaintiff was as inexperienced rider.

86.   (8)   THE RIGHT TO RELY ON IT:  Due to Defendant Howard's recent marriage, he rented a new home in Layton, Utah. Remaining at the Eden, Utah residence was no longer an option so Plaintiff had to leave the premises in the immediate future. Because Plaintiff was uncertain about transporting a motorcycle over such a long distance, he inquired in great detail about the condition of the vehicle before agreeing to ride it nearly 1,000 miles home. Defendant Howard attested to the truthfulness of the facts he represented. Therefore, Plaintiff justifiably relied upon their representation of material facts to be true.

87.   (9)   HIS CONSEQUENT AND PROXIMATE INJURY: As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged by Defendants to the amount they represented, $3,500.00 US Dollars, for what Plaintiff was led to believe by Defendants that he was receiving.

88.   Additionally, pursuant to A.R.S. 47-2710 (and under Utah and/or Common Law), Plaintiff is further entitled to all incidental and consequential damages, inclusive of an additional $750.00 for repairs and parts.

89.     Upon information and belief, Defendants' conduct was wanton and/or reckless and/or shows a reckless indifference in the interests of others, and Plaintiff therefore also demands Punitive Damages for the acts alleged herein.

90.     The amount Plaintiff prays for in Punitive Damages is up to a 100% penalty, which effectively DOUBLES the amount of the First Cause of Action.

91.     This action arises out of civil action. Pursuant to A.R.S. 12-341 (and under Utah and/or Common Law), Plaintiff is entitled to recover his reasonable costs.

92.     WHEREFORE, Plaintiff James Arnett, prays that judgment be entered in his favor on his Third Cause of Action for DOUBLE, meaning a sum of up to $7,000.00 US Dollars ($3500.00 US Dollars multiplied by a factor of two) or more for Fraud, together with $1,500.00 US Dollars ($750.00 US Dollars multiplied by a factor of two) in Consequential and Incidental Damages, with pre- and post-judgment interest, as set forth in this Complaint, including the costs of the preparation of this Case of no less than $1,500.00 $3,500.00 in the event of default, and such other relief as this honorable Court may find appropriate.

93.                          **FORTH CAUSE OF ACTION**
                              **ENDANGERMENT**

94.     All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

95.     Plaintiff alleges that the conduct of Defendants Howard, Nationwide Affordable Housing Inc., Life Line Media LLC, and the Ben Howard Trust, in regard to the issue of Endangering Plaintiff, qualifies as such, under A.R.S. 13-1201, Utah and/or Common

Law, meeting both elements For Endangerment:

96.   (1)    **Recklessly endangering another person,**

(2)    **with a substantial risk of imminent death or physical injury.**

97.    Plaintiff alleges that Defendants' conduct was wanton and/or reckless and/or shows a reckless indifference in the interests and safety of Plaintiff. For reason of Defendant Howard allegedly having foreknowledge of the condition of the motorcycle brakes, yet knowingly and willingly remaining silent, delaying departure until the worst possible weather conditions, Plaintiff's allegation is the following: That Defendant Howard did so with aforethought, in order to deliberately place Plaintiff James Arnett in great mortal danger, as a means of covering up his alleged acts of Fraud against Plaintiff, and as a means of eliminating the individual with a significant debt owed to him, specifically, Plaintiff James Arnett.

98.    Plaintiff further alleges that Defendant Howard schemed to intentionally cause the catastrophic injury or death of Plaintiff James Arnett, by subtle means (which might never have been detected, and determined to be an "accident" by authorities), making Defendant Howard liable for Endangerment under A.R.S. 13-1201 (and under Utah and/or Common Law). Furthermore, Plaintiff alleges that Defendant Howard insured Plaintiff's Motorcycle in his own name (rather than Plaintiff's name), the day AFTER the Bill of Sale was executed [Exhibit N"], with the intent of withholding the Title, in the event that the dangerous conditions he created resulted in catastrophic injury or death of Plaintiff Arnett, upon which he would be positioned to collect from the vehicle insurer (Progressive Ins. Policy 37128338-2 [Exhibit N]) – as well as alleviating himself from his substantial debt to Plaintiff James Arnett as an aggregate result of his actions.

99.    The amount Plaintiff prays for in Punitive Damages is an amount, as high as the estimated combined assets of Defendants ($4,000,000 US Dollars), in order to provide the Court sufficient latitude, as it shall deem necessary and just, to exercise the broad powers and authority of this honorable Court, for the purpose of deterring the continuation of ~~such~~ habitual, tortious behavior by Defendants, by awarding a commensurate and effective amount to Plaintiff to achieve that deterrent result.

100.    This action arises out of civil action. Pursuant to A.R.S. 12-341 (and under Utah and/or Common Law), Plaintiff is entitled to recover his reasonable costs.

101.    WHEREFORE, Plaintiff James Arnett, prays that judgment be entered in his favor on his Forth Cause of Action for any amount up to $4,000,000.00 US Dollars, with pre- and post-judgment interest, as set forth in this Complaint, including the costs of the preparation of this Case of no less than ~~$1,500.00~~ $3,500.00 in the event of default, and such other relief as this honorable Court may find appropriate.

~~102. Additionally, Plaintiff prays for the power of Subpena in order to unseal Utah State Court records of cash awards made to Defendant Howard in 2007, to demonstrate said estimated, combined assets of Defendants, in order to justify the amount of Punitive Damages.~~

~~103.    Upon information and belief, Plaintiff prays that this honorable Court forward copies of those same records to Utah State Law Enforcement investigators in order to compare to Defendant Howard's alleged applications for State public assistance and for receiving the benefit thereof for substantial medical payments over several years, which he may have defrauded from the same. Currently, Utah investigators do not have Probable Cause to unseal those records, based on Plaintiff's reported allegations alone.~~

104.                    **FIFTH CAUSE OF ACTION**
                        **UNJUST ENRICHMENT**

105.   All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

106.   Plaintiff James Arnett produced Goods, consisting of a three-hour Motion Picture, Audio Book and 30 Second TV Spot, and delivered those Goods to Defendant Howard, Defendant Life Line Media, and Defendant Nationwide Affordable Housing.

107.   Said Goods were received by, accepted by, and used by Defendants in their business since 8 December 2011 – to date.

108.   Defendants' subsequent copyright claim to Plaintiff's created work and its use by Defendants in their business is without license, right, nor making payment of any kind toward Plaintiff's created work, which constitutes an Unjust Enrichment to Defendants at Plaintiff's expense.

109.   No justification supports the enrichment of Defendants and the impoverishment of Plaintiff. Plaintiff may be without an adequate remedy at law.

110.   As a direct and proximate result of the Unjust Enrichment to Defendants, Plaintiff has suffered and will continue to suffer damages.

111.   Thereby, said Defendants meet all Three Elements of Unjust Enrichment under Utah and/or Common Law:

    1.       Benefit conferred on Defendants by Plaintiff;

    2.       An appreciation or knowledge by Defendants of the benefit;

3.     The acceptance or retention by the Defendants of the benefit under such circumstances as to make it inequitable for the Defendants to retain the benefit without payment of its value.

112.   Upon information and belief, Defendants' conduct was wanton and/or reckless and/or shows a reckless indifference in the interests of others, and Plaintiff therefore also demands punitive damages for the acts alleged herein.

113.   This action arises out of contract. Pursuant to Utah Law (and/or Common Law), Plaintiff is entitled to recover his reasonable attorneys' fees and costs.

114.   WHEREFORE, Plaintiff James Arnett demands that judgment be entered in his favor on his Fifth Cause of Action for the sum of up to $613,722.70 US Dollars or more in actual damages (as factored in ¶54), plus pre- and post-judgment interest, as well as up to $548,7200.00 US Dollars or more in damages, punitive and/or otherwise (for the reasons itemized in ¶55 – ¶56), as set forth in this Complaint, including attorneys' fees and costs of not less than $3,500.00 in the event of default, and such other relief as the Court finds appropriate.

115.                    **SIXTH CAUSE OF ACTION**
                       **COPYRIGHT INFRINGEMENT**

116.   All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

117.   On 15 February 2012, Defendant Howard and Defendant Life Line Media, filed for, and were issued United States Copyright  Pau003684884 [Exhibit X], claiming to be the "employer for hire", yet failed to specify the employees with whom they had

contracted, and claimed the full intellectual property rights and authorship for the entirety of Plaintiff's created work on DVD [Exhibit DVD-2], in response to a "cease and desist" letter, emailed to them by Plaintiff, on 31 January 2012 – establishing WILLFUL Infringement.

118.   Defendants had Direct Access to Plaintiff's created work and the elemental source files created by Plaintiff, from a full back-up copy maintained by Defendants in Utah.

119.   On information and belief, Defendants have been commercially exploiting Plaintiff's created work continually since 8 December 2011 to date – with the open credits conspicuously marked, "Life Line Media Presents", indicating that Defendants are the merely the exhibitor, followed by "An A.I.A. Motion Picture Company Production", indicating that the production, i.e., the product, is the property of Plaintiff Arnett, who has used the trade name "A.I.A. Motion Picture Company" since 1997, which goes back even further to 1958 by his father, who designed the logo for this family business.

120.   Defendants have no employment contract with Plaintiff, nor any license agreement, distribution or exhibition agreement, nor have Defendants made payment toward acquiring and clearing Plaintiff's created work.

121.   Plaintiff possesses the full project materials of his created work and elemental source files on an external computer data drive in Tucson, Arizona [Exhibit Z].

122.   Plaintiff James Arnett is the author of his created work, and is a commercially licensed Adobe Systems Inc. licensee, the software in which his created work was fully authored, whereas, Defendants were not commercially licensed Adobe Systems Inc. licensees to have any right to claim authorship of Plaintiff's created work. Nor are Defendants in the media production business – Defendants are merely distributors and a

self-published book author by night and real estate speculator by day.

123.   The content of the DVD Defendants filed with the U.S. Copyright Office is composed of audio and video materials – identical to Plaintiff's created work.

124.   Plaintiff Arnett has filed for a copyright with the United States Copyright Office, Library of Congress for his created work, as required by Title 17 USC§411(a) [Exhibit Y].

125.   Herein, said Defendants meet all ELEMENTS OF COPYRIGHT INFRINGEMENT, under Title 17 of the United States Code and Federal Law.

126.   This action arises out of contract. Pursuant to Utah Law,  Plaintiff is entitled to recover his reasonable attorneys' fees and costs.

127.   WHEREFORE, Plaintiff James Arnett demands that judgment be entered in his favor on his Sixth Cause of Action for the Remedies provided under Title 17 USC §502, §503, §504, §505, as set forth in this Complaint, to be determined at the time of trial, including attorneys' fees and costs of not less than $3,500.00 in the event of default, and such other relief as the Court finds appropriate.

Respectfully submitted this 9th day of September 2013.

James Arnett, In Propria Persona (I.F.P.)
9288 N. Monmouth Court
Tucson, Arizona 85742
(520)304-0129 (telephone)
jamesarnettaz@gmail.com (email)

**2:13-CV-00591-TS-DBP**

**SECOND AMENDED COMPLAINT PRIMA FACIE**

**EXHIBIT LIST**

**9 SEPTEMBER 2013**

| | | | | |
|---|---|---|---|---|
| (A) | Affidavit: Steven M. Adelson | | (N) | Bill Of Sale & Insurance Card |
| (B) | Affidavit: Edgar A. Ybarra | | (O) | Huntsville Property |
| (C) | Field Phone Records | | (P) | DigiDesign Mbox2 |
| (D) | Plane Reservations | | (Q) | Motion Picture On Vimeo |
| (E) | Payment Into Forum | | (R) | Motorcycle Brake Pad |
| (F) | CSS Emails Into Forum | | (S) | Invoice |
| (G) | Defendants Book | | (T) | Defendants Negotiation Email |
| (H) | Affidavit: Gerren B. Ard | | (U) | Prevailing Price |
| (I) | NAH Corporate Record | | (V) | James Arnett with Gerren Ard |
| (J) | Life Line Corporate Record | | (W) | CineMatrix Software Suite |
| (K) | Nevada Real Estate | | (X) | Fraudulent Copyright |
| (L) | Doc. 101 Huddleston vs. Howard | | (Y) | Copyright Filing §411(a) Proof |
| (M) | Motorcycle | | (Z) | Computer Hard Drive |

# EXHIBIT "A"

## MR. ADELSON'S STATEMENT

In or around February 2011, I attended a gathering of individuals in the apartment of James Arnett of Tucson, Arizona. At the time, Mr. Arnett was editing his feature motion picture BLOCKED. The purpose of this gathering was to look over the progress of this movie and offer comments.

I recognize the individual in the two photographs below. Although I do not recall his name, I do recall seeing him at the apartment on the evening Mr. Arnett presented his film. I also recall Edgar A. Ybarra was also there on the same occasion.

State of Arizona
County of Pima
On this _9th_ day of _AT_ 20_12_, _STEVEN M. ADELSON_
personally appeared before me whose identity
I proved on the basis of satisfactory evidence
to be the signer of the above instrument and
he/she acknowledged that he/she executed it

_Lauren Day_
Notary Public

OFFICIAL SEAL
LAUREN DAY
NOTARY PUBLIC-ARIZONA
PIMA COUNTY
My Comm. Exp. Sept. 6, 2016

Steven M. Adelson
(520)721-4233

_AZDL. B 14644601_
AZ License

_10-9-12_
Date



Photographs of Ben S. Howard from his Facebook.com page at http://www.facebook.com/benshoward

# EXHIBIT "B"

### MR. YBARRA'S STATEMENT

I recognize the individual in the two photographs below from James Arnett's apartment in Tucson, Arizona, where I saw him, in or around February 2011.

I also recall Steven M. Adelson there on the same occasion, as we were looking over the progress of Arnett's "Blocked" film.

State of Arizona
County of Pima

On this ___ day of _____ 20__, _EDGAR A. YBARRA_
personally appeared before me whose identity
I proved on the basis of satisfactory evidence
to be the signer of the above instrument and
he/she acknowledged that he/she executed it.

_____
Notary Public

OFFICIAL SEAL
LAUREN DAY
NOTARY PUBLIC-ARIZONA
PIMA COUNTY
My Comm. Exp. Sept. 6, 2016

Edgar A. Ybarra
(520)480-8943

AR PL D01404643   9/15
AZ License

10-9-12
Date

 

Photographs of Ben S. Howard from his Facebook.com page at http://www.facebook.com/benshoward

# EXHIBIT "C" 1 of 2

Payment History      Inbox   x

AL-MUNT CORP cellphonecity1@yahoo.com     2:08 PM (10 minutes ago)
to me

*Khalifa Riad Muntasser*

Office: 520-579-6679

Corporate Headquarters
3720 W Ina Rd, Suite 134
Tucson, AZ 85741

📄 **Payment History List.docx**
35K   View   Download

**account summary**

| Name | BEN HOWARD | | Amount Due | $0.00 |
|------|------------|---|------------|-------|
| **Account Number** | 340-9367508-1 | | **Future Charges** 10/09/2012 | $70.76 |
| **Billing Address** | PO BOX 223 HUNTSVILLE, UT 84317   Edit | | **My Bill** | View |
| **Status** | Active | | | |
| **Automatic Bill Pay** | Not Enrolled | | | |
| | | | | BridgePay Request |

**Current Lines of Services**
Wireless Lines: 2      Broadband Lines: 0

(520) 304-0129
(520) 358-5638

Top of Form

A/EPDu UKLTozh

**Payment History List**

🖫 Re-print Receipt   ⊗ Cancel

## EXHIBIT "C" 2 of 2

| Provider | Product | Date | Account ID | Confirmation ID | Payment | LD | Fee | Total | User | Payment Method | | Action |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cricket | Service Payment | 6/12/2012 1:10:34 PM | 52030401 29 | QPAYWP327000285 | $34.00 | $0.00 | $3.00 | $37.00 | 12350041 | Cash | | |
| Cricket | Service Payment | 5/10/2012 1:41:41 PM | 52030401 29 | QPAYWP318931571 | $70.76 | $0.00 | $3.00 | $73.76 | 12350041 | Cash | | |
| Cricket | Service Payment | 4/12/2012 1:57:49 PM | 52030401 29 | QPAYWP311738800 | $70.76 | $0.00 | $3.00 | $73.76 | 12350041 | Cash | | |
| Cricket | Service Payment | 1/11/2012 2:25:31 PM | 52030401 29 | QPAYWP287903708 | $70.76 | $0.00 | $3.00 | $73.76 | 12350041 | Cash | | |
| Cricket | Service Payment | 3/1/2011 4:46:03 PM | 52030401 29 | QPAYWP208041189 | $117.00 | $0.00 | $3.00 | $120.00 | 12350041 | Cash | | |
| Cricket | Service Payment | 2/9/2011 5:56:07 PM | 52030401 29 | QPAYWP203002596 | $38.00 | $0.00 | $3.00 | $41.00 | 12350041 | Cash | | |
| Cricket | Service Payment | 1/11/2011 4:57:31 PM | 52030401 29 | QPAYWP196039484 | $37.40 | $0.00 | $3.00 | $40.40 | 12350041 | Cash | | |
| Cricket | Service Payment | 12/30/2010 5:01:59 PM | 52030401 29 | QPAYWP193102386 | $39.78 | $0.00 | $3.00 | $42.78 | 12350041 | Cash | | |

# EXHIBIT "D"

Changes have been made to your 6/5/2011 flight   ⬚   BEN  x        ▦ ⎙ ▣

Expedia Travel Services notifications@expedia.com          5/28/11   ↰   ▾
to me ⬇

## Your Flight Details Have Changed
**Passenger(s): ARNETT/JAMES**
**Expedia Itinerary Number: 137137017384**
**United Airlines confirmation code: T1FX7M**

Dear Expedia Traveler,

United Airlines made the following change(s) to your itinerary:

* Changed the flight number for 2 of your flights.

Airlines will occasionally adjust flight schedules. United Airlines has done their best to find an alternative that offers minimal disruption to your trip and we have updated your itinerary accordingly. It is not necessary to call us regarding the change.

Your updated flight itinerary is below, and you can always view your most up-to-date itinerary at Expedia.

### Tucson to Denver

| Flight Change Details | Sunday, Jun 05, 2011 at 8:42 AM | Change in Flight |
|---|---|---|
| | United Airlines | Flight Number: UA~~6279~~ 6858 (change) |
| | From: (TUS) Tucson AZ, USA | Depart: 8:42 AM |
| | To: (DEN) Denver CO, USA | Arrive: 11:40 AM |
| | Status: CONFIRMED | Class: Coach |
| | Equipment: CRJ-700 Canadair Regional Jet | Seat: 13B |
| | Operated By: /UNITED EXPRESS/SKYWEST AIRLINES(UA) | |

### Denver to Salt Lake City

| Flight Change Details | Sunday, Jun 05, 2011 at 1:56 PM | Change in Flight |
|---|---|---|
| | United Airlines | Flight Number: UA~~5727~~ 6617 (change) |
| | From: (DEN) Denver CO, USA | Depart: 1:56 PM |
| | To: (SLC) Salt Lake City UT, USA | Arrive: 3:27 PM |
| | Status: CONFIRMED | Class: Coach |
| | Equipment: CRJ-700 Canadair Regional Jet | Seat: |
| | Operated By: /UNITED EXPRESS/SKYWEST AIRLINES(UA) | |

Sincerely,
The Expedia Travel Team

---

Please do not reply to this e-mail as this mailbox is not monitored.

You are receiving this transactional email based on a recent booking or account-related update on Expedia.com.

CONTACT US

To contact us or send feedback, please click here or contact us via postal mail at: Expedia, Inc., attn: EMC Team, 333 108th Avenue NE, Bellevue, WA 98004. For additional assistance, visit the Expedia Customer Support Center, or call 1-800-Expedia.

CST# 2029030-40

@2009 Expedia, Inc. All rights reserved.
are registered trademarks, or trademarks
herein may be trademarks of their respec

| | | |
|---|---|---|
| from: | James Arnett jamesarnettaz@gmail.com | plane logos |
| to: | B Howard <elderb123@gmail.com> | entioned |
| date: | Sat, May 28, 2011 at 9:52 AM | |
| subject: | Fwd: Changes have been made to your 6/5/2011 flight | |
| mailed-by: | gmail.com | |

For internal use only
* TPID: 1
* TUID: 230488885
* Itinerary Number: 137137017384

OQPOTO

## EXHIBIT "E"



**EXHIBIT "F"**

| | | | |
|---|---|---|---|
| me | Want to read my story? - Don't share it with anyone. | ✉ | 11/15/11 |
| Jason, me (2) | Jason Mallory - 2084 Robot Movie Project - Hi Jason, I went over your material - I saw that video for the exoskeleton before and I want or | ✉ | 11/1/11 |
| B Howard | File names - Promo01 DSC_6163.mov promo 01.wav Promo02 DSC_6164.mov promo 02.wav Promo03 DSC_6165.mov promo 03.wav | | 10/21/11 |
| me | Utah film directory - http://ut.reel-scout.com/crew_login.aspx | | 8/31/11 |
| Kimber, me (3) | Fwd: This is about funding anything... - Info from Kimber Forwarded message From: Kimber leigh <kimberaleigh@mac.com | | 6/27/11 |
| DAWN, Connie (3) | FW: SPECIAL GUEST FILMMAKER Available- Free of charge - Thank you kindly for your offer. Dawn, but there's more to finishing the s | | 6/11/11 |
| Expedia, me (2) | Changes have been made to your 6/5/2011 flight - Forwarded message From: Expedia Travel Services <notifications@expedia.com | | 5/28/11 |
| Expedia, me (3) | Expedia travel confirmation - Salt Lake City, UT (2) - Jun 05, 2011 - (Itin# 137137017384) - Forwarded message From: Expedia Travel S | | 5/24/11 |
| me | Extensions - See if these get there! | ✉ | 2/4/11 |
| B, me (8) | Web - Here are two Dreamweaver Extensions you need to install from within Dreamweaver. You will need two | ✉ | 1/25/11 |
| B Howard | Cleaned up version - Cleaned up version | ✉ | 11/14/10 |
| B Howard | more - more | ✉ | 11/14/10 |
| B Howard | Web stuff - Web Stuff | ✉ | 11/14/10 |
| B Howard | Covers - Covers | ✉ | 11/12/10 |
| me | Examples - See if you like the samples of this type of content presentation: http://www.projectseven.com/ | | 11/12/10 |
| me | Look - http://www.jamesarnett.com/sites/black/images.html | | 11/9/10 |
| me, B (4) | Cell Test - What happened to you? On Mon, Aug 9, 2010 at 9:47 AM, James Arnett <jamesarnettaz@gmail.com> | | 8/9/10 |
| me, B (2) | Skype - Tried to reach you but you didn't show up online. my skype is on and will stay on for the evening | | 5/24/10 |
| me .. Robert (17) | Great News! - Hi Ben. My friend Robert wanted to know more about the real estate collateral behind the film. Can | ✉ | 5/4/10 |
| me (2) | New Images - More : ) On Thu, Apr 29, 2010 at 1:55 PM, James Arnett <jamesarnettaz@gmail.com> wrote: Cool | ✉ | 4/29/10 |



# rcoming
## TRAUMA

End Depression,
Emotional Pain,
and Suffering

## ed by actual events

...afternoon in June, Ben Howard's life took a traumatic turn when a drunk driver hit his family head on, claiming the lives of his wife and two children, leaving the remaining children in critical condition. In an instant, this simple husband, businessman, and father was thrust on the journey of a lifetime where he discovers the simple truths that are the key to peace, healing, and the power to overcome.

...trauma release expert, Ben S. Howard, as he guides you through a gentle process of ending depression, emotional pain and suffering and on the path to a more rich, peaceful, and fulfilling life.

## -follow steps for overcoming:

| | | |
|---|---|---|
| ...ma | Emotional Abuse | Abandonment |
| ...ency | Verbal Abuse | Crime |
| ...buse | Victimization | Betrayal |
| ...se | Divorce | And More |

...going to therapy for thirteen years, and...

...self, Mt. Green, Utah

...eve letting go could be so easy... I had di...

...Daniel, Dallas, Texas

...scan
...gift

www.benshoward.com




---

*"...a true miracle!"*
D. Weber, Denver, Colorado

# Overcoming
## LIFE'S TRAUMA

*Find Closure to the Abuse, Tragedies, and Suffering of Life*

# Ben S. Howard

*(spine)* Overcoming LIFE'S TRAUMA    Ben S. Howard


EXHIBIT "G"

# EXHIBIT "H"

### MR. ARD'S STATEMENT

I, Gerren Ard, am a graphic artist and designer for multimedia production. I have a Bachelor of Arts degree in the field of Video Game Art and Design (GAD) and a Bachelor of Science Degree in Computer Information Systems (CIS). I have been an artist in the field for many years and worked directly with Mr. James Arnett on several successful projects since 2007, and I know his character very well.

I make the following statements under oath, swearing them to be the truth, which I can testify to honestly because I was a firsthand witness, directly involved with the matter of this case. I have read the complaint (**Document 1**) written by Mr. Arnett.

**I testify to the accuracy of paragraph 7.** I was called by telephone, by Mr. Arnett, who introduced me to Mr. Ben S. Howard on the telephone around June 8", 2011. At that time, I had accepted the offer of a job working on Mr. Howard's project in Utah. He bought me an airline ticket and I flew to Utah to work for him several weeks later.

**I testify to the accuracy of paragraph 10.** I was in Utah from July 25", 2011 to or around October 13th 2011, around a week after Mr. Arnett's departure from Utah in early October 2011. I can attest to everything he described after my arrival in Utah.

**I testify to the accuracy of paragraphs 12 through 34.** I was a firsthand witness. I saw and heard everything in the complaint, while living at the work site in Utah with Mr. Howard and Mr. Arnett until about October 13", 2011, and also afterwards while working with Mr. Arnett in Tucson.

The complaint from Mr. Arnett, while extensive and detailed, still doesn't fully convey the scope of Mr. Howard's petty actions, irresponsibility and deceptions. There are many more things I have to add, that will wait upon my opportunity to formally testify about not being paid-in-full for the work I have done for Mr. Howard. This complaint and testimony, I believe, would further illustrate the bad faith Mr. Howard practiced at what seemed to be any and every opportunity to take advantage of Mr. Arnett and myself.

STATE OF ARIZONA } ss
COUNTY OF PIMA }
This instrument was acknowledged before me this ___ day of
_____, 20 12 , by _____
In witness whereof I herewith set my hand and official seal.
_____ NOTARY PUBLIC

MIRIAM K. PATINO
NOTARY PUBLIC - ARIZONA
PIMA COUNTY
My Commission Expires
June 30, 2014

Gerren B. Ard
(520) 792-1847

B14922374
AZ License

10/19/12
Date

## EXHIBIT "I" 1 of 3

Link to Window on State Government - Susan
Combs, Texas Comptroller of Public
Accounts

Susan Combs, Texas Comptroller of Public
Accounts

image of star

<u>Taxable Entity Search Results</u>

# Franchise Tax Certification of Account Status

**This Certification Not Sufficient for Filings with Secretary of State**

<u>Obtain a certification</u> for filings with the Secretary of State.

It takes up to two weeks for this search to update when payment is made through the mail or
at a taxpayer service office. This agency may manually issue a Certificate of Account Status
(good standing) when an entity makes a payment to bring its account current. The paper
certificate issued by our office is valid and represents the entity's status with our office as of
the date of the certificate.

| Certification of Account Status | Officers And Directors Information |
|---|---|
| Entity Information: | **NATIONWIDE AFFORDABLE HOUSING, INC.**<br>2324 CHEEK SPARGER RD<br>BEDFORD, TX 76021-2678 |
| Status: | **NOT IN GOOD STANDING** |
| Registered Agent: | BEN S HOWRAD<br>1100 WEST PIPELINE STE. 202<br>HURST, TX 76053 |
| Registered Agent Resignation Date: | |
| State of Formation: | TX |
| File Number: | 0135849400 |
| SOS Registration Date: | June 8, 1995 |
| Taxpayer Number: | 30117844982 |

texas.gov | Statewide Search from the Texas State Library | State Link Policy | Texas Homeland Security

**Susan Combs,** Texas Comptroller • Window on State Government • Contact Us
Privacy and Security Policy | Accessibility Policy | Link Policy | Public Information Act | Compact with Texans

## EXHIBIT "I" 2 of 3

Link to Window on State Government - Susan
Combs, Texas Comptroller of Public
Accounts

Susan Combs, Texas Comptroller of Public
Accounts

image of star

Taxable Entity Search Results

# **Officers and Directors**

NATIONWIDE AFFORDABLE HOUSING, INC.

Return to: Taxable Entity Search Results

Officer and director information on this site is obtained from the most recent Public Information Report (PIR) processed by
the Secretary of State (SOS). PIRs filed with annual franchise tax reports are forwarded to the SOS. After processing, the
SOS sends the Comptroller an electronic copy of the information, which is displayed on this web site. The information will
be updated as changes are received from the SOS.

You may order a copy of a Public Information Report from open.records@cpa.state.tx.us or Comptroller of Public
Accounts, Open Government Division, PO Box 13528, Austin, Texas 78711.

| Title | Name and Address | Expiration/Resignation Date |
|-------|------------------|------------------------------|
| *PRESIDENT* | **REN S HOWARD**<br>2324 CHEEK SPARGER RD<br>BEDFORD , TX 76021 | |

texas.gov | Statewide Search from the Texas State Library | State Link Policy | Texas Homeland
Security

**Susan Combs**, Texas Comptroller • Window on State Government • Contact Us
Privacy and Security Policy | Accessibility Policy | Link Policy | Public Information Act | Compact with
Texans

# EXHIBIT "I" 3 of 3

Texas Comptroller Stationary

September 30, 2012

## CERTIFICATE OF ACCOUNT STATUS

This is in response to your inquiry about the status of

NATIONWIDE AFFORDABLE HOUSING, INC.

This entity is not in good standing as it has not satisfied all franchise tax requirements.

If you need any additional information or assistance, please contact the Texas State Comptroller's field office in your area or call (800) 252-1381, toll free, nationwide. The Austin number is (512) 463-4600.

Taxpayer number: 30117844982
File number: 0135849400

Form 05-342 (Rev. 12-07/14)

## EXHIBIT "J" 1 of 2

A Secure Online Service from Utah.gov

# Utah Business Search - Details

## LIFELINE MEDIA, LLC

Update this Business

**Entity Number:** 7977714-0160
**Company Type:** LLC - Domestic
**Address:** 6204 E 1800 N Eden, UT 84310
**State of Origin:**
**Registered Agent:** BEN HOWARD
**Registered Agent Address:**
6204 E 1800 N(EDEN UT 84310) PO BOX 223
Huntsville, UT 84317
View Management Team

**Status: Active**

Purchase Certificate of Existence

**Status:** Active *as of 04/21/2011*
**Renew By:** 04/21/2013
**Status Description:** Good Standing
**Employment Verification:** Not Registered with Verify Utah

**History**

View Filed Documents

**Registration Date:** 04/21/2011
**Last Renewed:** 05/08/2012

**Additional Information**

NAICS Code: 9999 NAICS Title: 9999-Nonclassifiable Establishment

**Former Business Names**

RFA FINANCIAL UT, LLC

« Back to Search Results

## EXHIBIT "J" 2 of 2

Rfa Financial Ut, LLC
Claim this Profile
**Address:**
6204 E 1800 N
Eden, Utah
84310-9508
Phone:
Website:
Category:
No Information Provided
No Information Provided
Investment Advice,
Investment Advice
This is My Company

Research This Company

- Summary
- Photos

Contact:    Ben Howard Est. Total Employees: 2
State of Inc: UT        Year Established:      2011
                       Est. Total Sales:     $ 91,000.00

# Basic Review

No Information Provided
RFA FINANCIAL UT, LLC

## EXHIBIT "K"

| ENTITY NAME | NEVADA ID | REG. NUMBER | FILE DATE |
|---|---|---|---|
| 4113 JEFFS HOLDINGS LLC | NV20111311527 | E0263972011-9 | 5/9/2011 |
| 4113 JEFFS PROPERTIES LLC | NV20111311536 | E0263982011-0 | 5/9/2011 |
| COUNT FLEET PROPERTIES LLC | NV20111343144 | E0291042011-2 | 5/20/2011 |
| COUNT FLEET ENTERPRISES LLC | NV20111344176 | E0291922011-8 | 5/20/2011 |
| 181 EAST HOLDINGS LLC | NV20111357905 | E0303792011-6 | 5/26/2011 |
| 181 EAST PROPERTIES LLC | NV20111358023 | E0303902011-1 | 5/26/2011 |
| 6622 WEST HOLDINGS LLC | NV20111369434 | E0313612011-8 | 6/1/2011 |
| 6622 WEST PROPERTIES LLC | NV20111369512 | E0313692011-6 | 6/1/2011 |
| 655 SOUTH HOLDINGS LLC | NV20111430635 | E0367982011-5 | 6/28/2011 |
| 655 SOUTH PROPERTIES LLC | NV20111430690 | E0368032011-3 | 6/28/2011 |
| SUMMER MEADOW ENT. LLC | NV20111470892 | E0402792011-6 | 7/18/2011 |
| SUMMER MEADOW PROP. LLC | NV20111470918 | E0402812011-0 | 7/18/2011 |
| BIRCHTREE HOLDINGS LLC | NV20111497223 | E0426782011-3 | 7/28/2011 |
| BIRCHTREE PROPERTIES LLC | NV20111497299 | E0426842011-1 | 7/28/2011 |
| WILD MAPLE HOLDINGS LLC | NV20111498130 | E0427602011-4 | 7/29/2011 |
| WILD MAPLE PROPERTIES LLC | NV20111498239 | E0427682011-2 | 7/29/2011 |
| SNOW PEAK HOLDINGS LLC | NV20111502143 | E0431202011-2 | 8/1/2011 |
| SNOW PEAK PROPERTIES LLC | NV20111502213 | E0431272011-9 | 8/1/2011 |
| DUSKYWING HOLDINGS LLC | NV20111502519 | E0431532011-1 | 8/1/2011 |
| DUSKYWING PROPERTIES LLC | NV20111502617 | E0431582011-6 | 8/1/2011 |
| CRIMSON PATCH HOLDINGS LLC | NV20111502798 | E0431692011-9 | 8/1/2011 |
| CRIMSON PATCH PROPERTIES LLC | NV20111502849 | E0431732011-5 | 8/1/2011 |
| EAST CIRCLE HOLDINGS LLC | NV20111518479 | E0445692011-5 | 8/7/2011 |
| 3114 SOUTH HOLDINGS LLC | NV20111530094 | E0455922011-6 | 8/11/2011 |
| 3114 SOUTH PROPERTIES LLC | NV20111530115 | E0455942011-8 | 8/11/2011 |
| SOUTH SILVERADO HOLDINGS LLC | NV20111613114 | E0529902011-3 | 9/24/2011 |
| SOUTH SILVERADO PROP. LLC | NV20111613133 | E0529912011-4 | 9/24/2011 |
| BURNING OAK HOLDINGS LLC | NV20111653889 | E0566512011-1 | 10/14/2011 |
| BURNING OAK ENTERPRISES LLC | NV20111654062 | E0566622011-4 | 10/14/2011 |
| 4819 ENOCH HOLDINGS LLC | NV20111671845 | E0582432011-1 | 10/25/2011 |
| 4819 ENOCH PROPERTIES LLC | NV20111671924 | E0582492011-7 | 10/25/2011 |
| 3839 WEST HOLDINGS LLC | NV20111677091 | E0587232011-2 | 10/27/2011 |
| 3839 WEST PROPERTIES LLC | NV20111677129 | E0587252011-4 | 10/27/2011 |
| 138 SOUTH HOLDINGS LLC | NV20111679001 | E0588982011-2 | 10/28/2011 |
| 138 SOUTH PROPERTIES LLC | NV20111679038 | E0589022011-9 | 10/28/2011 |
| 530 EAST HOLDINGS LLC | NV20111679064 | E0589042011-1 | 10/28/2011 |
| 530 EAST PROPERTIES LLC | NV20111679103 | E0589082011-5 | 10/28/2011 |

# EXHIBIT "L" 1 of 2

FILED IN CHAMBERS
U.S.D.C. - Atlanta

AUG 0 7 2012

James N. Hatten, Clerk
By: _PmCauce_
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| PAT HUDDLESTON, II,<br><br>　　　　Plaintiff<br><br>v.<br><br>GRAFTON ENTERPRISES MIDWAY<br>LLC, BENJAMIN HOWARD, and<br>GRAFTON ENTERPRISES, LLC,<br><br>　　　　Defendants | CIVIL ACTION NO.<br>1:09-CV-2799-ODE |

ORDER

This breach of contract case is before the Court on Defendant Benjamin Howard's ("Howard's") Renewed Motion for Summary Judgment [Doc. 95], to which Plaintiff Pat Huddleston II ("Huddleston") has responded in opposition [Doc. 99] and Howard has replied in support [Doc. 100].

For the reasons discussed below, Howard's Renewed Motion for Summary Judgment [Doc. 95] is DENIED.

## I.   Case History

As detailed in the Court's February 17, 2011 and June 28, 2009 orders [Docs. 89, 62], this case is an ancillary proceeding to Civil Action No. 1:08-CV-0011-ODE, in which the United States Securities and Exchange Commission ("SEC") filed suit against James A. Jeffrey ("Jeffrey"), Thomas E. Repke ("Repke"), and several entities known in this case as the "Coadum Defendants" (including Mansell Capital Partners III, LLC ("Mansell")).   The SEC alleged that the Coadum Defendants, which Jeffrey and Repke controlled and directed, operated a massive Ponzi scheme that

## EXHIBIT "L" 2 of 2

defrauded investors out of approximately $30 million. On January 3, 2008, the Court issued a temporary restraining order in Civil Action No. 1:08-CV-0011-ODE, in which it appointed Plaintiff Huddleston as Receiver for the estates of the Coadum Defendants.

Huddleston, as Receiver, brought this action to hold Defendants Howard, Grafton Enterprises Midway LLC ("Grafton Midway"),[1] and Grafton Enterprises, LLC ("Grafton") liable for events that occurred prior to the establishment of the Receivership. In or around May 2007, Mansell — one of the Coadum Defendants — sought to acquire a parcel of real property located in Midway, Utah (the "Property"), owned at that time by Harbor Capital Partners ("Harbor") [Doc. 51-7]. Mansell decided to use Grafton as a straw buyer to conceal from Harbor its involvement in the transaction: Grafton would purchase the Property from Harbor on Mansell's behalf and would then transfer the Property to Mansell [Id.]. At that time, it is undisputed that Howard at least served as a manager for Grafton [Doc. 95-2 at 5; Doc. 99-1 at 3]. Mansell agreed in a signed contract to pay Grafton $25,000 regardless of whether the transaction was successful, as well as an additional $175,000 in commission if Grafton successfully bought and transferred the property to Mansell [Doc. 51-7].

---

[1]Although the existence of Grafton Midway is not in dispute, it is not clear that the company was involved in the events that formed the basis for this civil action. Grafton Midway is represented by the same counsel retained by Howard, but has filed no pleadings in this case since the April 21, 2010 answer, filed by Grafton Midway and Howard, to Huddleston's complaint [Doc. 25]. Further, Huddleston's first and second amended complaints do not specifically allege that Grafton Midway was involved in the events for which Huddleston seeks damages.

**EXHIBIT "M"**





## EXHIBIT "N"



Utah State Tax Commission

**Bill of Sale**

TC-843
Rev. 7/06

Division of Motor Vehicles - 210 North 1950 West - Salt Lake City, Utah 84134 - Telephone (801) 297-7780

. Automobile      . Light Truck, Van or Util.      . Heavy Truck (over 12,000 lbs)      Trailer

✓ Motorcycle      Off-Highway Vehicle      Snowmobile      Boat

In consideration of_____ Dollars (S_____)

paid to me by    JAMES ARNETT
                        Buyer

I, _____, do hereby sell and convey to the
                    Seller

buyer the following vehicle, as is:   1995   SUZUKI   : VS1400 ;
                                        Year        Make          Model

JS1VX51LOR2102837 and _____
Vehicle Identification Number                    License Number

I, warrant to the Buyer that the said vehicle is free and clear of any lawful claims and demand of all and every person, whatsoever.

Used vehicles are sold as accepted and are not guaranteed.

This form does not represent documentary evidence of ownership unless accompanied by the outstanding certificate of title.

Seller's Signature

Date signed
8-31-11

---

**INSURANCE IDENTIFICATION CARD - Utah**

**Policy Number:** 37128338-2      **Effective Date:** 09/01/2011 to 09/01/2012

**Insurer:**  Progressive Classic Insurance Co
            P.O. Box 6807 Cleveland, OH 44101

**Your Agent:**
    HEINERS INS CENTER
    801-621-2620

**Named Insured:**
    BEN S HOWARD

| Vehicles: Year | Make | Model | VIN |
|---|---|---|---|
| 1994 | Suzuki | VS1400GLP | JS1VX51L0R2102837 |
| 2004 | Suzuki | DR-Z400S | JS1SK43A742100356 |
| 2007 | Yamaha | WR450F | JYACJ12YX7A002731 |

Form 4950 (12/07)

EXHIBIT "O"



**EXHIBIT "P"**



| Description: | Ships: | Price: |
|---|---|---|
| Digidesign Mbox 2 (MBOX2) | Same Day | $449.00 |

Supply Limited: 1 available

**WRITE A REVIEW**
Be one of the first to review this item!

Add to Your Basket: $449.00

Return to Last Page: Go Back

## MBox 2

Say hello to the most affordable Pro Tools LE systems from Digidesign: Meet the Mbox 2 family. Characterized by their totally portable designs, diverse yet flexible feature sets, and ultra-affordable prices, the Mbox 2, Mbox 2 Pro and Mbox 2 Mini each offer professional features to complement your recording and mixing needs in a studio that easily fits into your backpack. For Pro Tools professionals and musicians on the go, ultra-small Mbox 2 Micro allows Pro Tools editing, sequencing, and mixing anywhere you go.

Mbox® 2 is a next-generation USB-powered audio/MIDI production system that builds on the performance and simplicity of the original Mbox — Digidesign's most popular personal studio system ever. Featuring a wide range of connection options, including analog, digital, and MIDI I/O, Mbox 2 delivers professional performance in an incredibly compact package. Mbox 2 also includes award-winning, easy-to-use Pro Tools LE™ software, which offers many of the same features that top studios rely on to produce Grammy®-winning albums and Academy Award®-winning film sound. Projects created with Mbox 2 and Pro Tools LE software also open on Pro Tools|HD® and Pro Tools M-Powered™ systems — providing instant compatibility with countless Pro Tools®-equipped project and professional studio around the globe.







**EXHIBIT "Q"**



**EXHIBIT "R"**



# EXHIBIT "S" 1 of 2

| INVOICE DATE: 26 JANUARY 2012 | INVOICE NUMBER: 260112 |
|---|---|
| Ben S. Howard<br>3580 N. 2225 E.<br>Layton, UT 84040<br>RE: Motion Picture Production Services | Project: "Overcoming Life's Trauma"<br>Running Time: Three Hours<br>Description: High-Definition, Color, Stereo |
| | |
| Service:   Creative Development<br>Days:       12<br>Rate:        $1,500USD<br>Subtotal:   $18,000USD | Service:   Audio Assembly Editorial<br>Days:       28<br>Rate:        $400USD<br>Subtotal:   $11,200USD |
| Service:   Multi-State Exterior Cinematography<br>Days:       37<br>Rate:        $600USD<br>Subtotal:   $22,200USD | Service:   Compositing (2.8 hours running time)<br>Days:       28 Days<br>Rate:        $2,200USD<br>Subtotal:   $61,600USD |
| Service:   Data Management & Collation<br>Days:       25<br>Rate:        $400USD<br>Subtotal:   $10,000.USD | Services:   Animation<br>Days:       6<br>Rate:        $3,500USD<br>Subtotal:   $21,000USD |
| Service:   Production Audio Recording<br>Days:       25<br>Rate:        $400USD<br>Subtotal:   $10,000USD | Services:   Rotoscoping<br>Days:       7<br>Rate:        $2,500USD<br>Subtotal:   $17,500USD |
| Service:   Roughcut Editorial<br>Days:       28<br>Rate:        $500USD<br>Subtotal:   $14,000USD | Services:   Titles, Branding, Graphic Design<br>Vendor:      Gerren Ard<br>Subtotal:   $10,000USD |
| Service:   Final Editorial<br>Days:       21<br>Rate:        $600USD<br>Subtotal:   $12,600USD | Services:   Music Score Production<br>Vendor:      Robert A. Wolf<br>Subtotal:   $6,500USD |
| | Total:              $214,600USD<br>Received To Date:    $3,600USD<br>Balance Due:      $211,000USD |

Hard copy to follow via USPS. Please keep all correspondence limited to email and mailed hard copy for documentation purposes.

## EXHIBIT "S" 2 of 2

If this invoice is paid in full before 30 days of the invoice date listed above, a 5% discount will apply.

Due to the lack of good faith, and your possession of all the masters of the work performed to date, we are ceasing production until full payment for the work already delivered and itemized above, has been paid and received. Only then shall we complete the last of delivery of the final mixed audio. The rate for studio audio mixing is $500 per day.

If you have no intent of making payment, or we have not received the Balance Due by 26 February 2012, we will consider this project a total loss, wherefore, it shall be used as an portfolio piece, exhibited online in full, in order to generate paying work, which may offset the loss on this project.

If, beyond 26 February 2012, you wish to make payment and take ownership of my work, there will be a 37% delinquent payment processing fee.

Please remit payment by cashiers check only to:

James Arnett
9288 N. Monmouth Ct.
Tucson, AZ 85742

Thank you and have a nice day.

## EXHIBIT "T"

 **Ben S Howard** elderb123@gmail.com                    Feb 25 
to me

James,

I am not sure why you have chosen to do this. You were never contracted as you claim. I have received legal counsel on this matter and what you are doing constitutes extortion by very definition which holds serious *criminal* and *civil* penalties. I have been advised that the texts and e-mails you have sent me make this an open and shut extortion case.

extortion |ik'stôrSHən|

noun

the practice of obtaining something, esp. money, through force or threats.

DERIVATIVES

**extortioner** noun

I suggest you seriously consider your next course of action since the consequences can be sever.

James, you've been one of my best friends for years am I have no interest in becoming enemies. I love you and I just don't understand. I would welcome a call from you.

...

 **James Arnett** jamesarnettaz@gmail.com                    Feb 25 
to Ben

**EXHIBIT "U" 1 of 4**

**SOURCE: ww.tonylevelle.com/documents/28.html**
**NOTE: Plaintiff has no connection to the website or author.**

## Realistic Budgeting for Documentaries by David L. Brown.

## Written for <u>Release Print</u>, Film Arts Foundation, January 2005.

Crafting a realistic budget for your documentary is important to avoid a host of financial headaches, and to avoid presenting a red flag to funders. It is best achieved only after a detailed treatment (or script) is completed to enable a good estimate of the number of shooting days and locations required. The closer you, as producer, can come to a detailed shooting script (which then enables listing all elements of prep, production, and post) the more accurate your estimate of shooting days (and other line items) will be and the more realistic your budget will be. Since most documentary-makers don't develop a full script and shooting script before production, you will most likely need to develop the most detailed treatment possible that can be broken down into locations, interviewees, verite scenes, travel expenses and total shooting days. Then, you'll need to estimate the number of pre-production and post-production days, and research current rates for crew, gear and post-production facilities, and any other line items you're unsure about. You should most definitely be prepared to use a spreadsheet program like Excel.

Among the other initial questions to answer before beginning to budget are: film or video; and if video, what format? For this article, I'll assume that you're shooting in digital video (mini-DV or DVCAM—by far, the most popular [and sensible] formats for low-budget docs). If you're planning to shoot in Betacam, HD or 16mm, you're most likely very experienced with budgeting and documentary-making, and don't need much advice (or shouldn't). With a 20 to 1 shooting ratio (very low for most docs), a 16mm film budget could total at least twice that of a mini-DV budget (unless you own your own Eclair NPR, Nagra and flatbed). Film and processing can be budget busters.

To estimate post-production time, know that most hour-long documentaries (with paid pro editors) take about 14-20 weeks in editing after logging and transcribing. Some take a year, but no funder likes to see that in a budget. Most half-hour docs would take slightly over half as long, 8-11 weeks. But if you've shot 100 hours of video, it may take you four months to log and transcribe your footage. And it's extremely difficult to edit interviews without transcripts. To save money, transcribe only selects, but don't neglect to budget for transcribing. (pros get $50/hr. and take 4 hrs. to transcribe one hour of interview. Thus, transcribing 10 hours of interviews = $2,000) An intern willing to use your foot pedal transcribing machine is golden, even at $10/hr.

The now quaint guidelines of $2,000 per completed minute are obsolete by at least 50%, but most broadcast-quality hour-long docs with good production values seem to cost around $150K to $250K (although the range is much wider), when paying the crew (and yourself!) standard professional (documentary, not Hollywood feature) rates. Frontline docs cost around $350,000 for about 26 days of shooting and 16 weeks of editing. Of course, if you own your own camcorder and Final Cut Pro system and you don't need a lot of crew, music, travel, graphics and archival material, you can complete an hour doc for much less, well under $1,000 per completed minute.

## EXHIBIT "U" 2 of 4

Jonathan Caouette claims to have made his acclaimed doc Tarnation for under $300 on his iMovie, even though he later spend over $100,000 on archival clearances. Even if he paid himself well for his time, it's still an incredibly low budget for a doc that received an international theatrical release. Let's assume, though, that you're not going to donate 3,000 hours of your time to the project, along with use of your edit system, even though too many of us do it.

You should budget for professional documentary rates, (and media funders expect them) knowing that you can and should negotiate the lowest discounted rates you can. For example, an experienced Director of Photography/ Camera person might normally get $750 for 10 hours on commercial projects but asks $500 for 10 on documentaries, and might be willing to work for a flat $3,000 for ten days of shooting (if he or she likes you and your project), and might throw in a digital camcorder and some lights, flags and silks. You should shop around and try to negotiate multiple-day rates on camera, lighting, grip and sound gear and on all services.

Before drafting your first budget, it's very helpful to consult a pre-production checklist with every possible budget line item. You can find a good line item checklist in Simon and Wiese's book, Film and Video Budgets in the Film Arts Foundation library.

There are several acceptable formats for documentary budgets. ITVS has a good template that you can download from www.itvs.org. It separates "Staff" (Producer, Director, Writer, Associate Producer, but not Narrator) from "Crew" salaries. The other categories are: Pre-production/Research; Production, including Materials, Crew, Equipment, Location Expenses and Services; Post-Production, including Staff, Facilities and Services, Acquisitions/Rights/Talent (narrator), Masters and Dubs, and Administrative/Overhead; and Distribution (very important to include, perhaps 30-35% of your production budget).

Some higher end producers, including Wiese, recommend using "Above the Line" (Exec. Producer, Producer, Director, Writer, Narrator, Consultants) and "Below the Line" (everything else) format. I know very few who use this for doc budgets. I often use the ITVS model but, if there are no union benefits to consider, I include all personnel under "Personnel." Crew, gear and post rates will be different in Denver, Austin, New York and Peoria. Again, do your research on every line item, and for all rates for crew, gear, and services. Discuss length of day with crew, and have them sign deal memos that specify rate, overtime, and credits. Here are some ballpark rates (with a range from novice to Oscar-winner) for skilled and experienced Bay Area crew, along with gear and services.

Executive Producer: $400-500 per day, usually for just a few days, if needed at all.

Producer: $150-400/day, $600-2,000/wk depending on experience.

Director: about the same rates as producer. DGA rates could apply for a guild director. If you're Producer/ Director, budget for paying yourself $600-1,500/ week, depending on your experience.

Writer: $40-50/hr., $300-400/day.

Associate Producer: $150-200/day, $750-1,000/ wk.

Consultants: $200-500/day depending on their expertise. $75/hr. a reasonable average.

Director of Photography/ camera person: $350–500/10 hr. day, without camera.

Sound recordist: $350-400/ 10 hr. day without gear. Audio gear rental (mixer, mics, cables, stands) will be around $75/day depending on number of wireless mics ($75/day each). Boom person: same or $50 less than recordist

**EXHIBIT "U" 3 of 4**

Production Manager: $350-450/ day.

Location Manager: $350-450/ 10 hr. day plus expenses, mileage.

Gaffer/Key Grip: $350-450/ 10 hr. day.

Utility person: $200-250/ 10 hr. day

Production assistant/ craft service: $100-175/ day.

Assistant editor: $18-22/hr.

Editor: $350-450/8 hr. day; 1,800- 2,200 wk.

Narrator: $350-400 for 2 hr. session. Well-known actors may ask $1,000 or more, but often they work pro-bono for projects they support (with permission of their union, usually AFTRA).

Small (1 ton) grip truck w/ doc grip and lighting package: $200-250. Doc grip and lighting package without truck: $75-100. 3-Tota or Omni kit: $40

DVCAM or Mini-DV camcorder package w/ tripod: $150-250.

Betacam package w/ tripod: $400-600/ day.

Videotape stock (DVCAM or Mini-DV): Estimate your shooting ratio first. 30 to 1 is a low average for non-verite docs. Surfing for Life was 50 to 1. Stock: $6-$15 per hour. Window dubbing: $25-27/ hr. You might shoot 2-3 hours a day to get 5-6 useable minutes of footage.

Final Cut Pro, Media 100 and Avid editing system rental: Allow $1,000-1,600/ wk. for longer than an 8-week rental, knowing you can buy your own for the cost of a month rental, but never budget for equipment purchase! If you purchase, you rent it to the project at going rates, and you do not report a purchase as an expense to a funder.

For union personnel (IATSE, SAG, AFTRA), you should budget for pension and health (P&H) benefits at 18%. Most docs don't deal with union benefits, but you will often want to include them for budgets submitted to CPB, NEA, NEH and union-affiliated funders. If in doubt, contact the union for rates. Usually, its wise to budget 10% overtime for union personnel or any crew on a 10 hour day..

Other line items to remember:

Any special gear such as water housings, dollies (wheel chairs), jibs, Tyler mounts.

Travel, lodging, auto rental, crew meals, overtime, excess baggage (contact the airlines P.R. dept. a month before your flight to request an excess baggage waiver—$50 per bag adds up). Travel days for crew are usually paid at half the day rate.

Music. A good, experienced composer might receive $6,000 to $8,000 for scoring an hour doc. Using musicians rather than synthesizers adds to the cost. Copyrighted music is very expensive: licensing Surfing Safari cost me $3,500. Pre-recorded library music ("needle drops"—through audio post houses) are surprising good and inexpensive ($200-300 per cue depending on rights, plus research and dubbing fees).

Archival footage: If not public domain (eg. National Archive), average $20-45/sec. or $1,200-2,500/ min. and higher, depending on rights. Archival researcher: $300-350/day. Music and archival clearance person. $200-250/day.

# EXHIBIT "U" 4 of 4

Sound sweetening, mix: $150-175/hr., average about $1,500-3,000 for hour docs.

On-line editing/ color correction. $200-275/hr. With the blurring of off-line and on-line, budget conscious docmakers now use high end facilities only for severe color correction,or to master to Digital Betacam, not for on-lining every shot. Now, it's usually 4-5 hours instead of 35 at a facility like Video Arts.

Graphics: budget perhaps $1,500-2,000 per minute for fairly basic graphics, animated logos and maps, etc.

Office/Admin/Overhead—office, telephone, xerox, shipping (avoid overnight if possible. Fed Ex bills can mount and hurt you badly) Budget about 15% of total.

Insurance, including Errors and Omissions coverage. Budget $4,000 for a producers annual package that will include liability.

Accounting. Add 5-10% for many project.s

Legal. If you're doing contracts or other non-standard legal documents, or trying for "Fair Use." Richard Lee, the FAF attorney, has discounted rates for members. Perhaps $450-$1,500.

Fiscal sponsor fees: usually 7.5% added to the final budget total.

In-kind. Discounts or donations of anything from gear to crew to photocopying count as "In-kind contributions," and can be listed in a separate column. They are usually treated as funds raised.

Contingency: Most funders do not understand the concept, so build in about 10% throughout the budget, rather than a separate line item.

Build in an Income section divided into "Actual to-Date" and "Projected." The total income should equal your budget total with Distribution. Your categories might be Foundations, Corporations, Individual Donors, Special Fundraising Events. You might include your own funds spent under "Miscellaneous Individual Donations."

To summarize, the keys to a realistic documentary budget are: a detailed treatment to closely estimate number of shooting days and locations; a checklist to help you include every relevant line item; and research to identify appropriate rates for local crew, gear and services. Then, build in contingency and negotiate everything. Also, consulting with experienced docmakers can help make your budget more realistic, and your proposal more fundable.

David L. Brown has been producing and directing documentaries since 1971. His recent work included Seniors for Peace and Surfing for Life. He teaches Documentary Filmmaking at CCSF and UC Berkeley Extension, and History of Documentary at Film Arts. His website is http://www.dlbfilms.com/

**EXHIBIT "V"**



Gerren Ard & James Arnett at Harkins Theaters
where their feature film "Blocked" opened 8 June 2012.

## EXHIBIT "W" 1 of 5



ADVANCED SOFTWARE FOR THE MOTION PICTURE INDUSTRY

**New Product News**

### CineMatrix™ Industrial 5.0

Platform: Microsoft Windows XP™
Development Phase: ALPHA 7 of 7 Completed
Product Status: Beta 2of 2 - Feature Film Implementation
Implementation Date : 26 June 2006

As you read through this, the momentum of our work continues with great anticipation of reaching our new product release because the advances we have made in our Development Lab are truly remarkable. This last Beta is being put through the wringer on a full scale test on our lastest feature film, Mary Shelley's "*THE LAST MAN*" in production now.

Recently, **CineMatrix™ Industrial 5.0** and **CineMatrix™ Standard 5.0** have been incorporated into a single product with a toggling menu as a single, on-the-fly, mode switching application that will be marketed as **CineMatrix™ Industrial 5.0**.



Everything you know about filmmaking software is about to change.

## EXHIBIT "W" 2 of 5

# EXHIBIT "W" 3 of 5

**EXHIBIT "W" 4 of 5**



## EXHIBIT "W" 5 of 5

## EXHIBIT "X"

*Overcoming Life's Trauma.*

**Type of Work:** Motion Picture

**Registration Number / Date:** PAu003684884 / 2012-02-15

**Application Title:** Overcoming Life's Trauma.

**Title:** Overcoming Life's Trauma.

**Description:** Videodisc (DVD)

**Copyright Claimant:** Ben S Howard, 1967- . Address: PO Box 223, Huntsville, UT, 84317, United States.

**Date of Creation:** 2011

**Authorship on Application:** Ben S Howard, 1967- , employer for hire; Domicile: United States; Citizenship: United States. Authorship: entire motion picture.

**Alternative Title on Application:** Forgive and Be Free

Healing the Soul

**Rights and Permissions:** Ben S Howard, Lifeline Media, LLC, PO Box 223, Huntsville, UT, 84317, United States, (817) 313-5944

**Copyright Note:** C.O. correspondence.

**Names:** Howard, Ben S, 1967-



## SOURCE: www.copyright.gov

# EXHIBIT "Y"

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; June 2012. All rights reserved.

Copyright Office ...

For questions about ...

website at www.copyright.gov ...

... Office, ... at ...

**Privacy Act Notice.** Sections 408-410 of title 17 of the United States Code authorize the Copyright Office to collect the personally identifying information requested on this form in order to process the application for copyright registration. By providing this information you are agreeing to routine uses of the information that include publication to give legal notice of your copyright claim as required by 17 U.S.C. §705. It will appear in the Office's online catalog. If you do not provide the information requested, registration may be refused or delayed, and you may not be entitled to certain relief, remedies, and benefits under the copyright law.

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET**

**Form PA**
For a Work of Performing Arts.
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

PA        PAU

EFFECTIVE DATE OF REGISTRATION

Month        Day        Year

**1** TITLE OF THIS WORK ▼
OVERCOMING LIFE'S TRAUMA

PREVIOUS OR ALTERNATIVE TITLES ▼
HOW TO OVERCOME LIFE'S TRAUMA

NATURE OF THIS WORK ▼ See instructions
MOTION PICTURE (SELF-HELP)

**2** NAME OF AUTHOR ▼

**CUSTOMER'S RECEIPT**

REGISTER OF COPYRIGHTS — KEEP THIS RECEIPT FOR YOUR RECORDS
LIBRARY OF CONGRESS

20857673597        2013-09-09    857411    $65.00    5006

**POSTAL MONEY ORDER**

20857673597        2013-09-09    857411    **$65.00**

SIXTY-FIVE DOLLARS & 00¢

REGISTER OF COPYRIGHTS
LIBRARY OF CONGRESS
101 INDEPENDENCE AVE S.E. WASHINGTON DC 20559

PAY REGISTER OF COPYRIGHTS TRAUMA — JAMES ARNETT

⑆000000800 2⑈    ⑆20857673597⑆

**4** COPYRIGHT CLAIMANT(S)
JAMES ARNETT, ARNETT MOTION PICTURE COMPANY
9288 N MONMOUTH CT.
TUCSON, AZ 85742

TRANSFER If the claimant(s) named here in space 4 is(are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

MORE ON BACK ▶

**EXHIBIT "Z"**



## CERTIFICATE OF SERVICE

I hereby certify that on this day, Monday, the 9th day of September 2013, I mailed the preceding SECOND AMENDED COMPLAINT to the Office of the Clerk of the United States Court for the District of Utah at:

> U.S. Court for the District of Utah
> 350 South Main Street
> Salt Lake City, Utah  84101

I also hereby certify that I have mailed these identical materials via United States Postal Service, to the following Attorneys for Defendants Howard, et al.:

> TYCKSEN & SHATTUCK, LLC
> Bryan J. Stoddard
> 12401 S. 450 E., Suite E-1
> Draper, UT  84020

James Arnett, In Propria Persona (I.F.P.)
9288 N. Monmouth Court
Tucson, Arizona 85742
Telephone: (520)304-0129
Email: jamesarnettaz@gmail.com