SCANNED

FILED
U.S. DISTRICT COURT

2014 AUG 18  A 11: 44

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

James Arnett
Plaintiff, In Propria Persona (I.F.P.)
9288 N. Monmouth Court
Tucson, Arizona  85742
Telephone: (520)304-0129
Email: jamesarnettaz@gmail.com

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| JAMES ARNETT,<br><br>    Plaintiff,<br><br>v.<br><br>BENJAMIN SNOW HOWARD; LIFELINE MEDIA LLC, a Utah entity; NATIONWIDE AFFORDABLE HOUSNG, a Texas corporation; and the BEN HOWARD TRUST, an Idaho trust,<br><br>    Defendants. | **LAST AMENDED COMPLAINT**<br><br>Presiding Judge Ted Stewart<br><br>Referred to Magistrate Judge Dustin Pead<br><br>Case 2:13-CV-00591-TS-DBP |

---

Plaintiff James Arnett herein complies in full with the Order of this Honorable Court (Doc. 90). Plaintiff has just received this Order this very evening. This was not the fault of the United States Court for the District of Utah. The envelope in which the Order was sealed appeared this evening on Plaintiff's door step with no explanation attached.

Plaintiff's mail box arrangement is a common, community arrangement of mailboxes, consisting of vertical and horizontal stacked compartments for the many homes in the housing development. The U.S. Postal Carrier does not deliver correspondence to anyone's individual door step in this community; they only sort mail into the community mailboxes, which load from the rear.

The only explanation for Plaintiff's correspondence to appear at the door step this evening must be a neighbor who inadvertently received it, and did not feel obliged to drop it off to the correct address with any sense of urgency whatsoever.

While Plaintiff is grateful that his proposed claim was Granted by this Honorable Court, he also made the horrifying discovery of having missed a deadline issued by a United States Court. Plaintiff had no intent of defaulting and prays for this Honorable Court to forgive the appearance of such. There was no intent to defy an Order of this Honorable Court by any means.

Wherefore, Plaintiff immediately complies with the Order (Doc. 90) of this Honorable Court in this LAST Amendment to his Complaint.

## LAST AMENDED COMPLAINT

### Jurisdiction

Venue is proper in this Court pursuant to 28USC§1391 (and as Ordered [Doc. 49]), as Defendant Benjamin Snow Howard (Defendant Howard), a resident of Layton, Utah, conducted business with Plaintiff James Arnett (Plaintiff Arnett), a resident of Tucson, Arizona, soliciting services, making offers to acquire labor, in person and remotely, within the jurisdiction of the District of Arizona. Defendant Lifeline Media LLC is an entity registered in Eden, Utah; Defendant Nationwide Affordable Housing is a corporation registered in Hurst, Texas; Defendant Ben Howard Trust is a trust registered in Idaho. Each registered entity is directed and managed by their sole registered agent, Defendant Howard, who may be served with Process at his residence, located at: 3580 N. 2225 E., Layton, UT 84040 [See Exhibits A – E, supporting Jurisdiction and Venue].

### Complaint

1.     BACKGROUND: In November 2010, Defendant Howard contacted Plaintiff Arnett via the Skype.com internet telephonic service to solicit help producing his website at www.benshoward.net. Defendant Howard purchased and drop-shipped a Cricket field phone [Exhibit C] directly to Plaintiff for consultation services in CSS coding methods [Exhibit F] in order to assist building his website for an ambitious project based on his "Trauma Release Coach" business for the purpose of mass marketing. To that end, Plaintiff provided effective consultation. On or about 5 February 2011, Defendant Howard [author of "Overcoming Life's Trauma", and "Guilt Free Living", and "The Secret To Prosperity"] visited the Tucson, Arizona work studio of Plaintiff Arnett, [producer and director of the "September Eleventh" film series for the New York State Fraternal Order Of Police] for the purpose of completing the design and finalizing construction of his Internet venture, at his Web domain, http://www.benshoward.net. Defendant Howard asked Plaintiff to perform this service for him as a [gratis] personal favor, in order to help

him launch his plans to take his self-help seminar business from local events to the national level, proposing published book [Exhibit G], audio-book and movie embodiments of his "Overcoming Life's Trauma" live presentation, which Defendant Howard was performing on a regular basis in the State of Utah. Plaintiff provided him with a (CSS based) website design, from which, Defendant Howard could edit the specifics of his proposed services and product lines.

2.     When Defendant Howard was staying at Plaintiff Arnett's Tucson work studio [Exhibits A & B], located at: 7425 N. Mona Lisa Rd., unit 236, Tucson, Arizona 85741, he had solicited Plaintiff Arnett's services to produce an audio-book [See DVD-1] and a three hour motion picture for him [See DVD-2], over a two month period, both products based upon Defendant Howard's live presentation of "Overcoming Life's Trauma".

3.     Defendant Howard then offered Plaintiff Arnett assignment as a major equity partner and the producer and director positions in the project (having the essential expertise), in order to secure his cooperation to perform production in Utah. Plaintiff Arnett agreed but would advise him of a later date, regarding his availability, due to his obligation to complete the theatrical motion picture, "Blocked", he was then engaged in producing. Satisfied, Defendant Howard returned to Utah and deployed the website Plaintiff Arnett had coded for him.

4.     On or about, 21 May 2011, Plaintiff Arnett advised Defendant Howard that he was then available for his project. By telephone from Utah, Defendant Howard reiterated his offer that he made to Plaintiff Arnett in Tucson, offering assignment as a major equity partner in a two-way split of 50%-50% of the whole, and the producer and director positions in the project, and adding the additional offers to pay all of his expenses, including his Tucson work studio rent, meals, field phone, lodging, vehicle, a per diem for gas, food, coffee, cigarettes and round-trip air transportation. Defendant Howard insisted

that it was more efficient for the parties to formalize the agreement together in Utah. Plaintiff Arnett agreed. Defendant Howard booked a one-way flight to Salt Lake City, Utah for Plaintiff [Exhibit D].

5.     On 5 June 2011, Plaintiff flew from Tucson, Arizona to Salt Lake City, Utah, to begin work at Defendant Howard's personal residence, located at: 6232 E. 1800 N. Eden, Utah 84310 (no conspicuous address remained on the property, making for some confusion as to an exact identification of address). Upon Plaintiff's arrival, Defendant Howard briefed him on the project, characterizing the project to Plaintiff as personally commissioned to him by "God", via direct revelation, due to his ordination in the "Melchisedek Priesthood", conferred by the Church of Jesus Christ of Latter Day Saints (LDS), with the notable distinction of possessing a "Temple Recommend", providing Plaintiff reason to have confidence that Defendant Howard was sincere in his motivations and practices.

6.     Another LDS member, a single mother from a local university film program, **Ms. Dawn Strate Kalana**, was engaged by Defendant Howard as "Associate Producer". He offered her that credit in the film and her expenses were to be paid by Defendant Howard. Ms. Kalana accepted and worked for Defendant Howard. To date, neither credit, nor reimbursement for her expenses have been known to have materialized. However, a subsequent conversation with Ms. Strate in August 2013, more than a year following the filing of this law suit, produced a conflicting story than originally documented. She now claims credit as "Executive Producer", "Investor" and "Writer", rather than school intern, sponsored by Deseret Industries of Ogden, Utah. Defendant Howard stated to Plaintiff there was plenty of time to draft the equity agreement as the busy work schedule provided.

7.     On or about 8 June 2012, the graphic arts services of **Mr. Gerren Ard** [Exhibit H] were offered to Defendant Howard by Plaintiff Arnett. To that end, Plaintiff facilitated a

telephone call, in order for Defendant Howard to speak with, and hire the services of Mr. Ard. Defendant Howard then purchased him an airline ticket, approximately seven weeks ahead of the scheduled flight.

8.     On or about 23 June 2011, Plaintiff Arnett had completed both, the audio book [See DVD-1] and a commercial television spot [See DVD-1]; and developed the final production plans, with digital pipeline for producing the full three-hour, high definition, motion picture for commercial distribution as a self-help "work shop" series of video discs [See DVD-2].

9.     On or about 25 June 2011, Plaintiff Arnett began location filming in Utah. Defendant Howard, acting as the agent of Defendant Nationwide Affordable Housing [Exhibit I], did so in these affairs (financing the venture and making what few payments toward petty cash he disbursed to Plaintiff), until he changed the name of an existing entity under his sole control (RFA Financial LLC), to Defendant Lifeline Media [Exhibit J], an entity from which per diem payments to Plaintiff would then be made, which materialized only in petty cash stipends for cigarettes and coffee breaks at the "Valley Market".

10.     From late June 2011 throughout early September 2011, Plaintiff Arnett was delayed from filming Defendant Howard, due to him abandoning work regularly, to pursue romantic relationships with **Ms. Bonnie Carrigan**, **Ms. Angela Russel**, as well as his former wife, **Mrs. Robin Howard**, which resulted in Plaintiff often searching for lost special-needs children, essentially abandoned when Defendant Howard and guest would disappear without warning, and other impositionary, and elective delays of this type. To no effect, Plaintiff objected to these delays as costing him extra time, which had nothing to do with fulfilling his obligations on-schedule, as Defendant Howard had originally represented as being just a two month commitment.

11.    Filming only became productive, once Plaintiff Arnett and Defendant Howard went to film the Idaho locations in mid July 2011. During this time, Defendant Howard provided loose tobacco and paper for Plaintiff to roll his own cigarettes, claiming that he was running out of money. However, once returned from Idaho filming, the same type of delays persisted. The original two month project Plaintiff had accepted had doubled in time and was threatening to go much longer by the unnecessary delays introduced by Defendant Howard.

12.    On or about 25 July 2011, Mr. Ard [Exhibit V] arrived in Salt Lake City, and resided at the same Eden, Utah location in order to design the Lifeline Media branding for the products, and to produce the graphics for the motion picture product. Mr. Ard was paid the same petty cash stipend amounts weekly, until he would invoice for the totality of his labor, once it could be calculated.

13.    Defendant Howard disclosed to Plaintiff Arnett that a Federal Judge had "ripped him off", "singled him out for persecution", "swindled him", by making a large Civil judgment against him (in Case 1:09-CV-02799-ODE for refusing to return $200,000 belonging to the plaintiffs of that Case, which is on Appeal – although the truth of the matter was later discovered to be quite different than described by Defendant in Case: 1:09-cv-02799-ODE, in the U.S. Northern District Court of Georgia, Atlanta Division where, in Document 101, filed 7 August 2012 [Exhibit L], Defendant Howard was materially tied as a defendant in what the honorable U.S. District Judge Orinda D. Evans described as "...a massive Ponzi scheme that defrauded investors out of approximately $30 million.", pages 1&2), so he would not be able to make complete payment for Mr. Ard's services. Defendant Howard offered an equity ownership position in a three-way split of the whole 33.3%-33.3%-33.3% in the products which Mr. Ard was manufacturing, in order to make up the outstanding balance to him. The details of which, Defendant Howard claimed he would work out at a later time, once all of the photography was

completed. No such equity agreements were fulfilled at that appointed time, nor any time thereafter. In fact, Defendants were actually in the process of purchasing numerous real estate properties in Nevada [Exhibit K] with the monies he should have been paying to Plaintiff and Mr. Ard.

14.     Defendant Howard represented the equity as having great potential value, due to his access to celebrities "Glenn Beck" and "Marie Osmond" through his publishing service provider, who he was expecting to help him exploit the commercial potential of the project. Defendant Howard offered Mr. Ard equity because he claimed to Plaintiff and Mr. Ard that he was financially depleted and needed the cooperation of Mr. Ard to complete the project. Defendant Howard summarily reduced the agreed upon meals to once a day, left-overs, and reduced per diems to $10 a day, which Defendant Howard often consumed as he pleased, after returning from "lunch" meetings with his publishing service provider, while Plaintiff and Mr. Ard labored.

15.     On or about 28 August 2011, Defendant Howard disclosed to Plaintiff Arnett that he had no intention of providing Ms. Kalana her "Associate Producer" credit in the film, nor reimburse any of her expenses, stating that he felt no obligation to her whatsoever.

16.     Plaintiff Arnett and Mr. Ard immediately approached Defendant Howard to finalize the three-way equity interest in the project. Defendant Howard claimed that assigning equity at that point was premature and would interfere with his ability to make any distribution agreement in the future, if he had formal partners. On that basis, he again refused to assign Plaintiff and Mr. Ard equity. Plaintiff and Mr. Ard countered, that if they were not formal partners, then they needed to get paid for their professional services. Defendant Howard agreed and promised to make everything "good" by ultimately paying them their rates, if that were possible, or by assigning equity to them, once he knew its "true" worth.

17.     Immediately following that meeting, Defendant Howard disclosed to Plaintiff Arnett that he had no intention of providing Mr. Ard with any equity, which he had used to induce Mr. Ard to continue working. Defendant Howard stated to Plaintiff that he intended to pay off Mr. Ard with a small token fee, instead of paying him his full invoice amount, when the labor was calculated. Defendant Howard stated that arrangement meant more profit for himself and for Plaintiff. Plaintiff Arnett refused diminishing Mr. Ard's consideration by any means.

18.     Plaintiff Arnett and Mr. Ard had exhausted their personal funds by this time, receiving no payment for expenses, nor equity, beyond Defendant Howard making payment to Plaintiff's and Mr. Ard's Arizona rental units, in order to maintain the continued cooperation of Plaintiff and Mr. Ard. Defendant Howard insisted the distribution he was arranging would satisfy all payment issues. Deeply vested, Plaintiff and Mr. Ard continued to labor in earnest, giving Defendant Howard the benefit of the doubt.

19.     On or about 31 August 2011, Defendant Howard offered Plaintiff Arnett his personal 1994 Suzuki 1400 Intruder motorcycle, that he had possessed for over a decade, but was actually owned by the Ben Howard Trust, which he represented as a "1995" model, "just serviced", "safe", capable of "riding anywhere", as a "bonus" incentive to continue labor until payment for the completed Goods, or the equity materialized. Defendant Howard also offered to pay Plaintiff the expenses of riding home on it to Tucson, when the work in Utah was completed. Defendant Howard represented the 1994 motorcycle as being worth more than $3,000. Plaintiff accepted the bonus [Exhibit M].

20.     Unknown to Plaintiff Arnett, The motorcycle brake pads were in fact, metal on metal, the padless metal backings making direct contact with the discs - deadly to take on a thousand mile journey. Defendant Howard also demanded to remove the only remaining

safety equipment, the windshield. Defendant Howard provided a signed bill of sale [Exhibit N], without any identification of the seller (the title named the Ben Howard Trust in Idaho as owner). Defendant Howard's "poor" financial condition still provided him with the disposable funds to impulse buy an identical motorcycle for approximately $5,500 that was of much more recent manufacture, and without the electromechanical problems which the 1994 model suffered. Repair of those electromechanical problems, to make the vehicle safe and road-worthy, were discovered to be in fact, more costly than the value of the vehicle, rendering it as "totaled" condition, rather than "excellent" condition, as it was misrepresented by Defendant Howard. With Defendant Howard's new motorcycle having a windshield of its own, he had no more pretense for removing the windshield from the 1994 model, so Defendant Howard allowed Plaintiff to retain the last remaining safety device. But Defendant Howard removed the Idaho license plate from Plaintiff's motorcycle and installed it on his new motorcycle. When Plaintiff questioned him about the legitimacy of that action, Defendant Howard replied, "Sure, it's legal!". When Plaintiff questioned him about the liability of interstate highway travel to Tucson without a license plate, Defendant Howard replied, "You have three days to transport it, that's legal", then he provided Plaintiff with a Progressive Insurance Co. I.D. Card [Exhibit N], insuring a 1994 Suzuki Intruder 1400 – NOT a 1995 model as Defendants represented. Defendant Howard had insured the motorcycle under his own name the following day, not in the Plaintiff's name, despite having just released the property to Plaintiff the day before.

21.     On or about 11 September 2011, Defendant Howard demanded editorial changes, which he insisted were of special personal importance to him, and quickly became a "special revelation from God" to justify the changes. Those changes represented an obvious erosion of the marketability of the motion picture and the value of its equity to Plaintiff Arnett and Mr. Ard, who both refused the demands, agreeing it was another pretense for justifying continued non-payment and a betrayal of Defendant's Fiduciary

Duties. Defendant Howard then used intimidation to coerce these changes, by shouting, throwing and breaking objects, declaring that he would never pay Plaintiff nor Mr. Ard their rates, nor equity. A commotion ensued. This was witnessed by Defendant Howard's ex-wife, Mrs. Robin Howard. This resulted in more delays due to additional demands at threat, followed by Defendant Howard's apologies, but still no payment, nor equity materialized.

22.     By mid September, Defendant Howard's former wife, Mrs. Robin Howard, had agreed to re-marry him immediately. Defendant Howard gave his reason as his public assistance benefits for health insurance, provided by the State of Utah, would soon expire and he needed to get onto her medical plan immediately. Defendant Howard composed a Prenuptial Agreement for his soon-to-be wife to sign, in order to protect his assets from her, in case she discovered that he had never terminated his relationships with Ms. Carrigan and Ms. Russel (both of whom, persisted throughout the second marriage, ultimately resulting in their separation and divorce). Defendant Howard left his investment ledger open, revealing his assets to include in his Prenuptial Agreement. Plaintiff found Defendant Howard's ledger open in the work area, demonstrating to him an approximate $10,000 monthly income from a plurality of residential properties [Exhibit K].

23.     On or about 27 September 2011, the voice track and picture track of the motion picture were completed. The scope of the work was three hours of specialized, "green screen" visual effects techniques to superimpose Defendant Howard speaking in most every scene of the motion picture, to create the illusion that he was in many locations, when in fact, he was filmed on a green screen, at a property he owns at: 1087 S. 9275 E. Huntsville, UT 84317 [Exhibit O].

24.     At that time, Defendant Howard insisted that Plaintiff Arnett complete the "ambiance" portion of the sound track, despite the absence of audio speakers, from which

to monitor subtle audio ambiances. Plaintiff made an earnest attempt, however, the noise level created by the restlessness of Defendant Howard made that task impossible to do properly at broadcast standards using the built-in computer speakers. Plaintiff stated that he would build the ambiance track at his Tucson work studio, as originally planned, where he had the proper equipment for meeting broadcast standards.

25.     Defendant Howard insisted that the track be finished in Eden, Utah, inexplicably panicked that Plaintiff Arnett may not be able to complete the audio task, "for any reason". Plaintiff reassured Defendant Howard that it was a simple task, that required audio speakers, and a few representative speakers of sound systems the motion picture may be exhibited. Mr. Ard, a qualified audio editor, concurred. Regardless, Defendant Howard pressed vigorously, overly concerned that something bad may happen to Plaintiff somewhere on the highway between Eden and Tucson, never disclosing to anyone that the condition of the motorcycle was deadly without brake pads.

26.     To alleviate concern, Plaintiff Arnett gave his audio recording equipment to Defendant Howard: a ProTools software suite and a DigiDesign Mbox2 digital audio hardware device [Exhibit P], "if anything happens" to him. Defendant Howard sent his wife [by then re-married], Mrs. Robin Howard, to ask Plaintiff to remain in Utah to complete the ambient track. He explained his plan to conform the audio to broadcast standards in Tucson. Mrs. Howard accepted Plaintiff's reasoning and did not understand her husband's exaggerated concern. Defendant Howard never returned Plaintiff's audio equipment to him after making it home alive.

27.     On or about 30 September 2011, Defendant Howard still had not provided Plaintiff Arnett with the title to the 1994 motorcycle, and wanted him to wait until he made it home to Tucson, when he promised he would post it to him by US Mail. Concerned that Defendant Howard may hold the title hostage in order to coerce him with more threats

(specifically, to eliminate the potential for Defendant Howard to threaten to report the motorcycle stolen by Plaintiff, in order to force Plaintiff to sign away his rights to the Goods and thereby prevent him from seeking Judicial Relief), Plaintiff demanded the title before leaving. Defendant Howard complied after excusing his "oversight". Plaintiff also demanded that Mr. Ard be provided with a plane ticket home, in his presence, before he left Mr. Ard behind to return home by airline. Defendant Howard purchased a ticket for Mr. Ard, to return home on or about 12 October 2011.

28.    On or about 1 October 2011, Defendant Howard demanded more editorial changes to the motion picture. Without the financial means to leave Utah independently, Plaintiff Arnett was held until Defendant Howard would provide him with the means to travel home. These editorial changes were made in compliance to the demands. This additional work went on, around the clock, in 20 hour shifts by Plaintiff until the morning of 3 October 2011 when a large storm was due to arrive that evening. Defendant Howard demanded more changes, which delayed Plaintiff until the big storm struck. Fearing Defendant Howard may never again provide a means out of Utah (since he was scheduled to move to a new home that month), Plaintiff demanded and received his travel expenses in cash, then left late that afternoon (at approximately 5:20PM) without full payment for his four months of labor, nor equity.

29.    Even after Defendant Howard, Plaintiff Arnett and Mr. Ard prayed together for a safe trip, Defendant Howard never mentioned, nor warned Plaintiff that he would be riding into a storm covering both Utah and Arizona on a motorcycle without brake pads. He also knew that Plaintiff never rode a mile on an open freeway before. Defendant Howard's financial obligations to Plaintiff would be at an end, if an accident on the U.S. and Interstate highways of Utah and Arizona occurred. Nevertheless, Defendant Howard elected to remain silent as Plaintiff Arnett began a ride of nearly a thousand miles, in extreme weather conditions.

30.    By 5 October 2011, Plaintiff Arnett survived the journey home to Tucson, despite an electrical breakdown in Kanab, Utah. On or about 12 October 2011, Mr. Ard also made it home by airline, carrying the computer hard drive, containing all of the element files and finished tracks of the Motion Picture, Audio Book and TV Commercial Spot, authored by Plaintiff, for the audio mix to be completed in Tucson [Exhibit Z]. Plaintiff and Mr. Ard waited for Defendant Howard to come to Tucson to complete the audio mix, and bring the agreed upon payment or equity. Defendant Howard moved into another luxury home in Layton, Utah, and paid for classes to attempt the audio mix himself. During this time, Defendant Howard did not answer, nor return telephone calls from Mr. Ard.

31.    On or about 7 December 2011, Plaintiff Arnett received a call back from Defendant Howard, then wishing to come to Tucson, two months later than agreed. Plaintiff informed Defendant Howard that eviction was imminent. Without getting paid, Plaintiff stated that he would not be in a position to do anything but move. Defendant Howard still did not offer any payment nor equity, however, he stated, "Good luck with the move," then asked to stay at Plaintiff's mother's home and do the work there, still, without offering or making any payment. Plaintiff refused, then reminded Defendant Howard of his financial obligation to Mr. Ard. Defendant Howard replied that he was "putting together a holiday gift package with payment" for Mr. Ard. No "gift" package ever arrived, nor payment, nor equity was ever delivered.

32.    On 8 December 2011, Defendant Howard uploaded the motion picture for public exhibition on the Lifeline Media websites, www.benshoward.com and www.benshoward.net, using the Vimeo service at www.vimeo.com/33328737 [Exhibit Q] without license to exhibit the unpaid motion picture nor license for the music score, created by **Mr. Robert A. Wolf,** of Evansville, Indiana.

33.    On or about 22 December 2011, Mr. Ard informed Plaintiff Arnett that Defendant Howard still had not paid him anything since the token payment upon leaving Utah. Neither had Plaintiff received any further payment, nor equity. Plaintiff also discovered that Defendant Howard solicited his music score composer, Mr. Wolf, and had engaged him to compose, record and deliver the complete music score. Mr. Wolf disclosed to Plaintiff that he still had not been paid by Defendant Howard for those two months of work. Defendant Howard commissioned music scoring for his seminar events. Mr. Wolf completed that music composition too but he has not delivered it, due to non-payment.

34.    Plaintiff Arnett immediately demanded Defendant Howard pay both, Mr. Ard and Mr. Wolf $2,000 each, immediately before the Christmas holiday, at threat of using the motion picture as a portfolio piece. Defendant Howard threatened to retaliate by pirating a copy of Plaintiff's theatrical motion picture, "Blocked" online, which is in his possession. Defendant Howard then decided to pay Mr. Ard and Mr. Wolf only $1,000 each by Christmas. Mr. Wolf has not received any more payment by Defendant Howard, having received only $1,000 for producing a full length motion picture and live event scores.

35.    On or about 26 January 2012, Plaintiff Arnett discovered that the front and rear brakes of the motorcycle had completely failed. Upon replacement of the $68 US Dollar disc brake pad set, Plaintiff examined the old pads [Exhibit R]. The brake pad assembly was worn-through, with the brake piston (calipers is the parts catalog term) making direct contact with the braking disc, destroying them deep below the surfaces of front and read discs, rendering them irreparable. Plaintiff invoiced Defendant Howard for the balance of combined labor [Exhibit S]: $211,000. Plaintiff applied travel and "per diem" money as payment toward the invoice. Plaintiff also offered a five percent discount, if payment was settled within 30 days. Because Defendant Howard had doubled the term of the project for elective, personal reasons and continued to refuse to make payment, Plaintiff determined that paying a delinquent payment fee was fair and reasonable for two additional months of

wasted time, hardships and the aggravation of each frustrated attempt to collect either ~~promised~~ payment, or ~~promised~~ equity in exchange for the great volume of labor manufacturing the Goods. Plaintiff issued that delinquent payment fee of 37%, which brought the balance due to $289,070 following a 26 February 2012 deadline, upon which date, the motion picture would be used for portfolio purposes. Defendant Howard had refused to make any payment, while continuing to benefit from the unpaid labor in the promotion of his books and seminar events, advertized on his Lifeline Media websites at: http://www.benshoward.net  and http://wwwbenshoward.com, still using the Vimeo service at www.vimeo.com/33328737.

36.     In response to two of Plaintiff Arnett's demands to remove the motion picture from public exhibition, Defendant Howard did not respond or comply. Plaintiff alleges that he then fraudulently filed a United States Copyright on the same. In reaction to "cease and desist" notices, first emailed by Plaintiff to Defendant Howard on or about 31 January 2013, Defendant Howard raced to file Copyright Pau003684884 for Plaintiff's Goods (issued on 15 February 2013), without any written agreement with Plaintiff, as required by Federal Law (Section 101 of the Copyright Act [Title 17 of the U.S. Code]), claiming authorship of the "entire motion picture" and as an "employer for hire", without specifying who his employees or independent contractors had signed away their rights. No such agreements exist, as Defendant Howard successfully evaded putting anything in writing throughout the commission of his alleged fraud and misrepresentations to Plaintiff. Defendant Howard's copyright to the intellectual property of his book does not extend into the intellectual property rights of the motion picture, owned by Plaintiff, Mr. Ard, or Mr. Wolf's music score, until those rights are transferred for consideration. On 25 February 2012, Defendant Howard attempted to induce Plaintiff Arnett to forbear seeking judicial relief [Exhibit T]. Defendant Howard thereafter denied his agreed-upon obligations to Plaintiff, allegedly believing that his Copyright claims had bookended a successfully executed fraud, since Defendant Howard had left Plaintiff in a financial condition where

he may never have the wherewithal to litigate and recover any of his rightful Claims – except the United States Court System does accommodate pro se and I.F.P litigants for justice to prevail. This is where this case stands today unsettled, 16 months later, with Defendant Howard maintaining that merely filing an allegedly fraudulent copyright alone justifies his tortious acts and behavior toward Plaintiff Arnett, continually praying for this Honorable Court to allow him to abscond by Dismissal of Plaintiff's Claims for no apparent, justifiable reason.

37.    On or about 19 June 2013, while Plaintiff was riding the motorcycle west on Mile Wide Road (a rutted dirt road in southwest Tucson), Plaintiff's passenger in the rear seat, Ms. Eileen West [Exhibit A-A], noticed and immediately reported to Plaintiff that she saw the speedometer fail. The needle had dropped from the indicated speed of approximately 30 miles per hours to zero when the motorcycle hit a deep rut in the road, while the motorcycle continued traveling forward at the same velocity. The speedometer had stopped functioning. At the time, Plaintiff dismissed the apparent breakage as one more in a series of expensive repairs which he could not afford to make before his trip to Utah, where he was Ordered to appear before this honorable Court on 30 July 2013.

38.    On or about 1 December 2013, Plaintiff polished the plexiglass of the original, factory windshield. Standing in front of the windshield, Plaintiff noticed the end of the speedometer cable disconnected [Exhibit A-B]. This was not visible from the driver's seat perspective.

39.    Plaintiff determined that he could not manually reattach the speedometer cable without removing the windshield. The gap between the windshield and the headlight is too narrow to reach in with both, a thumb and forefinger to screw the cable back into place. The repair required the complete removal of the windshield. Upon removing the windshield, Plaintiff discovered that the two-inch long cable nut had not broken or sheared

[Exhibit A-C]. The nut was completely intact and screwed back on – but required an inordinate amount of strenuous rotations to re-seat the cable as the manufacturer intended, when it was originally sealed at the factory. This is an anti-tampering feature, required by Federal Law, so the cable nut never unscrews on its own – by road vibration alone. An open-ended wrench is required to torque it on or off.

40.    Once Plaintiff reconnected the cable to the speedometer, it worked as intended and continues to function. From this, Plaintiff determined that there was no breakage, it was merely tampered with, disconnected at some point prior to Plaintiff taking possession of the motor vehicle from Defendant Ben Howard Trust in the summer of 2011 – when it only had 10,895 miles indicated on the [then-working] odometer [Exhibit M].

41.    How the Defendant managed to accrue only about ten thousand miles on a nearly twenty year old motorcycle is easily determined by the fact that the disc brakes [Exhibit R] had far more than 30,000 miles of apparent wear (assuming those were even the original factory brakes). Additionally, the speedometer cable was merely poked back into its receptacle, but was never screwed on, allowing it to pop off, simply by hitting a bump with sufficient force.

42.    The windshield prevented a wrench or a human hand from making it past the gap between the headlight fixture and the form-fitted bottom edge of the windshield to facilitate anything more than reach in with the index and middle finger, far enough to poke the cable back into its receptacle.

43.    Where it once seemed like a very odd demand for the Defendant to insist on removing and keeping the windshield without a motorcycle to put it on [¶20], however, that pretense would afford the opportunity for Defendant to remove the windshield to conceal his tampering with the odometer, without having to go through the considerable

trouble of reinstalling the windshield, once it was off. However, with the speedometer apparently functioning continually while Plaintiff drove the vehicle for several weeks around Defendant's residence without the speedometer cable popping out, discovery may have seemed unlikely to Defendant, and any further effort to conceal this act.

44.     At the time, Defendant had spoken to Plaintiff of his difficulty with installing and adjusting the windshield on an earlier occasion. Reinstalling the windshield turned out to be exactly as complex of a job to perform as the Defendant had described it to Plaintiff. The Defendant had firsthand knowledge and experience in gaining access to the speedometer. Nothing else serviceable requires the windshield to be removed. Defendant is also skilled as a used car salesman. Defendant disclosed to Plaintiff that the U.S. Government unrightfully forced his business out of operation. Defendant Howard's claimed that at least three of his personal use vehicles were acquired from this business by Defendant Ben Howard Trust.

45.     Despite the garaged appearance of the vehicle and the Defendant's representation of the vehicle being "Just serviced", the anti-tampering seal was already broken and the speedometer cable disconnected then poorly reconnected at some point prior to Plaintiff taking possession of the vehicle.

46.     There is only one explanation for how the odometer of a nearly twenty year old motorcycle indicated only 10,895 miles, yet the completely worn out condition of the brakes revealed many times that mileage – the Defendant obviously tampered with it, then poorly concealed it, ad hoc.

47.     With the true mileage of this 1994 motorcycle tampered to read substantially lower than its true mileage, this vehicle was not worth "more than $3,000.00", as the Defendant had represented it to Plaintiff, demonstrating a clear intent to defraud.

48.    Plaintiff alleges that Defendant Life Line Media, Defendant Nationwide Affordable Housing, and Defendant Ben Howard Trust meet the vast majority (if not all) of the Colman factors (Colman v. Colman, 743 P.2d 782, 786 Utah Ct. App. 1987) establishing Alter-Ego: **(1)** Undercapitalization of a one-man corporation; **(2)** Failure to observe corporate formalities; **(3)** Nonpayment of dividends; **(4)** Siphoning of corporate funds by the dominant stockholder; **(5)** Nonfunctioning of other officers or directors; **(6)** Absence of corporate records; **(7)** The use of the corporation as a facade for operations of the dominant stockholder or stockholders; and **(8)** the use of the corporate entity in promoting injustice or fraud. Therefore, Plaintiff makes the following CLAIMS FOR RELIEF, each severable as interpreted, and may be liberally constructed by this Honorable Court:

49.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT

50.    All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

51.    Upon information and belief, Defendants Howard, Defendant Lifeline Media, and Defendant Nationwide Affordable Housing, had represented his commercial project to Plaintiff Arnett as having substantial potential earning power, built around the draft of his Book "Overcoming Life's Trauma" [Exhibit G] (this is the final title of the Book, which went through several iterations of title but with essentially the identical content). Herein, said Defendants meet all Four Elements Of Breach Of Contract, under Utah and/or Common Law.

52.    To induce Plaintiff Arnett into accepting a commission to produce the Motion Picture, TV Commercial Spot and Audio Book ("Goods") based on said Book, Defendant Howard, acting as the authorized agent for Defendant Nationwide Affordable Housing

Inc., who he stated was financing the venture, and Defendant Lifeline Media LLC, who eventually was created to administrate the venture, made representations to Plaintiff that he would be assigned as a major equity interest partner in shares of sales derived from commercially exploiting the Goods Plaintiff produced, which would require two months of dedicated labor to produce.

53.    Defendant Howard's offers of major equity ownership of said Goods to Plaintiff, prior to his accepting of said commission, became the bargaining instruments to which the parties agreed.

54.    A lawful Contract was formed between the parties for the manufacture of said Goods, as defined under A.R.S. 47-2204 (and under Utah and/or Common Law) and by reason of Defendants Accepting and using Plaintiff's Goods on their web site, beginning on 8 December 2011 to date (and other online outlets), in whole or in part, which further constitute a lawful Contract, as defined under  A.R.S 47-2201(C) (and under Utah and/or Common Law) and Plaintiff's performance met with Acceptance under A.R.S 47-2606 (and under Utah and/or Common Law). Thus, Defendants had accepted the Fiduciary Duty to Plaintiff. This is the first element of the Breach – a Contract.

55.    Plaintiff Arnett fulfilled his obligations under the Contract at issue, by completing the manufacture and delivery of said Goods, with the Motion Picture at the final assembly stage {the final audio mix was halted by Plaintiff,  pursuant to A.R.S. 47-2705 (and under Utah and/or Common Law)}. This is the second element of the Breach – Performance by the party seeking recovery.

56.    Whereas, Defendant Howard had failed to perform, failing to either execute in writing the equity interest, or to make the payment for the Goods (at full rate), in lieu of said equity, as Defendant represented to Plaintiff, and failed to perform his Fiduciary

Duties to Plaintiff.

57.     Plaintiff seasonably notified Defendants of their non-performance and issued an Invoice on or around 26 January 2012. Plaintiff then emailed Defendant Howard a cease and desist letter on 31 January 2012 to cease exhibition, distribution and sales of the Motion Picture.

58.     Defendant Howard ignored the Invoice and did not respond until the following month on 25 February 2012, denying any Contract for said Goods existed, and making other statements inconsistent with his Duty to Good Faith and Fair Dealings, made evident by the official  United States Copyright record demonstrating that Defendant Howard filed for, and received Copyright Pau003684884 on 15 February 2012, speciously claiming authorship for the entire Motion Picture, and the claim to be the "employer for hire", with the unmixed version of said Motion Picture submitted on DVD. That was the entirety of Defendant Howard's efforts to avoid litigation, he never responded to any other communication demanding payment for the Goods thereafter, resulting in this Case being filed with this honorable Court (originally filed in the District of Arizona).

59.     Defendant Howard breached the Contract at issue by failing to perform, failing to execute a written equity partnership agreement and by withholding and refusing to make any substantial payment toward said Invoice for the Goods manufactured expressly for Defendants' unique, commercial purpose, unsuitable for resale to any other buyer. This is the third element of the Breach – Breach of the contract by Defendants.

60.     Defendants have publicly established Acceptance of Goods after a seasonable period had passed, on 8 December 2011 via continuous public exhibition without making any substantial or full payment, as required under A.R.S. 47-2606  and A.R.S. 47-2607, and continue to violate these same Arizona Revised Statutes (and under Utah and/or

Common Law).

61.     Pursuant to A.R.S. 47-2723 (and under Utah and/or Common Law), Plaintiff is eligible for damages to be awarded under the "prevailing price" of Goods at the time. This prevailing price is $3,000.00 per finished minute, per David L. Brown, Film Arts Foundation, January 2005 [Exhibit U].

62.     Total Running Time (TRT) of the Motion Picture is 175.5 minutes, totaling $526,500.00 US Dollars in 2005. By the time of Acceptance in 2011, inflation increased that figure by 15.18%, totaling $606,422.70 US Dollars as the prevailing price in the market at the time.

63.     For producing the 30 second TV Commercial Spot for Defendants, Plaintiff demands $3,800.00 US Dollars in payment.

64.     For producing the Audio Book of 134 minutes TRT for Defendants, Plaintiff demands $3,500.00 US Dollars.

65.     Therefore, as a direct and proximate result, Plaintiff has been damaged by Defendants in the amount of $613,722.70 US Dollars. This is the forth element of the Breach – Damages whereby, all four elements of Breach of Contract are established, under Utah and/or Common Law.

66.     Additionally, pursuant to A.R.S. 47-2710 (and under Utah and/or Common Law), Plaintiff is further entitled to all incidental and consequential damages, inclusive of (supporting documentation still being photographed and collected):

(A)     At least $2,600.00 in incidental damages to cover storage, moving and re-establishing Plaintiff Arnett's work studio;

(B)     The consequential damages from the inability to pay for air conditioning service in the summer heat that resulted in a $1,200.00 emergency room visit that Plaintiff suffered for a severe case of heat stroke;

(C)     The consequential damages from the loss of an overheated computer system that terminally failed at $1,100.00;

(D)     Said computer contained the complete development compiler software and source code for Plaintiff's proprietary "CineMatrix Industrial" filmmaking software suite [Exhibit W] (used as Plaintiff's primary production tool to produce all of his film productions), representing an investment of five years of development work, with an estimated cost of $540,000.00 to hire the re-development thereof by qualified computer programmers;

(E)     The incidental damages of $3,800.00 in unpaid bridge loans, which ultimately need to be repaid with interest. These incidental and consequential damages would not have occurred, but for Defendants' Breach of Contract.

67.     Therefore, as a direct and proximate result, Plaintiff has been incidentally and consequentially damaged by Defendants in the amount of $548,7200.00 US Dollars, to be remedied as provided under A.R.S. 47-2710 (and under Utah and/or Common Law).

~~68.     Additionally, Plaintiff prays for an Injunction to halt the use, exhibition and distribution of said Goods by Defendants until Plaintiff collects and receives all monies from Defendants, as adjudicated and awarded by this honorable Court.~~

69.     Upon information and belief, Defendant Howard's conduct in refusing payment for Goods that he was in Acceptance of, was wanton and/or reckless and/or shows a reckless indifference in the interests of others, and Plaintiff therefore also demands punitive

damages for the acts alleged herein, to an amount deemed appropriate by this honorable Court.

70.     This action arises out of contract. Pursuant to A.R.S. 12-341 (and under Utah and/or Common Law), Plaintiff is entitled to recover his reasonable costs, to be determined if leave is granted to calculate that total.

71.     WHEREFORE, Plaintiff James Arnett, prays that judgment be entered in his favor on his First Cause of Action for a sum of up to $613,722.70 US Dollars for the Breech of Contract, together with up to $548,720.00 US Dollars in Consequential and Incidental Damages, with pre- and post-judgment interest, as well as up to $150,000.00 US Dollars in punitive damages, as set forth in this Complaint, including the costs of the preparation of this Case of no less than $3,500.00 in the event of default, and such other relief as this honorable Court may find appropriate.

~~72.~~                  ~~SECOND CAUSE OF ACTION~~
                         ~~FRAUD~~
                 Dismissed by Order of this Honorable Court.

~~88.~~                  ~~THIRD CAUSE OF ACTION~~
                         ~~FRAUD~~
                 Dismissed by Order of this Honorable Court.

~~104.~~                 ~~FORTH CAUSE OF ACTION~~
                         ~~ENDANGERMENT~~
                 Dismissed by Order of this Honorable Court.

113.                     **FIFTH CAUSE OF ACTION**
                         **UNJUST ENRICHMENT**

114.   All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

115.   Plaintiff James Arnett produced Goods, consisting of a three-hour Motion Picture, Audio Book and 30 Second TV Spot, and delivered those Goods to Defendant Howard, Defendant Life Line Media, and Defendant Nationwide Affordable Housing.

116.   Said Goods were received by, accepted by, and used by Defendants in their business since 8 December 2011 – to date.

117.   Defendants' subsequent copyright claim to Plaintiff's created work and its use by Defendants in their business is without license, right, nor making payment of any kind toward Plaintiff's created work, which constitutes an Unjust Enrichment to Defendants at Plaintiff's expense.

118.   No justification supports the enrichment of Defendants and the impoverishment of Plaintiff. Plaintiff may be without an adequate remedy at law.

119.   As a direct and proximate result of the Unjust Enrichment to Defendants, Plaintiff has suffered and will continue to suffer damages.

120.   Thereby, said Defendants meet all Three Elements of Unjust Enrichment under Utah and/or Common Law:

1.    Benefit conferred on Defendants by Plaintiff;

2.    An appreciation or knowledge by Defendants of the benefit;

3.    The acceptance or retention by the Defendants of the benefit under such circumstances as to make it inequitable for the Defendants to retain the benefit without payment of its value.

121.   Upon information and belief, Defendants' conduct was wanton and/or reckless and/or shows a reckless indifference in the interests of others, and Plaintiff therefore also demands punitive damages for the acts alleged herein.

122.   This action arises out of contract. Pursuant to Utah Law (and/or Common Law), Plaintiff is entitled to recover his reasonable attorneys' fees and costs.

123.   WHEREFORE, Plaintiff James Arnett demands that judgment be entered in his favor on his Fifth Cause of Action for the sum of up to $613,722.70 US Dollars or more in actual damages (as factored in ¶62 of the First Cause of Action), plus pre- and post-judgment interest, as well as up to $548,7200.00 US Dollars or more in damages, punitive and/or otherwise (for the reasons itemized in ¶66 – ¶67 of the First Cause of Action), as set forth in this Complaint, including attorneys' fees and costs of not less than $3,500.00 in the event of default, and such other relief as the Court finds appropriate.

124.                        **SIXTH CAUSE OF ACTION**
                          **COPYRIGHT INFRINGEMENT**

125.   All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

126.   On 15 February 2012, Defendant Howard and Defendant Life Line Media, filed for, and were issued United States Copyright Pau003684884 [Exhibit X], claiming to be the "employer for hire", yet failed to specify the employees with whom they had contracted, and claimed the full intellectual property rights and authorship for the entirety of Plaintiff's created work on DVD [Exhibit DVD-2], in response to a "cease and desist" letter, emailed to them by Plaintiff, on 31 January 2012 – establishing WILLFUL Infringement.

127.   Defendants had Direct Access to Plaintiff's created work and the elemental source files created by Plaintiff, from a full back-up copy maintained by Defendants in Utah.

128.   On information and belief, Defendants have been commercially exploiting Plaintiff's created work continually since 8 December 2011 to date – with the open credits conspicuously marked, "Life Line Media Presents", indicating that Defendants are the merely the exhibitor, followed by "An A.I.A. Motion Picture Company Production", indicating that the production, i.e., the product, is the property of Plaintiff Arnett, who has used the trade name "A.I.A. Motion Picture Company" since 1997, which goes back even further to 1958 by his father, who designed the logo for this family business.

129.   Defendants have no employment contract with Plaintiff, nor any license agreement, distribution or exhibition agreement, nor have Defendants made payment toward acquiring and clearing Plaintiff's created work.

130.   Plaintiff possesses the full project materials of his created work and elemental source files on an external computer data drive in Tucson, Arizona [Exhibit Z].

131.   Plaintiff James Arnett is the author of his created work, and is a commercially licensed Adobe Systems Inc. licensee, the software in which his created work was fully authored, whereas, Defendants were not commercially licensed Adobe Systems Inc.

licensees to have any right to claim authorship of Plaintiff's created work. Nor are Defendants in the media production business – Defendants are merely distributors and a self-published book author by night and real estate speculator by day.

132.   The content of the DVD Defendants filed with the U.S. Copyright Office is composed of audio and video materials – identical to Plaintiff's created work.

133.   Plaintiff Arnett has filed for a copyright with the U.S. Copyright Office, Library of Congress for his created work, as required by Title 17 USC§411(a) [Exhibit Y]. The U.S. Copyright Office's processing number for Plaintiffs copyright application is 1-999155778. Plaintiff's copyright registration number for his motion picture is PAu003735055.

134.   Herein, said Defendants meet ALL ELEMENTS OF COPYRIGHT INFRINGEMENT, under Title 17 of the United States Code and Federal Law.

135.   This action arises out of contract. Pursuant to Utah Law,  Plaintiff is entitled to recover his reasonable attorneys' fees and costs.

136.   WHEREFORE, Plaintiff James Arnett demands that judgment be entered in his favor on his Sixth Cause of Action for the Remedies provided under Title 17 USC §502, §503, §504, §505, as set forth in this Complaint, to be determined at the time of trial, including attorneys' fees and costs of not less than $3,500.00 in the event of default, and such other relief as the Court finds appropriate.

137.  **SEVENTH CAUSE OF ACTION**

**ODOMETER TAMPERING**

138.   All of the preceding and subsequent paragraphs of this Complaint are hereby incorporated into this cause of action as though set forth in full herein.

139.   U.S. Code Title 49 Subtitle VI Part C Chapter 327 § 32703 states that: "*A person may not (2) disconnect, reset, alter, or have disconnected, reset, or altered, an odometer of a motor vehicle intending to change the mileage registered by the odometer;*"

140.   Defendant Howard was acting as the authorized agent for Defendant Ben Howard Trust when he transferred the 1994 motorcycle to Plaintiff on behalf of the Trust, who actually owned the motor vehicle.

141.   The physical evidence of the brake pads demonstrate that the true mileage of the motorcycle was far in excess (by at least 30,000 miles) of the mileage indicated on the odometer (10,895 miles). Because the brake pads do not appear to be original equipment, Plaintiff alleges that the true mileage may be almost double that of 30,000 miles.

142.   As specified in ¶37 through ¶47, the manner in which the odometer was tampered with, and simply screwed back on to be restored to full functionality, demonstrates that it was merely unscrewed to disconnect it with the intent to defraud.

143.   Defendant Howard had a pressing need to remove the motorcycle windshield to regain access to the speedometer cable one more time to conceal his disconnection. The windshield obstructed access to the cable nut. Defendant Howard had specialized knowledge regarding the difficult installation of the original factory windshield. Defendant Howard operated the motor vehicle for well over a decade with no miles

registering on the odometer past mile 10,895 – not until he merely poked the cable back into place. Unsecured, the cable eventually popped out because the cable nut was never threaded to a sufficient degree. Defendant Howard represented the motor vehicle as "just serviced" and "worth more than $3,000.00US Dollars" – when, in fact, it was worth less than the cost of repairing the brake system alone, a major undisclosed problem. The intent to defraud is fully demonstrated in every aspect of the transaction noted in the Complaint.

144.   U.S. Code Title 49 Subtitle VI Part C Chapter 327 § 32710 provides:

> **(a)** *Violation and Amount of Damages. A person that violates this chapter or a regulation prescribed or order issued under this chapter, with intent to defraud, is liable for 3 times the actual damages or $10,000, whichever is greater.*
>
> **(b)** *Civil Actions. A person may bring a civil action to enforce a claim under this section in an appropriate United States district court or in another court of competent jurisdiction. The action must be brought not later than 2 years after the claim accrues. The court shall award costs and a reasonable attorney's fee to the person when a judgment is entered for that person.*

145.   Herein, said Defendants meet ALL ELEMENTS OF ODOMETER TAMPERING, under Title 49 of the United States Code and Federal Law.

146.   This case was filed in the District of Arizona on 24 April 2012. Therefore, Plaintiff is entitled to enforce this section in this District Court, having jurisdiction in this matter.

147.   WHEREFORE, Plaintiff James Arnett, prays that judgment be entered in his favor on his Seventh Cause of Action for the dollar amounts provided in paragraph **(b.)**, with pre- and post-judgment interest, as set forth in this Complaint, including the costs of the preparation of this Case of no less than $3,500.00 in the event of default, and such other relief as this honorable Court may find appropriate.

Respectfully submitted this 15th day of August 2014.


James Arnett, In Propria Persona (I.F.P.)

9288 N. Monmouth Court

Tucson, Arizona 85742

(520)304-0129 (telephone)

jamesarnettaz@gmail.com (email)

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August 2014, I mailed the preceding AMENDED COMPLAINT to the Office of the Clerk of the United States Court for the District of Utah:

U.S. Court for the District of Utah
350 South Main Street
Salt Lake City, Utah  84101

I also hereby certify that I have mailed these identical materials via United States Postal Service, to the following Attorneys for Defendants Howard, et al.:

TYCKSEN & SHATTUCK, LLC
Bryan J. Stoddard
12401 S. 450 E., Suite E-1
Draper, UT  84020

James Arnett, In Propria Persona (I.F.P.)
9288 N. Monmouth Court
Tucson, Arizona 85742
Telephone: (520)304-0129
Email: jamesarnettaz@gmail.com